## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

**GREATER NEW YORK**
**MUTUAL INSURANCE COMPANY,**

                          **Plaintiff,**

**v.**

**LIAKAS LAW, P.C.,**
**DEAN N. LIAKAS,**
**NICHOLAS E. LIAKAS,**
("*Liakas Defendants*")

**MARCOS TAVAREZ,**
**JOSE SONE-MARTINEZ (TRUE NAME UNKNOWN),**
**MARK D. ROLNIK,**
**LUIS R. RODRIGUEZ,**
("*Runner Defendants*")

**JUMPSTART FUNDING, LLC,**
("*Funding Defendants*")

**ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC**
**/d/b/a TOTAL ORTHOPEDICS,**
**VADIM LERMAN, D.O. f/k/a VADIM KUZNETSOV,**
**KAREN AVANESOV, D.O.,**
**ALEXIOS APAZIDIS, M.D.,**
**SHIVEINDRA JEYAMOHAN, M.D.,**
**ABHISHEK KUMAR, M.D.,**
**ARISTIDE BURDUCEA, D.O.,**
("*Total Ortho Defendants*")

**MCCULLOCH ORTHOPAEDIC SURGICAL**
**SERVICES, P.L.L.C. s/d/b/a NEW YORK SPORTS AND**
**JOINTS ORTHOPAEDIC SPECIALISTS,**
**DAVID R. CAPIOLA, M.D.,**
("*McCulloch Defendants*")

**ACCELERATE RADIOLOGY, P.C. d/b/a**
**PRECISION ACCELERAD,**
**SIDDHARTH PRAKASH, M.D.,**
("*AcceleRad Defendants*")

Case   **Case** <u>1:26-cv-00450</u>

**BROOKLYN PREMIER ORTHOPEDICS AND PAIN MANAGEMENT PLLC a/k/a FJ ORTHOPAEDICS AND PAIN MANAGEMENT PLLC,**
**JONATHAN M. SIMHAEE, M.D.,**
("*Premier Defendants*")

**SPORTS MEDICINE & SPINE REHAB, PC,**
**SILVIA GERACI, M.D.,**
("*SMSR Defendants*")

**BROOKLYN MEDICAL PRACTICE, P.C.,**
**BIG APPLE PAIN MANAGEMENT PLLC,**
**NORTH SHORE FAMILY CHIROPRACTIC, P.C.,**
**UNICORN ACUPUNCTURE, P.C.,**
**SAYEEDUS SALEHIN, M.D.,**
**RICHARD J. APPLE, M.D.,**
**TODD LEBSON, DC,**
**DEKUN WANG, L.AC,**
("*410 Ditmas Defendants*")

**COMMUNITY MEDICAL IMAGING, P.C.,**
**ANDREW MCDONNELL, M.D.,**
("*CMI Defendants*")

**BRONX SC LLC d/b/a/ EMPIRE STATE AMBULATORY SURGICAL CENTER,**
**ANDERS J. COHEN, D.O.,**
**SAAD CHAUDHARY, D.O., and**
**BOGORAZ LAW GROUP, P.C.,**
("*Miscellaneous Defendants*")

**Defendants.**

---

## COMPLAINT

---

# Table of Contents

Preliminary Statement……………………………………………………………………………… 1

I.      JURISDICTION AND VENUE ........................................................................................2

II.     PARTIES .........................................................................................................................3
        i.      Liakas Defendants ...............................................................................................3
        ii.     Runner Defendants ..............................................................................................4
        iii.    Funding Defendants .............................................................................................7
        iii.    Total Ortho Defendants .......................................................................................9
        iv.     McCulloch Defendants ......................................................................................11
        vi.     AcceleRad Defendants .......................................................................................12
        vii.    Premier Defendants ...........................................................................................12
        viii.   SMSR Defendants ..............................................................................................13
        ix.     410 Ditmas Defendants ......................................................................................14
        x.      CMI Defendants .................................................................................................15
        xi.     Miscellaneous Defendants .................................................................................16

III.    RELEVANT STATUTORY AND LEGAL CONTEXT ................................................17

IV.     THE FRAUD SCHEME ................................................................................................20

V.      THE FRAUD SCHEME ENTERPRISE .......................................................................26
        i.      Liakas Defendants' Participation in the Fraud Scheme ....................................31
        ii.     Runner Defendants' Participation in the Fraud Scheme ...................................33
        iii.    Funding Defendants' Participation in the Fraud Scheme ..................................42
        iii.    Total Ortho Defendants' Participation in the Fraud Scheme ............................47
        iv.     McCulloch Defendants' Participation in the Fraud Scheme .............................60
        vi.     Clinic & Imaging Defendants' Participation in the Fraud Scheme ...................62
        vii.    Miscellaneous Defendants' Participation in the Fraud Scheme ........................75

VI.     DEFENDANTS' PATTERN OF RACKETEERING ACTIVITY ................................76
        i.      Claimant A .........................................................................................................76
        ii.     Claimants B & C ................................................................................................90
        iii.    Claimant D .......................................................................................................137
        iv.     Claimant E .......................................................................................................137
        v.      Claimant F .......................................................................................................137

VII.    DEFENDANTS' FURTHER PATTERN OF RACKETEERING ACTIVITY ...........163

VIII.   DAMAGES ..................................................................................................................163

IX.     CAUSES OF ACTION ................................................................................................165

X.      JURY TRIAL DEMAND ............................................................................................204

COMPLAINT                                                                                                          iii

## PRELIMINARY STATEMENT

Plaintiff, Greater New York Mutual Insurance Company ("GNY"), was founded in 1914 by immigrant property owners who were systematically excluded from the insurance market. These individuals, many of whom had recently arrived to the United States, came together to create a mutual insurer grounded in fairness and protection for the most vulnerable.

Their vision was simple yet profound: to ensure hardworking families, regardless of origin, could safeguard their livelihoods against unforeseen loss.

For more than a century, GNY has honored that founding ethos. It has stood as a bulwark against exploitation, committed to defending its policyholders and upholding the integrity of the insurance system. The immigrant founders of GNY understood vulnerability firsthand. They knew what it meant to navigate unfamiliar laws, languages, and customs while striving to build a better life. Their response was to create an institution that would protect, not prey upon, the vulnerable.

The scheme alleged in this Complaint is the antithesis of those founding principles. Defendants have orchestrated a fraudulent enterprise that targets immigrants and individuals of limited means. This enterprise recruits Claimants to stage or exaggerate accidents, fabricates injuries, and uses falsified medical documentation to inflate claims. Defendants directed claimants to undergo unnecessary and invasive medical procedures, often funded by predatory litigation loans controlled by investors, all to create the illusion of catastrophic injuries and drive up settlement values.

These actions are not isolated. Rather, they are part of a coordinated pattern designed to defraud insurers through sham lawsuits and inflated medical bills. Through coercion, misinformation, and predatory financial practices, Defendants have transformed the promise of

COMPLAINT                                                                 1

legal redress into a trap, one that leaves Claimants saddled with exorbitant debt, unnecessary surgeries, and shattered trust.

Plaintiff seeks relief under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq*., to dismantle this enterprise and recover damages caused by its pattern of racketeering activity, including mail fraud, wire fraud and violations of the Travel Act and the Hobbs Act. Plaintiff requests, *inter alia*, treble damages, attorneys' fees, and injunctive relief to prevent further abuse of the Claimants and the judicial system.

The fraudulent scheme described herein weaponizes the courts and the medical system to extort settlements from insurers, including Plaintiff, through fear of economic harm. Plaintiff brings this action to expose and dismantle that scheme. In stark contrast to the immigrant-driven mission that gave rise to GNY, Defendants' conduct reflects a calculated effort to enrich themselves at the expense of justice, equity, and human dignity. The law does not, and must not, countenance such abuse.

Plaintiff GREATER NEW YORK MUTUAL INSURANCE COMPANY, by and through its attorneys, THE WILLIS LAW GROUP, PLLC, allege as follows:

## I.    JURISDICTION AND VENUE

1.    This is a civil action arising out of RICO, 18 U.S.C. § 1961, *et seq*. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331, in that certain of the claims arise under the laws of the United States and over other claims herein under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.    Venue is proper in this District under and pursuant to 18 U.S.C. § 1965 and pursuant to 28 U.S.C. § 1391, in that numerous acts, practices, and events giving rise to the claims alleged in this Complaint occurred in this District and many Defendants reside in this District.

## II.    PARTIES

3.      Plaintiff GNY is a corporation duly organized and existing under the laws of the New York. At all times relevant herein, GNY was authorized to conduct business in New York and maintained a principal place of business in the State of New York. GNY maintains an umbrella of underlying entities that are under shared ownership and control, including, *inter alia*, Insurance Company of Greater New York, Strathmore Insurance Company, GNY Custom Insurance Company, GNY Custom Insurance Company, Greater Mid-Atlantic Indemnity Company, and Greater Midwestern Indemnity Company, which in commerce generally collectively operate under the shared trade name of Greater New York Group. Since 1914, GNY has been serving its policyholders and is currently the largest insurer of habitational properties in New York City. As relevant to certain claims made herein, GNY is duly authorized to conduct insurance business in the State of New Jersey.

### i.    Liakas Defendants

4.      Defendant LIAKAS LAW, P.C. ("Liakas Firm") is a professional corporation duly organized and existing under the laws of the State of New York. At all times relevant herein, the Liakas Firm maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

5.      Upon information and belief, Defendant DEAN N. LIAKAS ("Dean Liakas") resides in and is a citizen of the State of New York. He is also the managing partner of Liakas Firm. At all times relevant, Dean Liakas was licensed or otherwise authorized to practice law in the State of New York.

6.      Upon information and belief, Defendant NICHOLAS LIAKAS ("N. Liakas") resides in and is a citizen of the State of New Jersey. He is Senior Partner of Liakas Firm as well

as the Managing Member of Jumpstart Funding LLC. At all times relevant, N. Liakas was licensed or otherwise authorized to practice law in the State of New York.

7.      Liakas Firm, Dean Liakas, and N. Liakas are collectively referred to herein as the "Liakas Defendants."

### ii.  Runner Defendants

8.      "Runners" are persons who participated in the fraudulent scheme described below (the "Fraud Scheme") by recruiting potential claimants into staging and/or perpetuating fake trip-and-fall accidents and/or staged accidents at various sites throughout the State of New York as well as coaching claimants throughout the process of the Fraud Scheme, including but not limited to accompanying Claimants to the hospital and medical visits, arranging and/or facilitating funding and retention of the Liakas Defendants, and otherwise facilitating Claimant progress through the fraud scheme.

9.      Similar to the scheme set forth in *United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024) ("*Rainford*"), Runner Defendants typically have their own claims, which may be presented before, after, or in conjunction with their recruiting activities.

10.     Defendant MARCOS TAVAREZ ("Tavarez") is, upon information and belief, a resident of the State of New York. Tavarez is the spoke of the wheel for a number of Fraud Scheme Claimants ("Tavarez Wheel"). Tavarez is identified as "Runner #1" in the pending matter of *Union Mutual v. Liakas Law, et al.* ("*Union Liakas* Action"):



**Exhibit 1**, Second Amended Complaint, *Union Mutual v. Liakas Law, et al*., 1:25-cv-01857-FB-JRC, Doc. 110.

11.    Defendant JOSE SONE-MARTINEZ (TRUE NAME UNKNOWN) ("Sone") is, upon information and belief, a resident of the State of New York. Sone is associated with Tavarez and forms the spoke of an additional wheel of at least 23 more cases brought by family members and friends, including his own case as **Claimant A** herein (the "Sone Wheel").



12.     The Tavarez and Sone wheels amount to **42 known related claims**, the vast majority brought by Claimants having arrived in the U.S.A. from Jarabacoa, Dominican Republic within days to a few months prior to "accident," while residing or having resided at the same small number of addresses in Freeport, New York, and bring claims arising from sidewalk trip and falls in the city or from minor motor vehicles accidents that *always* involve a commercial vehicle. They are represented by the same small group of attorneys, see the same medical providers, and receive invasive surgeries, particularly spinal fusions, at a statistically impossible rate.

13.     Defendant MARK D. ROLNIK ("Rolnik") is and was licensed to practice law in the State of New York and maintains a business address of 325 Broadway, Ste 402, New York, NY 10007, and has been associated with Suites 401, 402 and 504 of that building.  Upon information and belief, Rolnik has a residential address in the State of New Jersey.

14.     Defendant LUIS R. RODRIGUEZ ("Rodriguez"), upon information and belief, is and was at all times relevant herein a resident of the County of Nassau, State of New York.

15.     Rolnik is identified as the "Co-Conspirator Firm" in the Union Liakas Action, and Rodriguez is identified as the Co-Conspirator Firm investigator/runner therein, with his own case represented by Liakas, funding, and surgery through the same medical providers herein.



Figure 1

16.     Upon information and belief, Defendant Liakas Firm also employs or has employed individuals purportedly as "paralegals," "intake specialists," "case managers," and other titles, or employees retained to perform "client relations," who were in fact tasked with recruiting potential claimants to further the Fraud Scheme. In essence, formalized Runners.

17.     Upon information and belief, the Liakas Firm further conspired with additional "external" service providers, to recruit potential claimants and shepherd them through the Fraud Scheme, and further split portions of the proceeds from the Fraud Scheme with such providers through payments disguised as case-related expenses.

18.     Tavarez, Sone, Rolnik, Rodriguez, and other known and unknown Runners are collectively referred to as "Runner Defendants."

### iii.  Funding Defendants

19.     "Funders" are litigation finance companies that advance money to claimants during (and in some instances before) the pendency of a claim and/or lawsuit as a "purchase of receivables." Funders will also frequently pay upfront amounts to medical providers, including Medical Provider Defendants, to induce performance of surgeries and treatment as well as advances to Claimants directly to induce cooperation.

20.     Advances are structured so as to be considered non-recourse advances and not "loans," as they are provided at rates which would in other circumstances be usurious. This structure incentivizes the prolonging of lawsuits and the rendering of unnecessary care, often leaving Claimants as the party (in theory supposed to be recovering near 66.6%) receiving the smallest portion of recovery.

21.     This is an intended feature, not a bug, and indeed forms the "blueprint" of case handling among certain attorneys, particularly those who have obtained an unethical direct interest in their client's or an affiliated firm's client's case.

COMPLAINT                                                                                          7

22.     These advances are frequently timed to coincide with, or are expressly contingent upon, Claimants proceeding with unnecessary surgeries.

23.     Defendant JUMPSTART FUNDING, LLC ("Jumpstart Funding") is a New Jersey limited liability company. At all relevant times herein, Jumpstart Funding was *not* authorized to, but did, do business in the State of New York. Jumpstart Funding is directly owned by, at minimum, N. Liakas, has a registered address of the Liakas Firm New Jersey location, and, upon information and belief, has at all times relevant herein been entirely operated by dual-role Liakas Firm employees.

████████ : Uh, yeah, so the clients they generally will get absolutely destroyed with funding if they took out a lot of money, in addition to, if they take out surgical costs, medical costs as well. But I know during mediation, usually the attorney will ask for principle current, principle value, current value, what's medical cost, what's personal costs and then in their mediation packet, like that's what they'll write down as well, um, so they try to, ya know, negotiate with defense counsel or mediate with the counsel to get, ya know, that's generally how they'll come to an agreement with an amount, but, I know sometimes the attorney, whatever handling attorney, they can negotiate those liens with the funding company.

████████ : You said something, um, that caught my ear, you said uh, at settlement and when we're talking about the split of the proceeds, I think you said something to the effect that the Plaintiffs are destroyed with the funding, or words to that effect. What did you mean?

████████ : Yeah, the interest on the funding can be very very high (laugh). So let's say, ya know, they settle at 100,000 and their funding is like they took out a principle of 10,000 and then the current value is, can be the amount of like, sometimes it can be double so 20,000, sometimes it triple, quadruple the amount of what they initially took out so it really can range how much they're going to have they owe the company back.

### iv.  Total Ortho Defendants

24.    At all times relevant herein, Defendant ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC a/k/a Total Orthopaedics & Sports Medicine ("Total Ortho") is and was a limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, Total Ortho maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

25.    Total Ortho has had a contract with Nassau University Medical Center ("NUMC") to operate its Orthopedics Department since 2007. The entirety of Total Ortho's current spinal surgeon staff and their spinal surgeries are currently under internal investigation at NUMC, and Total Ortho's involvement in the Orthopedics Department is being, at minimum, reduced.

26.    Defendant VADIM LERMAN, D.O. f/k/a VADIM KUZNETSOV ("Lerman") resides in and is a citizen of the State of New York. At all relevant times herein, Lerman has been licensed or otherwise authorized to practice medicine in the State of New York and was the

COMPLAINT                                                                                                    9

operator, officer, director and/or employee of Total Ortho. Upon information and belief, Lerman has been an owner of Total Ortho since at least 2016.

27.    Lerman was denied his continued authorization to treat injured workers in a scathing 19-page decision by the State of New York Workers' Compensation Board ("WCB") dated April 15, 2025, which found, *inter alia*, Lerman engaged "in wanton disregard and deviation from the standard of care" that amounted to professional misconduct in the form of at least negligence, incompetence, and particularly relevant herein, "Willfully making or filing a false report, or failing to file a report required by law or by the department of health or the education department, or willfully impeding or obstructing such filing, or inducing another person to do so," (Education Law §§ 6530 [3], [5], [21]), and "**a clear pattern of these behaviors being repeated**." **Exhibit 2,** WCB April 15, 2025, Denial of Authorization to Lerman.

28.    Defendant KAREN AVANESOV, D.O. ("Avanesov") resides in and is a citizen of the State of New York. At all relevant times herein, Avanesov has been licensed or otherwise authorized to practice medicine in the State of New York and was the operator, officer, director and/or employee of Total Ortho. Upon information and belief, Avanesov has been an owner of Total Ortho since at least 2012 and is the ultimate supervisor of Total Ortho's spinal surgery practice.

29.    Defendant ALEXIOS APAZIDIS, M.D. ("Apazidis") resides in and is a citizen of the State of New York. At all relevant times herein, Apazidis has been licensed or otherwise authorized to practice medicine in the State of New York. From 2020 through 2023, Apazidis was an operator, officer, director and/or employee of Total Ortho.

30.    Apazidis was previously disciplined by the licensing board for failure to keep proper records and having insufficient controls in place regarding over 200 prescriptions for

ketamine. Apazidis is currently a defendant in RICO claims in New York State Court for allegedly utilizing verbatim operative reports, purporting to detail individualized findings and intraoperative decision making, in at least 43 anterior cervical discectomy and fusion procedures and 14 posterolateral fusion surgeries (indeed, copies of those same verbatim operative reports surface herein as well), many of which the proffered identical justifications were flatly inconsistent with clinical and diagnostic findings.

31.     Defendant SHIVEINDRA JEYAMOHAN, M.D. ("Jeyamohan") resides in and is a citizen of the State of New York. At all relevant times herein, Jeyamohan has been licensed or otherwise authorized to practice medicine in the State of New York and was an owner, operator, officer, director and/or employee of Total Ortho. Upon information and belief, Jeyamohan separated from Total Ortho in 2025.

32.     Defendant ABHISHEK KUMAR, M.D. ("Kumar") resides in and is a citizen of the State of New Jersey. At all relevant times herein, Kumar has been licensed or otherwise authorized to practice medicine in the State of New York and was an owner, operator, officer, director and/or employee of Total Ortho. Upon information and belief, Kumar separated from Total Ortho in 2025.

33.     Defendant ARISTIDE BURDUCEA, D.O. ("Burducea") resides in and is a citizen of the State of New York. At all relevant times herein, Burducea has been licensed or otherwise authorized to practice medicine in the State of New York and was an owner, operator, officer, director and/or employee of Total Ortho.

34.     Total Ortho, Lerman, Avanesov, Apazidis, Jeyamohan, Kumar, and Burducea are collectively referred to as the "Total Ortho Defendants."

**v.  McCulloch Defendants**

35.     Defendant MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C. s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS ("McCulloch

COMPLAINT                                                                                              11

Ortho" or "NY S&J" when utilizing the alias) is a professional service limited liability company duly organized and existing under the laws of the State of New York. At all times relevant herein, McCulloch Ortho maintained its principal place of business in the State of New York and is authorized to and does conduct business in the State of New York.

36.     Defendant DAVID R. CAPIOLA, M.D. ("Capiola") resides in and is a citizen of the State of New York. At all relevant times herein, Capiola has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of McCulloch Ortho and NY S&J.

37.     McCulloch Ortho, NY S&J, and Capiola are collectively referred to as the "McCulloch Defendants."

### vi.  AcceleRad Defendants

38.     Defendant ACCELERATE RADIOLOGY, P.C. d/b/a PRECISION ACCELERAD ("AcceleRad") is a professional service corporation organized and existing under the laws of the State of New York. At all times relevant herein, AcceleRad maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

39.     Defendant SIDDHARTH PRAKASH, M.D. ("Prakash") resides in and is a citizen of the State of New York. At all relevant times herein, Prakash has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of AcceleRad.

40.     AcceleRad and Prakash are collectively referred to as the "AcceleRad Defendants." The AcceleRad Defendants are also Defendants in the Union Liakas Action.

### vii. Premier Defendants

41.     Defendant   BROOKLYN   PREMIER   ORTHOPEDICS   AND   PAIN MANAGEMENT PLLC a/k/a FJ ORTHOPAEDICS AND PAIN MANAGEMENT PLLC

COMPLAINT                                                                                        12

("Premier") is a professional limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, Premier maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

42.    JONATHAN M. SIMHAEE, M.D. ("Simhaee") resides in and is a citizen of the State of New York. At all relevant times herein, Simhaee has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee of Premier.

43.    On August 26, 2025, the WCB removed Simhaee's authority to treat injured workers because "[t]he provider [Simhaee] entered into an agreement with the Board to cease submitting PARs containing the designation of an incorrect, or false, therapeutic category. However, the provider continued to submit false PARs in breach of said agreement."

44.    Premier and Simhaee are collectively referred to as the "Premier Defendants."

### viii.        SMSR Defendants

45.    Defendant SPORTS MEDICINE & SPINE REHAB, PC ("SMSR") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, SMSR maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York.

46.    SILVIO GERACI, M.D. ("Geraci") resides in and is a citizen of the State of New York. At all relevant times herein, Geraci has been licensed or otherwise authorized to practice medicine in the State of New York and was the owner, operator, officer, director and/or employee SMSR.

47.    SMSR and Geraci are collectively referred to as the "SMSR Defendants".

COMPLAINT                                                                                          13

### ix.  410 Ditmas Defendants

48.    Defendant BROOKLYN MEDICAL PRACTICE, P.C. ("Brooklyn Med") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, Brooklyn Med maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Brooklyn Med maintained an office at 410 Ditmas Avenue, Brooklyn, New York.

49.    BIG APPLE PAIN MANAGEMENT PLLC ("BAPM") is a professional limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, BAPM maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. BAPM maintained a purported limited rental agreement at 410 Ditmas Avenue, Brooklyn, New York.

50.    NORTH SHORE FAMILY CHIROPRACTIC, P.C. ("NSF Chiro") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, NSF Chiro maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. NSF Chiro maintained a purported limited rental agreement at 410 Ditmas Avenue, Brooklyn, New York.

51.    UNICORN ACUPUNCTURE, P.C. ("Unicorn") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, Unicorn maintained its principal place of business in the State of New York and is authorized to and does conduct business in New York. Unicorn maintained a purported limited rental agreement at 410 Ditmas Avenue, Brooklyn, New York.

52.    SAYEEDUS SALEHIN, M.D. ("Salehin") resides in and is a citizen of the State of New York. At all relevant times herein, Salehin has been licensed or otherwise authorized to

practice medicine in the State of New York and was the (or at least the nominal) owner, operator, officer, director and/or employee of Brooklyn Med.

53.    RICHARD J. APPLE, M.D. ("Apple") resides in and is a citizen of the State of New York. At all relevant times herein, Apple has been licensed or otherwise authorized to practice medicine in the State of New York and was the (or at least the nominal) owner, operator, officer, director and/or employee of BAPM.

54.    TODD LEBSON, DC ("Lebson") resides in and is a citizen of the State of New York. At all relevant times herein, Lebson has been a licensed or otherwise authorized chiropractor in the State of New York and was the (or at least the nominal) owner, operator, officer, director and/or employee of NSF Chiro.

55.    DEKUN WANG, L.AC ("Wang") resides in and is a citizen of the State of New York. At all relevant times herein, Wang has been licensed or otherwise authorized to practice acupuncture in the State of New York and was the (or at least the nominal) owner, operator, officer, director and/or employee of Unicorn.

56.    Brooklyn Med and Salehin, BAPM and Apple, NSF Chiro and Lebson, and Wang and Unicorn are collectively referred to as the "410 Ditmas Defendants."

### x.  CMI Defendants

57.    Defendant COMMUNITY MEDICAL IMAGING, P.C. ("CMI") is a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, CMI maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

58.    Defendant ANDREW MCDONNELL, MD ("McDonnell," and collectively with CMI, the "CMI Defendants") was at all times relevant herein a physician licensed to practice medicine in the State of New York, employed by, and the "on-paper" owner of CMI.

COMPLAINT                                                                                                    15

### xi. **Miscellaneous Defendants**

59.    Defendant BRONX SC LLC d/b/a/ EMPIRE STATE AMBULATORY SURGICAL CENTER ("ESASC") is a limited liability company organized and existing under the laws of the State of New York. At all times relevant herein, ESASC maintained its principal place of business in the State of New York and is ostensibly authorized to and does conduct business in New York.

60.    Defendant ANDERS J. COHEN, D.O. ("Cohen") was at all times relevant herein a physician licensed to practice medicine in, and a resident of, the State of New York.

61.    Defendant SAAD CHAUDHARY, D.O. ("Chaudhary") was at all times relevant herein a physician licensed to practice medicine in, and a resident of, the State of New York.

62.    Defendant BOGORAZ LAW GROUP, P.C. ("Bogoraz Law") was at all times relevant herein a professional corporation organized and existing under the laws of the State of New York. At all times relevant herein, Bogoraz Law maintained its principal place of business in the State of New York and is ostensibly authorized to, and does, conduct business in New York.

63.    The Total Ortho Defendants, McCulloch Defendants, AcceleRad Defendants, Premier Defendants, SMSR Defendants, 410 Ditmas Defendants, CMI Defendants, ESASC, Chaudhary and Cohen are collectively referred to herein as the "Medical Provider Defendants."

64.    CMI Defendants and AcceleRad Defendants are collectively referred to herein as the "Imaging Defendants."

65.    SMSR Defendants, Premier Defendants, and 410 Ditmas Defendants are collectively referred to herein as the "Clinic Defendants."

66.    Total Ortho Defendants, McCulloch Defendants, Chaudhary, and Cohen are collectively referred to herein as the "Surgeon Defendants."

COMPLAINT                                                                                    16

67.     The Legal Service Defendants, the Runner Defendants, the Funding Defendants, the Medical Provider Defendants, and Bogoraz Law are collectively referred to herein as "Defendants."

## III.     RELEVANT STATUTORY AND LEGAL CONTEXT

68.     New York law prohibits unprofessional conduct in the practice of medicine, nursing, and chiropractic, which includes exploiting patients for financial gain. 8 N.Y.C.R.R. § 29.1(b)(2) (prohibiting medical, nursing, and chiropractic professionals from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party").

69.     New York law prohibits physicians and physician assistants from "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services." *See* N.Y. EDUC. LAW § 6530(18); *see also* 8 N.Y.C.R.R. § 29.1(b)(3) (prohibiting physicians, physician assistants, nurse practitioners, and chiropractors from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services"). Consideration to and from a third party includes an arrangement in excess of fair market value or that provides compensation that varies directly or indirectly based on the volume or value of any referrals or business between the parties.

70.     Under 42 U.S.C. § 1320a-7b (the "Anti-Kickback Statute"), it is an unlawful act for someone who "knowingly and willfully solicits or receives any remuneration directly or indirectly, overtly or covertly, in cash or in kind" "in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be

made in whole or in part under a Federal health care program" and for someone who "knowingly and willfully offers or pays any remuneration directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person."

71.    Courts have construed violations of the Anti-Kickback Statute to constitute an offense that is properly considered to be a form of "bribery" that satisfies statutes wherein an underlying predicate act includes, *inter alia*, bribery offenses, such as 18 U.S.C. § 1952, the Travel Act.

72.    A medical provider's representations about the medical necessity of the treatment provided are material because proximate causation is a necessary element of a negligence claim, and where treatment was not medically necessary, indicated or justified, the cost, expense, pain and suffering, and other alleged damages resulting from such treatment are not proximately related to the subject incident and such treatment can itself constitute an intervening and superseding event.

73.    A medical provider's representations contained within the medical records themselves regarding observations and treatment rendered are plainly material, as they are source material relied upon by the parties, the Court, and jurors to render conclusions, findings of fact, and holdings of law.

74.    Under RICO, predicate acts sufficient to demonstrate a pattern of racketeering activity include mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), Hobbs Act violations (18 U.S.C. § 1951), Travel Act violations (18 U.S.C. § 1952), and bribery under state law.

75.    While a RICO plaintiff must plead a "pattern" of racketeering activity (predicate acts) as that term is defined in 18 U.S.C. § 1961(5), a RICO plaintiff need only plead that one of such defendant's predicate acts proximately caused its injury.

COMPLAINT                                                                                                    18

76.     The mail and wire fraud statutes apply where use of the mail or wires occurs in furtherance of a scheme or artifice whereby one intends to defraud another of property. Whether the scheme succeeds as intended, or the target of the scheme is in fact deceived, is irrelevant. Mailings in furtherance of a scheme can in fact be facially truthful and may still serve as a violation and, as relevant here, a predicate act.

77.     The use of the mail or wires need not be by a Defendant themselves; it is sufficient that the use of the mail or wires was foreseeable, and such mail or wires were a necessary step in furtherance of the scheme.

78.     18 U.S.C. § 1951 is a sufficient predicate act regardless of whether such offense is a completed extortion, attempted extortion, or a conspiracy to extort; each suffices under §§ 1951 & 1961(a). An attempt or conspiracy to obtain a victim's money/property (18 U.S.C. § 1951[a]) through prohibited extortionate mechanisms aimed to induce the victim's consent (§1951[b][2]) is a properly pled Hobbs Act violation. 18 U.S.C. § 1951(b)(2) does not require that the use of force or violence alleged be against the extortion scheme's intended target. Fear of economic harm is recognized as a sufficient "fear" within the statute's ambit.

79.     Conduct in violation of 18 U.S.C. § 1951, including conspiracy, New York PL §§ 215.00 & 215.05, and any other recognized form of bribery (including Anti-Kickback Statute violations, *supra*) are expressly defined and specified as "unlawful activity" that is sufficient to trigger violations of the Travel Act, 18 U.S.C. § 1952.

80.     New York law requires an insurer abide the duty to defend, which is triggered upon the filing of a claim or complaint, regardless of whether such claim is fraudulent or meritless.

81.     New Jersey law permits, *inter alia* and as relevant here, any insurance company duly registered in the State damaged by violations of the New Jersey Insurance Fraud Prevention

Act ("NJ IFPA"), N.J.S.A. § 17:33A-1, *et seq*. to bring an action "in any court of competent jurisdiction to recover compensatory damages, which shall include reasonable investigation expenses, costs of suit and attorneys fees." N.J.S.A. § 17:33A-7. Plaintiff is an insurance company as defined therein.

## IV.    THE FRAUD SCHEME

82.    From at least 2018 to the present, with a marked escalation since 2020, Defendants, together with others known and unknown, for their financial benefit, orchestrated a widespread fraud scheme to defraud Plaintiff and others by (i) fraudulently misrepresenting pre-existing and degenerative conditions as acute trauma, transforming legitimate minor or localized injuries into lucrative full-body claims, and otherwise manufacturing purported injuries from whole cloth; (ii) preparing and collecting documentation as well as submitting, filing, prosecuting and asserting fraudulent personal injury lawsuits on behalf of Claimants that were frequently directly related and within short temporal proximity; (iii) providing or alleging to have provided medically unnecessary and excessive healthcare services to such Claimants; (iv) providing monies directly or indirectly to Defendants and to Claimants to fund the fraud scheme; and/or (v) using the fraudulent diagnoses and medically unnecessary and excessive healthcare services to inflate or manufacture settlement value (the "Fraud Scheme").

83.    Despite the complexity of the granular facts of each matter, the goal and *modus operandi* are straightforward: get desperate people to fake and/or grossly exaggerate minor accidents, fake and/or grossly exaggerate injuries, and undergo needless surgeries to prolong litigation and obtain fraudulent windfall settlements from Plaintiff and others. The Claimants were compelled to cooperate by promises of windfalls by Liakas Firm, litigation funding often timed with, if not directly contingent on, filing suit and undergoing needless surgeries, and by the urging

of the Runners, and in some instances, kickbacks by the Medical Provider Defendants and others known and unknown.

84.     Runners, under the direction of the Liakas Defendants, Medical Provider Defendants, and/or Funders, and in furtherance of and as a necessary step for the execution of the Fraud Scheme, recruited claimants ("Claimants") into staging and/or perpetuating fake trip-and-fall accidents at various locations throughout the State of New York and/or participating in staged motor vehicle accidents. The Runners then referred, transported, assigned, or otherwise presented these Claimants to the Liakas Firm, where its attorneys and/or other employees met with these Claimants. In other circumstances, Claimants were referred and/or transported to the Clinic Defendants, who would in turn sign them up with the Liakas Firm.

85.     Regardless of any actual bodily injury or lack thereof stemming from the purported accidents, these Claimants were instructed by the Runners and others, under the direction of the Liakas Firm, Medical Provider Defendants, and others known and unknown, to manufacture and/or grossly exaggerate particular specified bodily injuries that purportedly resulted from such accidents and to seek medical treatment from providers who would render treatment and documentation in furtherance of the scheme.

86.     The Liakas Firm filed lawsuits on behalf of the Claimants, seeking payment for the manufactured and/or grossly exaggerated injuries and needless, unjustified treatment thereto, and setting forth purported facts about the subject "accidents." These suits, initiated by a "Complaint," were typically verified under penalty of perjury by Defendant Dean Liakas himself and/or employees of the Liakas Firm at the Liakas Firm's instruction.

87.     New York law mandates an insurer such as Plaintiff discharge its duty to defend, a legally mandated obligation that is *immediately* triggered by the filing of a complaint as described

above. Even if the complaint's allegations are false or groundless – or fraudulent – the insurer must abide its duty to defend its insured, including investigation, claims handling, and litigation defense. In each underlying case, CPLR § 3101(f) required automatic and/or timely disclosure of insurance carriers and policies, making the Liakas Firm and others acutely aware of *who* would be paying in the event the Fraud Scheme succeeded and how much they were obligated to cover in indemnity.

88.    In simpler terms, a) Plaintiff incurred direct out of pocket costs as a direct result of the Fraud Scheme at the moment a complaint was filed, with post-complaint predicate transmission/mailing sent directly to Plaintiff or its panel counsel; b) the Liakas Firm had actual knowledge that the Fraud Scheme's intended targets were insurance carriers, and c) as to the cases documented herein, Plaintiff, specifically, was to be an intended victim of the particular iterations of the Fraud Scheme.

89.    Medical records were frequently mailed directly to Plaintiff's employees or their panel counsel assigned to the individual matters. Bills of Particulars and Supplemental Bills of Particulars were similarly transmitted or mailed. Negotiations occurred with *Plaintiff* directly and/or its agents, and any ultimate settlement or award was agreed to by Plaintiff directly.

90.    In order to falsely inflate purported case value and thereby effectuate (or coerce) greater Fraud Scheme proceeds, Liakas Defendants, directly and/or indirectly through the Runners and/or others under their control, including employed Medical Coordinators, directed the Claimants to seek medical diagnosis and treatment from certain associated medical providers with which the Defendants had an agreement or understanding as to the fraud scheme. This included the Medical Provider Defendants, who provided a variety of services (radiology, physical therapy, pain management, and orthopedic surgery) at Fraud Scheme-friendly facilities located in multiple states, including New York and New Jersey. Regardless of where the Claimants themselves were

COMPLAINT                                                                                                  22

located, the ultimate goal was to falsely substantiate and perform unwarranted knee and shoulder

surgeries and, most valuably, unwarranted spinal fusions.

91.    In <u>State Farm Mut. Auto. Ins. Co. v. Tri-Borough N.Y. Med. Prac. P.C.</u>, 120 F.4th

59 (2d Cir. 2024), the Second Circuit expressly recognized the potential use of state courts as a

medium to effectuate a fraud scheme like the one alleged here and was used in furtherance of the

conduct of an enterprise. Indeed, implementation of the fraudulent treatment protocol required

Medical Provider Defendants to "routinely order unnecessary diagnostic tests for patients that do

not affect their treatment, and that some of those tests are duplicative of information already

obtained…" 120 F.4th at 74.

92.    Here, the relevant Clinic and Surgeon Defendants routinely ordered a variety of

imaging services in every single case. In virtually every instance, MRIs of the cervical and lumbar

spine, shoulders and knees were ordered from certain radiologists involved in the fraudulent

scheme, including Imaging Defendants, whose reports contained findings that routinely deviated

from the Claimants' conditions as demonstrated by the actual imaging.

93.    Surgeon Defendants herein routinely did not consult the MRI films themselves, but

knowingly and intentionally relied upon the above-described reports to misrepresent the

Claimants' conditions as causally related to the alleged incidents to falsely, but facially, justify

unnecessary procedures. The Clinic Defendants used the MRI reports to justify clinically

worthless, but extensive and costly, unnecessary treatment protocols. While the specific body parts

at issue varied among the Claimants, the body parts *always* included the spine and either a knee, a

shoulder, or both.

94.    The Medical Provider Defendants provided false diagnoses, the use of their

facilities and resources, and unnecessary, excessive, unwarranted, and costly medical services

COMPLAINT                                                                                    23

and/or medical services that were not causally related to the alleged accident, for which the Medical Provider Defendants received compensation through increased referral streams for these purposes, along with financial compensation through both Funding Defendants directly, and *via* liens on Claimant case proceeds.

95.     During this process of pre-determined and escalating manufactured treatment, additional documentation known as Bills of Particulars and Supplemental Bills of Particulars were prepared by the Liakas Firm and verified by the Claimant or those acting at the Liakas Firm's direction, and served upon all parties to the pending lawsuit, typically by mail and in some instances by wire. For the Claimants represented by Liakas Defendants in personal injury lawsuits, Liakas Defendants submitted documents attesting to the alleged accidents and associated injuries. Supplemental Bills of Particulars were typically filed in escalating fashion to increase the economic pressure on Plaintiff to capitulate and pay off the Fraud Scheme under fear of economic harm.

96.     Armed with the fraudulently documented medical diagnoses and medical services falsely claimed related to the accidents, the Liakas Defendants, by and through the Medical Provider Defendants, falsely inflated the purported values of personal injury lawsuits in order to extract manufactured and falsely inflated settlements and awards, prolonged litigation and dramatically increased defense costs to general liability carriers, including from Plaintiff.

97.     Liakas Defendants, Medical Provider Defendants, and Funders would encourage, induce, and/or otherwise conspire with one another to induce the Claimants to have as many needless surgeries as so willing, regardless of necessity, so as to extort and/or defraud Plaintiff and others similarly situated.

COMPLAINT                                                                                        24

98.    Plaintiff and others similarly situated are uniquely susceptible to this form of strong-arming through fear of economic harm. Each additional surgery positions them into the Fraud Scheme's intended horns of dilemma: tender the policy limits or face the potential of an outsized excess verdict. If Plaintiff fails to comply, it is exposed to bad faith allegations, often forcing Plaintiff to capitulate *even if the claim is knowingly fraudulent* because of its legal duty to protect its insureds. The Fraud Scheme is further actualized through actual force and harm to Claimants *via* knowingly needless surgery.

99.    Liakas Defendants further provided, by mail or by electronic service to Plaintiff and/or Plaintiff's panel counsel, medical authorizations and HIPAA releases signed by each Claimant (or by someone else *via* Power of Attorney) for the release of each Claimant's medical records. Liakas Defendants had actual knowledge, were recklessly indifferent regarding, and/or reasonably should have known the contents of such records were false. Liakas Defendants had actual knowledge the HIPAA releases would be transmitted to the Medical Provider Defendants by mail or wire.

100.    The scheme shares many structural elements similar to those found in *Rainford* (2d Cir. 2024):

> The scheme involved recruiting poor and homeless people to fake accidents at properties around the New York area. The recruit would stage an accident and then seek unnecessary medical treatment—sometimes including surgery—from doctors who were part of the scheme. The organizers of the scheme would then refer the recruit to a lawyer, who would sue the property owner or the owner's insurance company for damages. The proceeds from the lawsuits, which often settled, were then divided among the co-conspirators, with the recruits receiving relatively little.

*Rainford*, at 468 (2d Cir. 2024).

COMPLAINT                                                                                              25

101.    Further evoking the structure and modus operandi in *Rainford*, the claimed injuries herein virtually always centered around the shoulders, knees, and - most lucratively - the neck and back.

> A.  Because it was part of the money, the money thing.  I guess every part was -- every body part was valued, I guess.

Trial testimony of Wandy Diaz, *United States v. Rainford*, 18-cr-00289, Doc. 153 at 384.

102.    Ms. Diaz's testimony also identified overlap in certain parties herein:

> lawsuit that you filed in connection with your staged accident.
> Did you meet with a lawyer in connection with that accident?
> A.  Yes.
> Q.  Do you recall his name?
> A.  Nicholas Liakas.

> Q.  Ms. Diaz, do you know if a lawsuit was filed in connection with your accident?
> A.  Yes.

*Id.* at 386-87.

## V.    THE FRAUD SCHEME ENTERPRISE

103.    The Count I Fraud Scheme Enterprise (the "Fraud Scheme Enterprise") operated by way of an association-in-fact within the meaning of 18 U.S.C. § 1961(4). The Count IV Liakas Firm Enterprise is a corporate entity, statutorily sufficient to constitute a viable Enterprise as the term is defined under 18 U.S.C. § 1961(4).

COMPLAINT                                                                                                  26

104.    Defendants associated together as an enterprise for the common, illegal purpose of defrauding and/or extorting Plaintiff, and those similarly situated, into making general liability indemnity payments *via* baseless and/or needlessly protracted litigation, falsely escalating manufactured treatment through rote, pre-determined protocols, and the threat of economic harm.

105.    The Fraud Scheme Enterprise was an ongoing organization with a decision-making and operational structure that, while informal, was coordinated and functioning, including: (i) leadership, management, and pursuit of claims necessary to the Fraud Scheme by the Liakas Firm, Dean Liakas (as to litigation and overall management of the Fraud Scheme as to litigation logistics), and N. Liakas (as to runners, recruitment, business development, Enterprise relationships, and Funder relationships and logistics); (ii) operators who executed day-to-day acts, including Liakas Firm employees, as well as the Medical Provider Defendants who purportedly treated Claimants, but whose true purpose was to provide falsely substantiated clinical, diagnostic, and surgical treatment; and (iii) facilitators who provided financial and logistical support, including Runners and Funders. The Enterprise used established channels - email, phone, mail, bank wires, and corporate entities - to achieve the common purpose.

106.    The Fraud Scheme Enterprise is and was distinct from any single Defendant named herein. Each Defendant is a separate legal/real person who conducted or participated in the conduct of the Enterprise's affairs, not merely its own affairs. Without the Fraud Scheme Enterprise machinery operating, the individual components could not profit from the Fraud Scheme in their own right. There was no hub with rimless spokes; each Defendant's particular role in and contribution to the Enterprise was necessary and dependent on other Defendants' performance of their respective roles and contributions.

107.    The Enterprise engaged in, and its activities affected, interstate commerce, including through interstate communications, mailings, and financial transactions across state lines, as well as several instances of Claimant transit to utilize out-of-state surgical centers.

108.    Each Defendant so charged in Count I, *infra*, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, exercising decision-making authority, directing subordinates, and/or carrying out essential functions of the Enterprise ("Count I Defendants").

109.    Each Defendant so charged in Count III, *infra*, agreed to participate in the Fraud Scheme Enterprise, wherein there was agreement between any of its members to engage in a pattern of racketeering activity, knowingly engaged with the Enterprise, and, while not necessary to establish at the pleadings stage, did in fact engage in overt acts in furtherance of the Fraud Scheme Enterprise and its common purpose ("Count III Defendants").

110.    Each Defendant so charged in Count IV, *infra*, conducted or participated, directly or indirectly, in the conduct of the Liakas Firm Enterprise's affairs through a pattern of racketeering activity, exercising decision-making authority, directing subordinates, and/or carrying out essential functions of the Enterprise ("Count IV Defendants").

111.    Each Defendant so charged in Count V, *infra*, agreed to participate in the Liakas Enterprise, wherein there was agreement between any of its members to engage in a pattern of racketeering activity, knowingly engaged with the Enterprise, and, while not necessary to establish at the pleadings stage, did in fact engage in overt acts in furtherance of the Fraud Scheme Enterprise and its common purpose ("Count V Defendants").

112.    From approximately 2018 through the present and continuing, each of the Count I and IV Defendants committed at least two predicate acts of racketeering within the past ten years,

including but not limited to violations of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 1952 (Travel Act violations), § 1951 (Hobbs Act violations), and state law bribery of and/or receiving by a witness (N.Y. Penal Law §§ 215.00 & 215.05) specifically as pled *infra*. The predicate acts were related (same participants, victims, methods, and purpose) and amounted to, or posed a threat of, continued criminal activity.

113.    The pattern of racketeering activity described above and set forth in detail below reflects continuity because:

   a.   the predicate acts occurred repeatedly over a substantial period of time – at least seven years and are continuing; they are not a single, isolated scheme (closed-ended); and/or

   b.   the Enterprise's regular way of doing business relied on the same unlawful methods and remains ongoing or, at minimum, poses a specific threat of repetition at the time of this filing (open-ended).

114.    The Count I Fraud Scheme Enterprise is not a mere "rimless hub and spokes" conspiracy. Each Defendant's particular role in and contribution to the Enterprise was necessary and dependent on other Defendants' performance of their respective roles and contributions, and each participant was fungible within the specific role played; indeed, in at least 2 Claimant instances, Liakas Firm was substituted by Bogoraz Law (collectively, "Legal Provider Defendants," below), and the Fraud Scheme Enterprise continued unimpeded.

115.    The general structure of the association-in-fact enterprise is depicted as below:



116.    As set forth above, on behalf of Defendants and in furtherance of and as a necessary step for the execution of the Fraud Scheme Enterprise, the Liakas Defendants represented numerous individuals who were recruited by Runner Defendants and staged a trip-and-fall accident and/or staged motor vehicle accidents, and claimed injuries unrelated to the accident alleged in lawsuits the Liakas Defendants knew were fraudulent.

117.    The Medical Provider Defendants provided unnecessary and excessive treatment unrelated to the claimed accident, often under inducement by Funders, including the Funding Defendants. The above identified persons and entities are just a fraction of the individuals who participated in the Fraud Scheme between 2018 and the present.

118.    Numerous additional predicate acts and exemplar Claimants involving nearly all of these Defendants are set forth with particularity and detail in the *Union Liakas* Action (Ex. 1) and Roosevelt Road RE, LTD., et. al. v. Liakas Law, P.C., et. al., which collectively provided in depth

exemplars of sixteen (16) Claimants, along with detailing a connected ring of nineteen (19) claimants (Tavarez Ring) with jarringly similar accident circumstances and treatment, most if not all having arrived in the U.S. from the Dominican Republic (and specifically Jarabacoa), living in or initially temporarily residing in Freeport, New York upon arrival in the country, yet having accidents counties away in Brooklyn, Queens, and the Bronx, retaining the same lawyers, and being provided with the same doctors, funding providers, and surgeries. The identified, particularized allegations of predicate acts contained in operative Complaints of the *Union Liakas* and *Roosevelt Liakas* Actions, attached as Exhibits 1 & 3, are incorporated as if fully set forth herein.[1]

<u>i.</u>    <u>Liakas Defendants' Participation in the Fraud Scheme Enterprise</u>

119.    Since at least 2018, the Liakas Firm has been involved in thousands of lawsuits, virtually all comprised of injury claims resulting from motor vehicle accidents, labor law claims, and, as relevant here, trip and falls, covered by various insurers and reinsurers, including Plaintiff and others, in furtherance of and as a necessary step for the execution of the Fraud Scheme. By the very nature of personal injury litigation in the State of New York, including disclosure of relevant insurance policies, the Liakas Defendants knew precisely who the conduct of the Enterprise was designed to directly and unlawfully extract money from in each and every case.

120.    At all times relevant, Liakas Defendants directed, authorized, coordinated, and controlled the conduct engaged in by the Runners to recruit individuals (i.e., Claimants) to stage trip-and-fall accidents and/or falsely claim injuries unrelated to the alleged trip-and-fall accidents.

---

[1] For avoidance of doubt, predicate acts from the Union Liakas and Roosevelt Liakas actions are set forth solely as further substantiation of a pattern of racketeering activity; GNY seeks no damages resulting from the specific predicate acts alleged within the Union Liakas and Roosevelt Liakas actions.

COMPLAINT                                                                                                    31

121.    At all times relevant, Liakas Defendants, in cooperation and mutual understanding with each other, represented Claimants in personal injury lawsuits and directed, authorized, coordinated, and controlled the prosecution of Claimants' lawsuits, assigning duties and responsibilities to attorneys/employees of Liakas Firm, and intentionally submitting or causing the filing of and submission of fraudulent assertions and medical documentation to various courts within the State of New York and all named parties in the personal injury lawsuit.

122.    Liakas Defendants, directly and through employed medical coordinators, paralegals and case managers, directed the Claimants to seek medical treatment from the Medical Provider Defendants specifically, knowing and understanding that the Medical Provider Defendants would provide the kind of false and misleading medical documentation needed for higher settlement values in exchange for continuing to funnel patients to the Medical Provider Defendants. The Liakas Defendants further worked in direct coordination with the Medical Provider Defendants to ensure the highest value "treatments" that could be falsely substantiated were provided.

123.    Liakas Defendants knowingly transmitted and received by mail, facsimile, and/or email documents that contained assertions of legitimate trip-and-fall accidents, the existence of injuries, and the necessity of medical treatment that Liakas Defendants knew or reasonably should have known were false.

124.    Liakas Defendants provided by mail or by electronic service to defense counsel in the underlying cases medical authorizations and HIPAA releases purportedly signed by each Claimant for the release of each Claimant's medical records that Liakas Defendants knew, were recklessly indifferent regarding, or reasonably should have known were false. The Liakas Defendants made use of the wires by submitting documentation *via* the New York State Courts Electronic Filing system ("NYSCEF"), including verified Complaints filed in regard to each

COMPLAINT                                                                                        32

Claimant and Bills of Particulars served upon opposing counsel in relation to each Claimant's lawsuit.

125.    This unlawful conduct was central and essential to the Fraud Scheme, in pursuing Claimants' personal injury lawsuits, prolonging litigation (and thus directly causing needless and escalating defense costs paid by Plaintiff), and inflating settlement value - and ultimately, the wrongful financial gain of the Liakas Defendants and the other members of the Enterprise from the lawsuits.

126.    The intentional prolonging of litigation did not prevent Liakas Law from obtaining revenue from the Fraud Scheme, as Liakas Law securitized and/or factored its receivables from the Fraud Scheme in their entirety (**Exhibit 4,** financing statement and continuation).

### ii.  Runner Defendants' Participation in the Fraud Scheme

127.    Upon information and belief, since at least 2018, the Runner Defendants have been involved in recruiting Claimants into stating and/or perpetuating fake trip-and-fall accidents at various sites throughout the State of New York and/or otherwise instructing Claimants on how to successfully malinger a minor incident into surgeries with the knowing cooperation and substantial assistance of the Medical Provider Defendants, the Legal Defendants, and the Funding Defendants.

128.    Upon information and belief, the Runner Defendants communicated with the Claimants, Liakas Defendants, Funding Defendants, and Medical Provider Defendants through telephone calls, texts, emails and mail, and indirectly.

129.    The Runner Defendants engaged in overt acts in furtherance of and as a necessary step for the execution of the Fraud Scheme. Among other things, the Runner Defendants a) referred and/or transported Claimants to Liakas Defendants so that Claimants could retain Liakas Defendants; b) directed, coached, transported and/or otherwise substantially assisted Claimants in coordinating medical treatment from Medical Provider Defendants; c) directed, referred, or

COMPLAINT                                                                                      33

otherwise brokered out Claimants to high-interest funding loans from Funding Defendants; and, d) directed, coached, coordinated and/or otherwise substantially assisted in the prosecution of Claimants' personal injury lawsuits.

130.    Upon information and belief, Rolnik acted as an intermediary – effectively, as a broker – between Liakas Firm and other law firms and between certain runners, including Defendant Rodriguez and Tavarez (and possibly Sone), and others known and unknown, by knowingly and/or intentionally facilitating, forwarding, and/or referring fraudulent personal injury matters to Liakas Firm (who received Claimants willing to participate in the scheme), or by overseeing and/or participating in the manufacture of claims in the first instance.

131.    Rolnik is affiliated with hundreds of personal injury actions, the vast majority of which are referred out. Prior to 2020, the majority of these cases were referred to Bader & Yakaitis; from 2020 on, many of these referrals were directed to Liakas Firm, in addition to other firms.

132.    Rolnik uses no advertising, has virtually no internet or social medial presence, and otherwise has no uniquely substantial history of success in prosecuting personal injury cases. His office is an interior office space in a non-descript building in lower Manhattan at 325 Broadway, New York, New York on the fourth floor.

133.    For over 20 years, Rolnik occupied that fourth floor space (and *via* affiliates, subsequently the third floor below it), along with, at various times, Barry Woolfson ("Woolfson") and attorneys "S.B." and "A.H."

134.    Woolfson previously worked for Rolnik, non-party Funder "The Law Funder LLC," and now operates his own personal injury practice from the third floor wherein he continues to receive Rolnik referrals.

COMPLAINT                                                                                    34

135.    S.B. and A.H. are former employees and partners of Rolnik. They also operated a separate partnership with each other out of the same location (incorporated in 2003 and remains active). S.B. continues to occupy the fourth-floor space with Rolnik, continues to do work for Rolnik, and also operates a substantially similar solo practice at the same location. A.H. also worked with Woolfson at The Law Funder (as an Executive Vice President) and is discussed further *infra*.



136.    Despite having no storefront, no advertising, no social media or internet presence, and an inauspicious background and/or history of unique litigation success, Rolnik is *somehow* in a position to broker massive volumes of highly suspicious personal injury cases to several law firms accused of engaging in fraud schemes, including as relevant herein.

COMPLAINT                                                                                                        35

137.    It is alleged Rolnik gathered and continues to gather Claimants through a network of Runners, including Defendants Rodriguez, Tavarez, Sone, and others known and unknown, and, both directly and *via* delegation, manufactured and continues to manufacture the factual circumstances surrounding such purported accidents.

138.    Rolnik then assisted and continues to assist in "packaging up" the basic information on these personal injury cases, including in some cases taking photographs of alleged injuries/defects, and facilitating medical care for the potential Plaintiff-Claimants with the Medical Provider Defendants, with the intent and purpose of driving the value of the personal injury cases upward through unnecessary and excessive medical treatment that is predictable and pre-determined. In form and function, Rolnik runs a lawsuit factory, which creates all of its necessary parts for the final product.

139.    Rolnik further facilitated funding with Funding Defendants and others, including as discussed *supra*, *via* a funding company owned by his wife and other affiliates.

140.    In a prior Claimant matter, Rolnik admitted under oath on December 21, 2022, as a non-party and the referral source on the case, that he was the one who took photographs of the purported defect:



```
22              Did you take any photographs in
23         regards to a lawsuit filed by ████████
24    ██████?
25    A    I did.
```

141.    Rolnik had gone to the alleged accident site alone, without the "client," raising serious concerns about the actual location of the incident.  This conduct allows for the highly likely inference that Rolnik simply selected areas with defect(s) that may be similar to the location of an

accident, but with no accident ever occurring at the location of the subject photographs. Or, more plainly, it allowed him to choose the site, wherein no actual accident occurred. His testimony continued below:

```
17        Q       He was not there, how do you know
18        he -- how do know that that is the
19        location where he said he fell?
20        A       Well, he described it and I took
21        the photographs and then when I came
22        back I showed him the photographs and I
23        said "is this where you fell," and he
24        said, "yes, that is it."
```

142.    Rolnik admitted that he then sent those materials to the referral recipient to be utilized in prosecuting the injury claim. Rolnik claimed he no longer had the camera used for those photographs and could not produce originals – which were purportedly printed, *i.e.*, no metadata.

```
Q       Was anyone with you when you took
those photographs?
A       No.
Q       Do you have the originals?
A       I have -- no, I don't.  I printed
them out I and I sent them over to
Blake.  So, no, I don't have the
originals.
```

143.    Similarly, but with even further separation from fact, Runner Defendant Rodriguez has claimed to have taken photographs of a purported defect - on a prepaid phone which he longer

had and therefore could not produce originals. He further stated he took pictures of a defect at a location *as instructed by Rolnik*, without the Claimant present, without having input from the Claimant, and indeed having "never spoken" to the Claimant.



144.    The above claim was similarly packaged up and sent to the referral firm to prosecute the action.

145.    When Rodriguez had his own case, he a) was represented by Liakas; b) claimed a trip and fall in Brooklyn despite residing in Nassau County; c) had funding through non-party Funding Company-1 ("FC-1," discussed *infra*); d) underwent surgery by McCulloch; and e) underwent a spinal fusion by Defendant Cohen. Despite Liakas's use of an incorrect middle initial, it was in fact one in the same (*Luis L. Rodriguez v. Extra Space Storage, et al.*, 515258/2021).



146.     In yet another Claimant's case (from the *Union Liakas* Action/Tavarez wheel), when the Claimant presented to the hospital on the purported day of accident, the Claimant was accompanied by Runner Defendant Tavarez, who gave his phone number but a false name and provided the email address *of Rolnik's paralegal* as his contact information to the emergency room staff.

147.     In *another* case, a Rolnik-referred Claimant had never even seen the purported photographs of the claimed defect until sitting at EBT:

> Q.    Did you take any photographs, at all,
> concerning your March 25th, 2019, accident?
> A.    No.
> Q.    Have you ever reviewed or seen any
> photographs related to your March 25th, 2019,
> accident?
> A.    No.

> MR. HORN:  Julio, he wants to know
> if -- have you ever seen even like a -- a
> photo of -- of the accident location.  Did
> somebody show that to you?  It's not a
> trick question.
>     THE WITNESS:  I did not see photos.  I
> saw it in person.

148.     Similarly, from yet another Claimant:

COMPLAINT                                                                              39

```
      Q       Have you ever seen that photograph
before?
      A       No, I just seen it just now, right
now.
```

```
      Q       So, my first question, did you take
this photo?
      A       Did I take this photo?  No, ma'am.
      Q       You did not take the photo?
      A       No, ma'am.
      Q       Do you know who took the photo?
      A       I know my lawyer did.
```

149.     Runner Defendants, and particularly Rolnik, further engaged in self-dealing through self-funding their own referred cases and/or "trading" funding as described *infra*, at "iii."

150.     In the matter referenced *supra,* at ¶ 143, wherein Rolnik's investigator/runner, Defendant Rodriguez, no longer had the prepaid phone used to take pictures, no input from the Claimant, and at Rolnik's direction photographed the "defect" - and where Rolnik referred the case out, maintaining an interest in its outcome - it was noted the Claimant had funding through "Highlands Lending Corp." When pressed to produce an authorization for the funding documents, the referral firm provided an authorization directed *to Rolnik's law office address*, which was subsequently marked undeliverable and "return to sender."



7. Name and address of health provider or entity to release this information:
Highlands Lending Corp., 325 Broadway, Suite 102, New York, NY 10007

151.    The true funding entity is in fact located in New Jersey - *with Rolnik's wife* as "President." Highland Lending Corp. has been operating since 2012.



152.    Similarly, "Cash in Time LLC," also engaged in litigation funding, has an operating address at Rolnik's law office, and the registered agent is the husband of "S.B.," Rolnik's long time affiliate as employee, partner, and officemate discussed *supra*, at ¶¶ 133, 135.

153.    Similarly, "Stillwater Property Group, LLC," despite holding itself out as a "real estate distressed debt" arbitrageur and manager, and subsequently reincorporating as Stillwater Real Estate Property Group LLC, has engaged in litigation funding, and in fact has its publicly listed address within the referral-recipient firm above, Bader & Yakaitis (identified in the *Union Liakas* Action as "Co-Conspirator Firm 1 Affiliate"); the registered agent is in fact Alex Bader. The various "Stillwater" group of companies are associated with varyingly Bader and another attorney and apparent business partner Jared White (while the address is the firm, the phone number is affiliated with White).

COMPLAINT                                                                        41

| | |
|---|---|
| **Registration Number:** | 5102090 |
| **Name:** | JARED DAVID WHITE |
| **Business Name:** | JARED WHITE ESQ |
| **Business Address:** | 261 5TH AVE RM 1802<br>NEW YORK, NY 10016-7713<br>(New York County) |
| **Business Phone:** | (646) 389-3044 |
| **Email:** | |
| **Date Admitted:** | 04/08/2013 |
| **Appellate Division Department of Admission:** | 1st |
| **Law School:** | Brooklyn Law School |
| **Registration Status:** | Currently registered |
| **Next Registration:** | Nov 2027 |

646-389-3044
STILLWATER REAL ESTATE AND
PROPERTY GROUP LLC
1430 BROADWAY SUITE 1802
NEW YORK, NY 10018

154.    Similarly, "Hillcrest Investment Partners LLC" has engaged in litigation funding and is also tied to Jared White (while the address is the firm of Bader & Yakaitis, the phone number is affiliated with White).

155.    Upon information and belief, certain other Runners would be internally referred to as "investigators" or "brokers" for their roles in bringing in claimants and facilitating the initial phases of the Fraud Scheme, and as other known descriptors including "paralegal," "case manager," and "client services liaison."

### iii.  Funding Defendants' Participation in the Fraud Scheme

156.    Upon information and belief, since at least 2018, the Funding Defendants, including those named and unnamed, known and unknown, have been involved in providing high-interest funding loans to Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

157.    As an integral part of the scheme, in concert and with the substantial assistance of the Legal Defendants and other Funders, the Funding Defendants gave Claimants money in the form of high-interest litigation funding loans secured by the settlement payments anticipated from Claimants' personal injury lawsuits. This was done to secure Claimants' cooperation.

COMPLAINT                                                                                        42

158.    In an effort to bypass the letter of New York State's Rules of Professional Conduct, Funding Defendants engaged in a scheme whereby funding was "traded" so that funding from Jumpstart would not go to Liakas clients, but to related/affiliated clients with affiliated firms, with such affiliated firms providing funding in kind to Liakas Claimants.

159.    It is alleged that, at least in part, this "advance trading" was a continuation by Liakas Defendants/Jumpstart, incorporated in 2021, of the previous system in place between Rolnik and Bader & Yakaitis.

160.    Funders, known and unknown, paid certain Medical Provider Defendants upfront for unnecessary and expensive surgeries to secure their cooperation with the scheme. Defendants would recoup those funds  and their high interest from settlement proceeds. Through securing cooperation of Claimants and Medical Provider Defendants in providing such unnecessary treatment, Funding Defendants and other Funders artificially inflated the value of underlying claims and extended the time of litigation, in turn increasing the amount of their own recovery *via* astronomical interest and increased Liakas Defendants' contingency fees.

161.    Funding Company-1 (FC-1) is a funding company with which Liakas frequently facilitates advances to Claimants.

162.    FC-1 and its parent, **Eastern Asset Management** ("Eastern"), as well as several of the other large Funders operating in New York, operate with such significant overlap in management, operations, securitization, and originations that the lines defining where one company ends and the other begins cannot be reasonably and definitively articulated.

163.    Eastern's Founder and Managing Partner is also a founding partner of **Westbury Management Group** ("WMG"), the parent company of **Law Cash** (itself with a history of business with Case Cash)**.**

COMPLAINT                                                                                        43

164.    Eastern's Operating Partner was CEO of **Golden Pear Funding** from 2009-2020 (which upon information and belief, an ownership stake in Golden Pear is maintained indirectly through an LLC), is the current CEO of FC-1, and was previously COO of **Law Cash**. Golden Pear currently securitizes and issues notes and funds based on aggregated advances, along with its Joint Venture partner **Case Cash** (Liakas uncle/disbarred attorney Gregory Elefterakis), over whom Golden Pear has maintained a senior secured debt since 2018; Golden Pear has conducted business by and through Case Cash since 2011.

165.    In July 2019, Eastern purchased FC-1 after "successfully rehabilitating" "non-performing litigation assets" acquired from a hedge fund. Within eighteen (18) months, FC-1 tripled its originations. This timing is noticeably lockstep with the explosion of the Fraud Scheme detailed herein and also in lockstep with FC-1 packaging and securitizing those receivables.

166.    Also in 2019, WMG obtained **Momentum Funding.** In September 2019, **Legal Business Services** absorbed Law Cash and key Westbury Management personnel, including the managing partner above, with Westbury Management Group retaining Momentum.

167.    In 2021, a full roll-up of WMG, Legal Business Services, Momentum Funding, Law Cash, and **Ardec Funding** resulted in the new entity, **Cartiga**. On May 12, 2025, Cartiga entered a letter of intent with a Special Purpose Acquisition Vehicle to become a publicly traded company on Nasdaq. The ownership and control of this soon-to-be public company, a purported competitor, is inextricably intermingled with FC-1; as with FC-1, the lending subsidiaries of Cartiga securitize their advances.

168.    Cartiga has notoriously been documented *via* recorded phone calls to allegedly be intimately aware of and complicit in the Fraud Scheme, and despite evolving corporate compliance

obstacles, remains willing to "do a few favors" to maintain clientele – and keep their "clients" on the hook:

> from the spinoffs realize, I didn't need -- I
> don't need this.  I can just do my own, but we
> tell them that things are different.  Funding
> companies are looking into things more closely.
> This is -- maybe that gravy train is ending,
> blah, blah, blah.  They're looking at things more
> closely, and so here is the new scenario.  Okay,

>             RICHARD:  Okay, I mean, I don't know if
> you guys want to talk about this, but I feel like
> we're all in it together.  We all kind of know
> the deal, and I feel it's useful for me to share
> --

> involved.  Chris has been involved, and we'd like
> to just, you know, we had a nice run with you,
> getting things in.  And we're just getting a
> little bit more questions asked, so we want to
> make sure we have --
>             RICHARD:  That's fine.
>             JIM:  We'd rather not, but we
> understand that we may have to do a few favors
> for you.  That's what I'm saying.  But it's -- we
> don't --



> JIM: Okay, that's good to hear. I didn't -- I don't know all the intricacies. It's just that -- we just want to come back with like, a scenario, and then as things progress, as you know, MRIs are positive, you know, the workers' comp is not controverted, you know, the next step is going to be the scope. It's going to be a possible fusion, and now I still don't think we want to get to these big chunks of funding, because it -- you know, then you've got to deal with it down the road.
>
> I just like to give the client as little money as possible that he's happy and he's

169.    Turning back to Rolnik, he has been involved with three attorneys: Barry Woolfson, who operates his own injury firm located one floor below Rolnik and receives Rolnik referrals;[2] the previously discussed S.B.;" and, lastly, "A.H." Formerly associated with Rolnik's firm, formerly S.B.'s law partner, and formerly Executive VP of The Law Funder during Woolfson's tenure there, A.H. has since transitioned to a role at Law Cash, **and following the "roll-up" is Vice President & Head of Underwriting at the above-referenced Cartiga since 2022.**

---

[2] Including Index #: 510549/2019, brought by Rolnik, self-funded through Highland Lending.

170.    **Indeed, within the matter of *Kristopher Hassett v. Cartiga*, which produced the above-referenced phone transcripts, <u>A.H. is identified by name</u>, as well as a suspect "<u>partner firm <u>*providing cases*</u> to a certain law firm</u>;"** *i.e.,* a suspect partner firm *referring cases out*.

> 17.    On May 17, 2023, during a meeting with Mr. Brady, A███ H███████, an underwriter for Defendant and attorney in the State of New York, Paul Cagno, an underwriter for Defendant and attorney in the State of New York, Mr. Bogansky, and Mr. Dion, Plaintiff requested to cancel the funding of potentially fraudulent New York Labor Law § 240 claims and reiterated his concerns surrounding the two partner firms.
>
> 18.    On May 26, 2023, during a meeting Mr. Brady, Mr. Bogansky, and Mr. Dion, Plaintiff shared a video of an investigation Plaintiff had conducted of a partner firm providing cases to a certain law firm.

171.    Upon information and belief, the Funding Defendants have received or have the right to receive the majority of, or significant part of, the Claimants' portion of the settlement proceeds from Claimants' personal injury lawsuits; Funding Defendants and other relevant Funders directly profit from the prolonged litigation resulting from the Fraud Scheme.

<u>iv.</u>  <u>Total Ortho Defendants' Participation in the Fraud Scheme</u>

172.    Since at least 2018 (and in fact much earlier), Total Ortho has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme. Portions of Total Ortho's individual component of the scheme date back as far as 2006.

173.    Total Ortho's management and ownership mirror the supervisory positions of the Orthopedic Department of Nassau University Medical Center in Long Island ("NUMC").



174.    Separately, the Total Ortho corporate entity is contracted to provide "clinical supervision" to the Orthopedics Department at NUMC – despite that virtually the entire clinical staff being "supervised" is Total Ortho.

175.    In 2012, non-party Karen Avanesov ("Avanesov") became an equity partner in Total Ortho, taking on several joint secured loans with Ruotolo in favor of Total Ortho.

176.    Defendant Lerman, licensed in 2010, became associated with Avanesov through another practice and then joined Total Ortho and NUMC in August 2012, becoming a Member of Total Ortho at some point between 2012 and 2016.

177.    In 2014, Avanesov and Lerman each individually invested $450,000 into Amendia, a spinal implant manufacturer.

178.    In 2016, Avanesov and Lerman were granted ~$288,000 worth of equity in Amendia – each.

COMPLAINT                                                                                        48

179.    In 2017, Avanesov and Lerman each individually purchased an additional ~$250,000 of equity through a special series of preferred shares.

180.    Between 2014 and 2017, through grant, purchase, or otherwise, Avanesov and Lerman obtained significant equity stakes in Amendia. Individually, they each tied for the 5th largest such physician-owned stake. When combined, **their equity constituted the largest such stake in the country.**



| Recipient | Value of interest ⇕ |
|---|---|
| Luis E Duarte | $1,356,320.00 |
| Randolph C Bishop | $864,400.00 |
| HANSEN A YUAN | $768,000.00 |
| KARL D SCHULTZ | $714,400.00 |
| VADIM LERMAN | $688,771.00 |
| Karen Avanesov | $688,711.00 |

181.    Also in 2017, Amendia merged with Spinal Elements (April 2017), and adopted the corporate name of the latter (July 2017). Neither Avanesov nor Lerman nor Spinal Elements has ever updated their disclosures to reflect the change in corporate name.

COMPLAINT                                                                                                49

182.   Turning back to 2016, **thus began a concerted and intentional operation by, among others, Avanesov and Lerman, whereby:**

a.   **litigation funding (or secured liens) for surgery would be received privately by the surgeons and/or Total Ortho (and varyingly, Neurotrack LLC, OrthoConcierge LLC, and other Total Ortho principle-owned affiliates);**

b.   **the patient would be referred to present to NUMC's emergency room, where inability to pay and/or lack of prior authorization did not preclude treatment at the facility by so funneling through the ER;**

c.   **the very same clinic surgeons they saw in Brooklyn or elsewhere, counties over, now wearing their "clinical supervision of the Orthopedic Department" hat at NUMC, would decide emergency surgery was required (including self-dealt implants for which the hospital would pay).**

2016

The patient is a 37-year-old male who was involved in a motor vehicle accident, stated injury CT-spine was treated non operatively with the physical therapy, medication management as well as underwent multiple lumbar epidural steroid injection.

The patient developed worsening of his pain in neurological deficits including worsening of the weakness in the right lower extremity. The patient has difficulty with walking maintaining upright position as well as uncontrollable pain. The patient went to emergency room, where he was admitted and changed IV steroids to oral pain medication. Due to failure of conservative care with no improvement and worsening of the leg pain, decision was made to proceed with surgical intervention. The risks and

2016

modifications. The patient saw Pain Management and underwent 2 lumbar epidural steroid injections resulting in no improvement. Worsening of the symptoms was noted. The patient admitted himself to the emergency room hospital due to uncontrollable pain, which was not controlled with oxycodone and muscle relaxants. The patient's symptoms were not improving, so the patient elected surgical intervention due to failure of conservative care. Risks, benefits,

2017

- Indication: indicates well known to the spine practice for his cervical radiculopathy. Followed up for several months. "The patient did not improve and had severe exacerbation of his symptoms and came to the emergency department at Nassau University Medical Center." "He was admitted for pain control and IV steroid and IV pain medication. Did not improve. Persistent and neurologic deficit with weakness and numbness in his upper extremities."

- Procedure: anterior cervical discectomy C6-7, anterior instrumentation, placement of intervertebral cage and use of allograft, neural monitoring and fluoroscopy.

COMPLAINT                                                                                       50

(in relation to the 2017 case):

> Further, the reasoning behind admission to the hospital the day before surgery is unclear as well. It is indicated that symptoms were exacerbated prior to the admission. No new diagnostic tests were performed in the hospital to evaluate the worsening symptoms. The intraoperative finding of Dr. Leven indicated a very large extruded disc herniation which I cannot appreciate, at least on MRI dated March 2017. According to the postop note, there was significant improvement of symptoms, but it seems that the claimant continued to have neck pain. The claimant

2018

7. Nassau University Medical Center 4/4/18-4/6/18: Emergency admission for ACDF. "10/10 pain" in emergency department. Noted to be in "no acute distress." Nursing assessment "3/10" pain upon admission, "0" at 3:36am prior to surgery. There is no record of any pain medication given prior to surgery.

Operative reports:

   a. 4/5/18: C6-7 anterior cervical discectomy/fusion ("ACDF") Drs. Vadim Lerman/Karen Avenesov. Claimant admitted to ER 4/4/18 for worsening neck pain and upper extremity weakness.

2020

> Patient is well known to the spine practice for complaints of cervical radiculopathy with neck pain and neurologic deficits. The patient had persistent radicular symptoms with motor and sensory deficits as well as severe neck pain which were progressing and were consistent with the severe nerve root impingement and disc pathology noted on the MRI. Patient presented to the ED with intractable pain that did not improve with hospital admission. Patient

Also, in 2020 – a 24-year-old patient:

knee derangement. The claimant was then referred to Dr. Vadim Lerman, a spine surgeon who evaluated him in December 18, 2019. His initial consultation indicates that the pain was limited to cervical and lumbar spine without radiation to his arms or legs. All of his subsequent notes confirmed lack of any radiculopathy. He also indicated that the claimant had received multiple epidural injection in the prior year, the last one being in November 2019 without much improvement. He continued follow-up with Dr. Lerman who repeated the MRI of the cervical and lumbar spine in January 4, 2020.

Dr. Lerman recommended the claimant to go to the emergency room and be admitted to Nassau University Medical Center on March 11, 2020 and performed bilateral hemi laminectomy facetectomy, discectomy and posterior lateral fusion of the L5 – S1 on the following day. He was then discharged from the hospital two days later to go home and

COMPLAINT                                                                    51

2020. Dr. Lerman and other providers reported lack of any radiculopathy in his upper or lower extremities. His lumbar spine MRI also did not reveal any evidence of nerve root compression and or acute disc herniation. His neck MRI was also negative for any acute disc herniation or spinal cord/nerve root compression. There was no clinical indication for the surgical procedure that he was subjected to.

```
        Q.    Now, did you discuss both the
back and the neck MRIs with Dr. Lerman?
        A.    I tried.  He just said my neck
was first.  I wish he would explain why,
but he looked at the MRI and said, "You
have to go to the emergency room."
```

```
        Q.    Did he tell you to go to the
emergency room immediately or no?
        A.    Yes.
        Q.    Did he elaborate any further
with respect to what he meant by your neck
being "in bad shape?"
        A.    No, he did not.  Not that I can
recall.
```

```
        Q.    Did you have any conversation
at all about the back -- the lower back
MRI, with Dr. Lernar?
        A.    Yes, I asked him why.  I asked
him about my results concerning my back and
he said, "We'll talk about that later.
Right now, you need to go in for your
neck."
```

COMPLAINT                                                      52

Q.    So is it your understanding based on the conversation with Dr. Lerman two or three days before the The Nassau University Hospital visit, that he was already -- he already had the understanding that you needed neck surgery?

A.    Yes, according to him.

Q.    Okay.  All right -- um, and then when you went to the emergency room, the Nassau University Emergency Room in March of 2024, before the surgery you made complaints about your lower back, correct?

A.    Yes.

Q.    What was done for you in the hospital in response to that complaint?

A.    Nothing.

---

A.    November of 2023.  I mean, that's when it's out of control.  I also had neck pain since before the surgery, the very first surgery.  Before the surgery, I didn't have the pain.  They saw something that I didn't feel.  But after the surgery, my neck has never been the same.

183.    The reason for this, upon information and belief, was two-fold: 1) the patients, often in their early 20s and 30s, would bypass procedural safeguards including pre-surgical clearances by parties not under their control and need for prior authorizations, and the decision to perform "emergency" surgery would be made by the very same clinical doctors the patients saw one or two counties over in the city; and, 2) as the only "safety net" hospital in the region, if a patient came in through the ER, NUMC ***must*** treat regardless of ability to pay (and regardless of Total Ortho,

COMPLAINT                                                                                           53

by design, having already been paid upfront or through a lien interest), including purchase of implants from which Total Ortho principles derived further profit.

184.    It is alleged that these Claimants so routed through the ER were provided with scripts to recite so as to move through the ER to the OR without issue.

185.    Upon information and belief, a similar system was in place at Mr. Sinai South Nassau, where Total Ortho Defendants frequently performed surgeries.

186.    If the patient *was* so previously authorized, the surgery would be steered to the self-owned Syosset Ambulatory Surgical Center, or other Ambulatory Surgical Centers with referral schemes in place, including ASC of the Rockaways, Hudson Regional, New Horizons (NJ), and others.

187.    On November 7, 2025, it was reported that, beyond Lerman, the entirety of Total Ortho spinal surgeons and surgeries at NUMC were under internal review, and NUMC was planning to investigate alternatives to the group and minimize Total Ortho's role moving forward.

188.    Defendant Lerman, as an orthopedic surgeon and a principal of Total Ortho, controlled and directed the medical services provided to Claimants by Total Ortho, including overseeing his employees in their evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

189.    Defendant Avanesov, as an orthopedic surgeon and a principal of Total Ortho, controlled and directed the medical services provided to Claimants by Total Ortho, including overseeing his employees in their evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

COMPLAINT                                                                                                    54

190.    Defendant Jeyamohan, as an orthopedic surgeon employed by Total Ortho, controlled and directed the medical services provided to Claimants by Total Ortho, including overseeing his employees in their evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

191.    Defendant Kumar, as an orthopedic surgeon employed by Total Ortho, controlled and directed the medical services provided to Claimants by Total Ortho, including overseeing his employees in their evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

192.    Defendant Burducea, as an physician and, upon information and belief, a principal of Total Ortho and earlier an employee of Total Ortho, controlled and directed the medical services provided to Claimants by Total Ortho, including overseeing his employees in their evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

193.    Defendant Apazidis, as an orthopedic surgeon and employee of Total Ortho from 2020-2023, and as principal of Alexios Apazidis, M.D. P.C., s/d/b/a Total Spine ("Total Spine") before and after 2020-2023, controlled and directed the medical services provided to Claimants by Total Ortho (and Total Spine outside that timeframe), including overseeing his employees in their evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

COMPLAINT                                                                                      55

194.    As operator and owner of Total Spine, prior to joining Total Ortho in 2020, Apazidis operated out of his own location, wherein he had reciprocal sub-rental agreements with non-parties Rutland Medical Clinic/Medical Now PC (owned on paper by Dr. Marvin Moy), primarily utilized Nexray Medical Imaging PC a/k/a Soul Radiology (owned on paper by Dr. William Weiner) for imaging, as well as had ongoing direct involvement with Arthur Bogoraz (husband of the principal attorney of Defendant Bogoraz Law). This is confirmed both by voluminous documentation filed on NYSCEF reflecting overlapping treatment with these providers,[3] public documents and arbitral awards, as well as expressly confirmed by first-hand witness accounts.



We are in receipt of your correspondence dated on June 18, 2019. This response incorporates many other responses between GEICO and counsel for Rutland Medical. In addition, this June 18th letter continues to reiterate the same information without adding anything to the previous responses for which GEICO is still seeking documents. Furthermore, counsel for Rutland continues to repeat the same objections without attaching the documentation they state they are attached. Rutland Medicals June 18th response attached Exhibit C that is supposedly the lease agreement between Rutland and Dr. Alexios Apazidis for the location at 951 Brook Avenue, Bronx, NY (see page 11 and 12 of Rutlands June 18th letter). However, Exhibit C is actually the lease between Medical Now, PC and Dr. Alexios Apazidis for the location at 200-01 Linden Boulevard, Saint Albans, NY 11412. Rutland Medical continues to respond to GEICOs requests by attaching the same responses that have previously been submitted. Counsel for Rutland is not providing the documentation that is being requested by GEICO.

Certificate of Incorporation
of

**MEDICAL NOW P.C.**

Pursuant to Section 1503 of the Business Corporation Law

SEVENTH:    The name(s) and address(es) of the individual (s) who is/are the original shareholder(s), officer (s) and director (s) of the Corporation is:

Marvin Moy
License #250526
157 Mott St.
New York, NY 10013

---

[3] As of December 30, 2025:
Apazidis & Rutland Medical: 678 documents (plus Apazidis & Moy: 138 documents).
Apazidis & Nexray: 1,421 documents (plus Apazidis & Soul Radiology: 212 documents).

COMPLAINT                                                                                     56

00:08:00 Speaker 1

I think it was kind of both because I knew the guy as well, Arthur Bogoraz.

00:08:07 Speaker 2

Yep.

00:08:08 Speaker 1

From when I was working with Apazidis and Apazidis knew him. So we were kind of both speaking to him, I guess. So. He was trying to do it, a favor or what have you. I don't know whether he was more on his side or not, but it was kind of. It was, you know, it was kind of. He was doing kind of a favor for both of us.

00:08:30 Speaker 2

OK. And you know, turning back to 2017 here and again, I know it's, you know going back eight years or so when he enters the agreement with you and ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ , I mean the connections with Moy and Weiner. Did those connections did come

with Apazidis into the practice? Was that already there, or did that come with you? And ▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ and I need to connect the dots.

00:09:06 Speaker 1

So this is something that... was introduced to me through somebody else. OK. But he started working very, you know, I got them, you know, introduced them. Doctor Moy and Dr. Apazidis and he started working very, very closely with them. I mean all they do is as you say, they're, they're looking for an orthopedic doctor. If you know, if they need your services and you want to go and provide those services and you know they spoke and he started working for them.

00:09:43 Speaker 2

I think he was at Rutland for a while, right? He was actually physically at the facility...

COMPLAINT                                                                                    57

> 00:09:50 Speaker 1
>
> I'm sorry?
>
> 00:09:51 Speaker 2
>
> And he was actually physically at the Rutland facility, right? Moy's clinic. He was actually doing work there physically for a period of time, right.
>
> 00:10:00 Speaker 1
>
> Yes, I mean, I think they had like 3 or 4 clinics that we were going to, some of them he was covering some of them I was covering but at the end of the day, you know he was the boss of the practice. He want to make all the decisions where he wants to go and who wants to work with. And yes, he chose to work with them and he was working with them. For a very long time.
>
> 00:10:30 Speaker 2
>
> Yeah, basically until it all came crashing down, but he dodged it.
>
> 00:10:37 Speaker 1
>
> Yeah, he did, actually. I personally think he did.

195.    Both Moy's clinic and Weiner's MRI facility were in fact controlled by a non-physician, Pierre, and as ultimately found by The Hon. Gardephe of the Southern District of New York on December 11, 2024, "[Arthur] Bogoroz also had a [*quid*] *pro quo* arrangement… in which Pierre referred patients from medical clinics he [controlled] to the Bog[oraz] law firm[4] in exchange for Bog[oraz] referring law firm clients to Pierre['s clinics] ..."

196.    Pierre, Bogoraz, Moy, and Weiner were all indicted in January 2022. Pierre, Bogoraz, and Weiner were in fact convicted; Moy purportedly disappeared in a boating accident while the case was pending.[5]

---

[4] Co-Defendant Bogoraz Law.
[5] https://nypost.com/2022/10/30/manhattan-md-charged-by-feds-vanishes-in-li-boat-accident/



197.    As part of the Fraud Scheme, Total Ortho Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to GNY and others involved in Claimants' personal injury lawsuits for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

198.    As part of the Fraud Scheme, Total Ortho Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

199.    As part of the Fraud Scheme, Total Ortho Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such claims and lawsuits.

COMPLAINT                                                                                              59

200.    Total Ortho Defendants knowingly profited from upfront payments from the Funding Defendants, liens, and referral streams for the alleged medical and diagnostic services rendered by Defendants Lerman, Leven, and/or any other employee/agent of Total Ortho, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

201.    Total Ortho Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendants Lerman, Leven and/or any other employee/agent of Total Ortho provided medical and diagnostic services and received reimbursement for such services.

### v.  McCulloch Defendants' Participation in the Fraud Scheme

202.    Since at least 2018, McCulloch Ortho has been involved in the medical treatment of numerous Claimants involving purported trip-and-fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme, both directly and through selective use of NY S&J.

203.    Defendant Capiola, as an orthopedic surgeon and employee of McCulloch Ortho, controlled and directed the medical services provided to Claimants by McCulloch Ortho, including evaluating, diagnosing, and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

204.    As part of the Fraud Scheme, McCulloch Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' personal injury lawsuits for authorization and to seek

COMPLAINT                                                                                        60

reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

205.    As part of the Fraud Scheme, McCulloch Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

206.    As part of the Fraud Scheme, McCulloch Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

207.    McCulloch Defendants knowingly profited from upfront payments from the Funding Defendants and liens for the alleged medical and diagnostic services rendered by Defendants McCulloch Ortho, Capiola, and/or any other employee/agent of McCulloch Ortho, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

208.    McCulloch Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Defendants McCulloch, Capiola, and/or any other employee/agent of McCulloch Ortho provided medical and diagnostic services and received reimbursement for such services.

COMPLAINT                                                                                    61

### vi. Clinic & Imaging Defendants' Participation in the Fraud Scheme

209.    The purpose of the Clinic & Imaging Defendants in the scheme was not to try and make anyone better. Their role in the scheme was to provide facially justifiable justification for excessive, unnecessary, increasingly invasive treatments and surgeries and to "unlock" various high-dollar treatment protocols and other surgeries through inflated, manufactured, and/misrepresented findings.

210.    The 410 Ditmas and CMI Defendants operate effectively a single operation. Following the same playbook of *Rainford* and *State Farm v. Tri-Borough*, after an initial evaluation of the Claimants by, in most instances, Brooklyn Med,[6] the Claimants would be immediately referred to CMI for numerous MRIs bearing no semblance to their initial complaints and would be prescribed physical therapy with Brooklyn Med, chiropractic treatment with NSF Chiro/Lebson, and acupuncture with Unicorn, usually 3x/week each, regardless of complaints.

211.    The MRI referrals to CMI would always include an MRI for the cervical and lumbar spine and either a knee, a shoulder, or both. Invariably, all reports prepared by CMI would contain purported conditions that were used to justify continued unnecessary treatment and referrals. CMI would omit any degenerative findings.

212.    The 410 Ditmas Clinic used these fraudulent imaging reports, but not the underlying imaging studies that either show degenerative conditions or fail to show any evidence of an acute injury. This was done to justify months of purported physical therapy sessions and injections for Claimants, which were in turn represented as being a course of allegedly failed conservative treatment in order to justify surgeries.

---

[6] If Salehin was not there that day, NSF Chiro/Lebson would perform the initial consultation with identical referrals and recommendations.

COMPLAINT                                                                                      62

213.    Post-MRIs, the Claimants were invariably referred to NSF Chiro for one or more EMGs, BAPM for neck or back injections (or both), and shortly thereafter, to Total Ortho Defendants for inevitable spinal surgery.

214.    NSF Chiro's EMG tests, regardless of clinically negative raw result data, would invariably provide not a diagnosis, but instead a generic, and typically unsupported, claim that the tests demonstrated "evidence of" radiculopathy.

215.    BAPM/Apple would provide between 1-3 injections, which invariably failed. The diagnoses offered by Apple would be virtually identical for every patient. The only difference between the vast majority of BAPM/Apple's reports are the date and patient name, followed by - in *each and every instance* - referral for spine surgery to Total Ortho.

216.    As part of the Fraud Scheme, 410 Ditmas Defendants employed dual- and multi-purpose employees who effectively operated as Runners by, among other things, steering Claimants to Liakas Firm and other affiliated firms. The 410 Ditmas Defendants further directly employed several Claimants, including Willie Wactor (508260/2020), Sherlon Roberts (529975/2021), Akmal Fazilov (516926/2017), Roxanna Cordero and Crissia Andino (513213/2016), and Crissia Andino again (510062/2019). Fazilov's job, for 30-36 hours a week - his *full-time job* - was to deliver papers between and amongst law firms and the clinic.





217.   The same non-physician family that "manages" the 410 Ditmas Clinic Defendants, also contains a non-physician brother who "manages" CMI, and another brother who is business partners with Defendant Avanesov of Total Ortho.

COMPLAINT                                                                                          64

218.    Notably, pursuant to prior testimony from Defendant Lerman, Defendant Salehin is an undisclosed owner in Total Ortho. This renders every referral from Brooklyn Med to Total Ortho at best self-interested, and at worst, in the case of Medicaid/Medicare patients, a violation of the Stark Law, 42 USC § 1395nn, as well as the Anti-Kickback Statute.

```
Q    How many partners are there?
A    There is three partners.
Q    Who are they?
A    Dr. Avanesov, Dr. Saleehin, Dr. Ruotolo and me.
```

219.    As part of the Fraud Scheme, 410 Ditmas Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' claims for authorization and to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

220.    As part of the Fraud Scheme, 410 Ditmas Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

221.    As part of the Fraud Scheme, 410 Ditmas Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Schwitzer Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging inflating the settlement value of such lawsuits.

222.    410 Ditmas Defendants knowingly profited from upfront payment from Funding Defendants and liens for the alleged medical and diagnostic services rendered by PPNY Defendants, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

223.    410 Ditmas Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom 410 Ditmas Defendants and CMI Defendants provided medical and diagnostic services and received reimbursement for such services.

224.    410 Ditmas Defendants, and its related individual Defendants, were not sought to treat; they were sought to issue causality statements and set the stage for ever-escalating and more invasive treatment to falsely substantiate serious injuries where none exist. Their primary purpose is paper for litigation and subsequent referral for unnecessary surgery.

225.    As part of the Fraud Scheme, CMI Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff, the Liakas Firm, and others to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

226.    As part of the Fraud Scheme, CMI Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants, Plaintiff, and others knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

227.    CMI knowingly profited from upfront payment from Funding Defendants and liens for the alleged medical and diagnostic services rendered by PPNY Defendants, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged workplace accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

228.    CMI Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom CMI and/or any other employee/agent provided medical and diagnostic services and received payment for such services.

229.    Premier and SMSR Defendants operated in similar fashion.

230.    Since at least 2018, Premier has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

231.    Premier essentially operates as an outpost of the Center for Musculoskeletal Disorders ("CMD"), a practice based out of New Jersey and Queens which has an identical set of physicians.

232.    Defendant Simhaee, as an orthopedic surgeon and a principal of Premier, controlled and directed the medical services provided to Claimants by Premier, including overseeing his employees in their evaluating, diagnosing and performing inflated examinations and treatments that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

233.    As part of the Fraud Scheme, Premier  Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' personal injury lawsuits for seek funding or to assert liens for

medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

234.    As part of the Fraud Scheme, Premier Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

235.    As part of the Fraud Scheme, Premier Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

236.    Premier Defendants knowingly profited from upfront payments from the Funding Defendants and liens for the alleged medical and diagnostic services rendered by Simhaee and/or any other employee/agent of Premier which were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

237.    Premier Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud, for whom Premier Defendants, and/or any other employee/agent of Premier provided medical and diagnostic services and received reimbursement for such services.

238.    Since at least 2019, SMSR has been involved in the medical treatment of numerous Claimants involving purported trip-and-fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

COMPLAINT                                                                                           68

239.    SMSR operates under the "Musculoskeletal Resources Injury Doctors" ("MSR") umbrella. MSR is in fact owned and operated by Health Plus Management, LLC ("HPM"), a non-physician owned, non-professional limited liability company. HPM itself was acquired by a private equity firm, InvestCorp., in January 2019.



240.    That same year, and no later than October 2, 2019, HPM perfected its secured interest in SMSR's entire accounts receivable, less Medicaid/Medicare funds; *i.e.*, the very lien receivables and funding flows at issue herein.[7]



241.    HPM further provides the marketing, capital, staffing, backroom office functions, HR, payroll, recruiting, intake, and scheduling. Importantly here, HPM also provides the referral network, including specifically "medical and legal referral sources." Having the ultimate right to

---

[7] The relationship between HPM and SRSM (as well as non-party PMR of NY) extends back to at least 2005.

the income stream in addition to controlling nearly all aspects of the business effectively renders HPM in control of the professional corporation and turns the on-paper owner into an employee. In other words, providers like SMSR become a "doc-in-a-box," allowing private equity to access income streams and business ownership of entities they are, in fact, excluded and prohibited from under New York State law.

242.    The owners or members of a professional corporation or PLLC must be professionals who are licensed to practice the profession. New York BCL § 1503; LLC §§ 1203, 1204. An individual not licensed within the same profession as the professional corporation may not engage in the practice of the profession, or exercise control or ownership of such entity either directly or by proxy. BCL §§ 1504, 1508; LLC §§ 1203, 1207, 1209.

243.    HPM is an institutional-grade, private equity-operated violation of these laws.



244.    This scheme is not new.[8] The policy concern therein is prioritization of profits over patient care and the commonplace overbilling and fraud such arrangements engender. These

---

[8] https://nypost.com/2000/07/16/clinics-paying-5000-a-year-for-rent-a-docs-med-mills-get-no-show-pros-to-act-as-fronts/

concerns are not misplaced. Such facilities, including not just SMSR but also 410 Ditmas and CMI Defendants, are designed to execute rote protocol schemes and maximize billing.

245.    And indeed, HPM maintains a separate "concierge" branding and website, through which they market their pipeline to personal injury attorneys.

> Musculoskeletal Resources represents an expansive network of musculoskeletal practices boasting 50 locations and over 100 providers, including board-certified and fellowship-trained physicians and licensed physical therapists. These professionals are not only experts in personal injury care but are also well-versed in the intricacies of accident injury claims and the legal aspects of personal injury cases.
>
> Through our Concierge, you gain a dedicated, centralized team committed to enhancing your case management efficiency. With a simple call, our team can expedite access to the physicians we support. Need an appointment? A physician expert to testify? **Consider it done!** We support your administrative needs, allowing you to focus on legal responsibilities while our supported providers ensure your clients receive the best possible medical care for their injuries.

246.    In other words, HPM offers a one-stop shop, effectively owned and in fact operated by private equity, where self-referrals and overtreatment are treated as a selling point.

247.    Defendant Geraci, as physician and employee and/or principal of SMSR, controlled and directed the medical services provided to Claimants by SMSR, including overseeing employees in their evaluating, diagnosing, and performing inflated examinations and treatments that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

248.    As part of the Fraud Scheme, SMSR  Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others involved in Claimants' personal injury lawsuits for funding or to assert liens for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

COMPLAINT                                                                                            71

249.    As part of the Fraud Scheme, SMSR Defendants provided fraudulent medical documentation by mail, facsimile and/or email to other medical service providers knowing that the fraudulent medical documentation would be used or relied upon to render and/or facially justify additional medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

250.    As part of the Fraud Scheme, SMSR Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants, Plaintiff, and others, knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

251.    SMSR Defendants knowingly profited from upfront payments from the Funding Defendants and liens for the alleged medical and diagnostic services rendered by Geraci and/or any other employee/agent of SMSR which were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

252.    SMSR Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud, for whom SMSR Defendants, and/or any other employee/agent of SMSR, provided medical and diagnostic services and received reimbursement for such services.

253.    Since at least 2018, AcceleRad has been involved in the medical treatment of numerous Claimants involving purported trip and fall injuries in furtherance of and as a necessary step for the execution of the Fraud Scheme.

COMPLAINT                                                                                          72

254.    Defendant Prakash, as a radiologist and a principal of AcceleRad, controlled and directed the medical services provided to Claimants, who were referred to AcceleRad by each of the McCulloch Ortho, Total Ortho, and Liakas Defendants and others known and unknown at various times, by providing radiological and imaging diagnostics and MRI reports identifying purported positive findings that are thereafter relied upon by treating providers to justify procedures irrespective of the fact that so-called "abnormal" findings were intentionally misleading, false, manufactured, or otherwise not consistent with the MRI films themselves.

255.    Notably, AcceleRad is a continuation of Precision Radiology, a practice previously owned and operated by perpetual RICO defendant Kolb and his former partner Lichy (who affirmed under oath Kolb had been altering MRI reports to benefit and grow his personal injury clientele). It operates out of the same building and maintains the same employees, including the same custodian of records.

256.    Like its predecessor, AcceleRad rents office space that **does not actually house an actual MRI machine with which to actually perform testing.**

257.    MRIs (or other tests) are performed somewhere else at an undisclosed facility by an undisclosed technician, and the study is subsequently sent to Precision AcceleRad for review and report, almost universally by Dr. Siddharth Prakash. This has been the case since at least 2016. While AcceleRad relies on these "Excess Capacity Agreements," the lack of disclosure as to actual facility that performed the tests, *who* performed the tests, and the actual origination of the images, leaves Precision AcceleRad as having never legitimately authenticated an MRI.

COMPLAINT                                                                                    73

> 13.    PRECISION operated out of the same offices used by LK at 222 East 68th Street, New York, New York 10065. Because LK's facilities do not contain MRI equipment, PRECISION, in accordance with federal and state law, entered into "Excess Capacity Agreements" with various entities ("Excess Capacity Providers") that owned and operated MRI facilities which were not being utilized on a full-time basis. Pursuant to these agreements, PRECISION paid the Excess Capacity Providers for technicians' time and "table time." Each MRI study was then subsequently forwarded to PRECISION for its review and written analysis.

258.    As part of the Fraud Scheme, AcceleRad Defendants intentionally submitted or caused the submission of fraudulent medical documentation by mail, facsimile and/or email to Plaintiff and others to seek reimbursement for medical services that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident.

259.    As part of the Fraud Scheme, AcceleRad Defendants provided fraudulent medical documentation by mail, facsimile and/or email to Liakas Defendants knowing that the fraudulent medical documentation would be used to falsely bolster and add value to Claimants' personal injury lawsuits, thereby prolonging litigation and inflating the settlement value of such lawsuits.

260.    AcceleRad knowingly profited from upfront payments from the Funding Defendants and liens for the alleged medical and diagnostic services rendered by Prakash and/or any other employee/agent of AcceleRad, that were unnecessary, excessive, unwarranted and/or costly, and were not causally related to the alleged accident but were rendered in furtherance of and as a necessary step for the execution of the Fraud Scheme.

261.    AcceleRad Defendants also knowingly profited from the increased number of patients who were referred to them as part of the Fraud Scheme, for whom Prakash and/or any

COMPLAINT                                                                      74

other employee/agent of AcceleRad and RadNet provided medical and diagnostic services and received reimbursement for such services.

### vii. Miscellaneous Defendants' Participation in the Fraud Scheme

262.    Each Miscellaneous Defendant is a RICO Conspiracy (§ 1962[d]) Defendant.

263.    Defendant Cohen, a neurosurgeon, controlled and directed the medical services provided to Claimants, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

264.    As set forth at further length in the *Union Liakas* Action, despite being the head of neurosurgery at Brooklyn Hospital Center (located where the majority of the Claimants either lived or fell, and which has an ambulatory surgical center) and being affiliated with Weill Cornell (with facilities within New York City), Cohen consistently sends Claimants to Hudson Regional Hospital in New Jersey to perform surgeries, pursuant to, upon information and belief, a financial compensation arrangement with Hudson Regional. Ex. 1, ¶ 101.

265.    Here, the relevant Cohen surgeries occurred in 2023 and 2025 and similarly took place in New Jersey with no explanation for same – particularly notable given the Freeport location of the relevant Claimants. The relevant surgeries here took place at CareWell Health Medical Center in East Orange, New Jersey ("CareWell"), similarly a private for-profit hospital. Cohen agreed to, and knowingly engaged in, conduct in furtherance of the Enterprise through knowingly unnecessary surgeries.

266.    Defendant Chaudhary, a surgeon, controlled and directed the medical services provided to Claimants, including evaluating, diagnosing and performing surgeries that were unnecessary, excessive, unwarranted, and/or costly and not causally related to the alleged accident, but were performed pursuant to the fraudulent treatment protocol and Fraud Scheme.

COMPLAINT                                                                                                    75

267.     Defendant ESASC, an ambulatory surgical center, knowingly agreed to, and did, engage in and further the scheme through facilitating knowingly unnecessary surgeries, often with knowingly false, exaggerated, or impossible-in-context paperwork generated by its own staff, arranging logistics regarding such knowingly unnecessary surgeries, and falsifying purported imaging as set forth in detail, *infra*.

268.     Defendant Bogoraz Law continued, and in fact accelerated, the Fraud Scheme Enterprise in the stead of Liakas Defendants in the matters of, at least, Claimants B and C. Bogoraz Law directly controlled the treatment of these Claimants to fraudulently inflate their purported value through knowingly unnecessary surgeries in continued coordination with Funders, Runners, Co-Defendant Apazidis, and others known and unknown.

## VI.     DEFENDANTS' PATTERN OF RACKETEERING ACTIVITY

269.     In addition to the activity described above, the Count I and Count IV Defendants engaged in the following activities in furtherance of the Fraud Scheme Enterprise, and where applicable the Liakas Firm Enterprise, with the cooperation, assistance, agreement, facilitation, and furtherance of the schemes by Count III and Count V Defendants, all of which directly damaged Plaintiff:

### i.     Claimant A

270.     Claimant A/Defendant Sone alleged a purported trip and fall on June 15, 2020, on a raised sidewalk flag located in the Bronx, New York. Sone arrived in the U.S. from the Dominican Republic in August 2019. Claimant A's relevant records are attached as **Exhibit 5-A**.

271.     Claimant A's sister and Claimant A's relative, both of whom are part of the Sone wheel depicted in ¶ 11, each resided in Freeport, New York. Claimant B, whom Claimant A shared

three different Bronx addresses with,[9] also previously resided in Freeport – at an address shared with a documented staged accident no-fault fraud ring (appropriately labeled the "Freeport Ring," consisting of nineteen individual claimants, independent from the rings identified herein),[10] as also shared with Claimant D herein, and also shared with the relative of "Claimant B" from the *Union Liakas* Action/Tavarez wheel (who had a purported fall one month after Sone/Claimant A, was represented by Liakas, and underwent surgery by Total Ortho and McCulloch Ortho):



272.    There were no witnesses to the accident. There was no video footage of the accident. Claimant A did not go to the hospital, and the facts as alleged are virtually identical to the same claims made by virtually every person in Claimant A's orbit, including "Runner 1" Defendant Tavarez, Claimant A's sister and Claimant A's relative, and virtually everyone he has lived with since arrival in the U.S.

273.    Claimant A's sister, Pamela Sone de Duran, was represented in her own case, purportedly arising from a trip and fall in December 2019, by Rolnik-affiliated referral recipient Barry Woolfson, with a Complaint filed one month before Claimant A in March 2021.[11]

---

[9] Each such address also shared with a different roommate who was a Claimant represented by William Schwitzer & Associates (503062/2018; 505589/2023; 526221/2020), the former shared with a Subin Claimant (802585/2024E) and a Roytblat Claimant (807428/2024E), and the latter two shared with Claimant C and yet another trip-and-fall claimant (520452/2022, <u>arrived in US November 2021, accident date May 2022</u>, **and testified Claimants A and C were with him at the time of his fall**).

[10] *See* 600724/2024, *American States Insurance Company et al. v. M.A. Duran Ramirez et al.*

[11] 505159/2021.

274.    Upon information and belief, the source of such belief stated above, specifically the consistency with similar instances involving other Claimants with virtually identical allegations with virtually indistinguishable red flags, the proximity of Claimant A's sister's case, the relationship with Defendant Tavarez ("Runner 1") and others similarly situated, it is alleged that Claimant A's purported accident was concocted by an associated runner and referred to Liakas *via* Rolnik. Without discovery, same cannot be documented despite due diligence by Plaintiff, with information necessary to establish same unavailable and in the sole possession of Liakas Defendants, Rolnik, and Claimant A/Sone.

275.    Four days following the alleged accident, on June 19, 2020, Claimant A signed a Power of Attorney in favor of Liakas Firm.

276.    Having not sought treatment since the date of accident, three days after retaining Liakas, Claimant A sought treatment with a surgeon, Capiola, at McCulloch Ortho. Claimant A testified that an unidentified family friend told him what kind of doctor he needed, and then Claimant A researched and located McCulloch (at EBT: "I Googled him") – who happens to be the same provider with similar findings and surgeries on dozens of other Liakas Claimants and similar Rolnik referrals.

277.    The medical record for this initial evaluation was digitally signed by Defendant Capiola, but the examination was performed by Eric LeClair, PA, with no distinction as to what, if any, role Capiola had in the evaluation. Claimant A reported to PA LeClair that while running and playing basketball, he tripped and fell on an uneven sidewalk flag. He complained to PA LeClair of left foot and right shoulder pain. There was no mention of low back pain.

278.    On **July 31, 2020, less than <u>two months after the purported accident</u>,** the following picture was posted on Sone's social media:[12]



Claimant C.          Claimant B.          Claimant A.

279.    The above picture contains eleven people and at least twelve injury lawsuits.

Q.    And is it a photograph of yourself with friends at a bar?

A.    Yes.  We were celebrating a soccer tournament we won.

Q.    And that is dated July 31st of 2020, sir?

A.    I don't know.  I wouldn't be able to tell you the exact date.

Q.    Sir, are you up on the bar laying on your right side?

A.    Yeah.  I'm supporting my arm on the side of my friend back there.

---

[12] Also pictured: Waldy Perez (702696/2023, trip and fall, Liakas representation); Eliezer Ortiz Leonardo (505589/2023, commercial MVA, Schwitzer; prior 501814/2017, 502556/2018); Johan Miguel Perez Rodriguez (517510/2023, same incident and medical providers as Claimants B & C; also 723041/2024, 723041/2024)

COMPLAINT                                                                                        79

280.    Claimant A returned to McCulloch Ortho on August 25, 2020. Again, the note was digitally signed by Defendant Capiola, but the examination was performed by PA LeClair, with no distinction as to what, if any, role Capiola played in the evaluation.

281.    LeClair informed Claimant A that his right shoulder MRI demonstrated a SLAP tear and increased signal consistent with partial rotator cuff tear/tendinosis.

282.    Claimant A was offered either (1) a corticosteroid injection or (2) a right shoulder surgery, the latter being recommended because of "MRI findings [and] failure of conservative treatment," without any significant conservative treatment having occurred.

283.    The MRI findings were that of supraspinatus tendinosis; fraying of the superior labrum consistent with a Type 1 SLAP lesion; no significant tendinosis of the intraarticular portion of the biceps tendon; and no tearing of the rotator cuff.

284.    Despite the findings on Sone's right shoulder MRI showing no rotator cuff tearing and no mention of any labral tears, approximately six weeks later, on October 15, 2020,[13] Defendant Capiola performed surgery on Claimant A's right shoulder at Defendant ESASC. The records are devoid of any indication that Capiola actually examined Sone.

285.    The surgical findings claimed on the operative report are incompatible with the imaging studies performed:

| Structure | MRI Report | Operative Report | Inconsistency |
|---|---|---|---|
| Anterior and Posterior Labrum | No mention of tearing | Tearing of the anterior and posterior labrum | Found tearing of the anterior labrum and posterior labrum and flap components. MRI noted none of these. |
| Superior Labrum | Fraying consistent with Type 1 SLAP lesion | Claimed extensive tear | Found "significant flap tear with positive peel-back." MRI noted none of this. |

---

[13] Notably the same day Capiola performed another right shoulder surgery on an Elefterakis Claimant, Damon Jannelli – who required a revision surgery from a different surgeon less than 2 months later.

| Rotator Cuff | Supraspinatus, infraspinatus, subscapularis and teres minor showed no tear | Rotator cuff partial tearing | Undersurface of rotator cuff demonstrated partial tearing as well [as the labrum]. MRI noted no tearing of the rotator cuff. |
|---|---|---|---|
| Biceps | No significant tendinosis of the intraarticular portion of biceps tendon; no significant tenosynovitis of the biceps tendon in the bicipital groove | Biceps tenosynovitis with significant flap tear with a positive peel-back sign | MRI report states there is no significant tendinosis or tenosynovitis let alone a flap tear; Op report finds significant flap tear. |
| Shoulder Impingement | No mention | Impingement/ decompression | MRI has no mention of impingement. |

286.     The report was dictated four days after the surgery itself. Notably, arthroscopic pictures taken during the procedure do not reveal any rotator cuff tear.

287.     The report is effectively identical to the reports Capiola generated as to Claimants E and F, *infra*, down to the exact same size instrumentation of a 2.9mm BioComposite PushLock. The purportedly extensive procedure was completed from incision to closure in just twenty-seven minutes.

288.     Later independent medical examination of Claimant A and independent review of Claimant A's medical records, MRI reports, and intraoperative photos found that "neither the MRI report nor the intraoperative photographs identify instability of the superior biceps labral complex," and further that the tear seen only on the intraoperative photograph is "typically a degenerative finding and one that is unrelated to a specific trauma":

COMPLAINT                                                                                           81

> With respect to the right shoulder, neither the MRI report nor the intraoperative photographs identify instability of the superior biceps labral complex. The photograph does identify a flap tear involving the superior labrum, which would be consistent with a type I SLAP lesion. This is typically a degenerative finding and one that is unrelated to a specific trauma. Based on the intraoperative photographs, I am unable to corroborate the medical necessity to perform a superior labral repair. I would respectfully request

289.    Independent review of the right shoulder MRI films, in conjunction with the above, provided the following in flatly finding the procedure medically unnecessary:

> **DISCUSSION:** The additional medical records include the MRI study of the right shoulder performed on 08/18/20. The study does not demonstrate evidence of traumatic internal derangement. The intraoperative photographs from the surgery performed on the right shoulder on 10/15/20 by Dr. David Capiola identify a type 1 SLAP lesion, which represents a degenerative fraying of the superior labrum without detachment of the biceps labral anchor. As such, performance of a 'repair' for a type 1 SLAP lesion is medically unnecessary.

290.    In creating the multitude of falsified reports regarding Claimant A purporting to support, with no objective sign of injury on date of accident, that continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, McCulloch Ortho and Capiola knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

291.    Such transmissions were in fact made on March 8, 2024, when Empire State Ambulatory Surgical Center emailed such knowingly false records to Plaintiff's medical records agent, constituting a violation of 18 U.S.C. § 1343.

292.    On October 1, 2020, Claimant A had a new patient visit at Defendant Premier with non-party Vagmin Vora for his complaints of back pain. Vora noted that Claimant A did <u>not</u>

COMPLAINT                                                                                   82

complain of any radicular symptoms in the lower extremities, of any gait instability, and has yet to undergo physical therapy:

> CC: low back pain
> HPI: the patient hurt his back while playing basketball on June 6, 2020. The patient tripped and fell and injured his back. the patient went home after the fall. He does not complain of any radicular symptoms in the lower extremities. He has full control over his bladder and bowel. he does not complain of any gait instability.
> He has undergone physical therapy for his lower back with some benefit. He has not undergone any pain management injections. He did undergo an MRI of the lumbar spine.

293.    Vora further noted that Claimant A's lumbar MRI showed only evidence of disc degeneration at L5/S1. This was the only noted MRI finding. At that first visit, and despite the above, Vora stated that Claimant A *may* be a candidate for posterior lumbar decompression instrumentation fusion *L5/S1* if he failed nonsurgical treatment.

294.    Claimant A presented for a new patient visit to Defendant Premier with Defendant Simhaee for pain management on October 9, 2020. Contradicting Vora from eight days earlier, Simhaee claimed Claimant A had exhibited radicular symptoms to his lower extremities.

295.    At follow-up visits with Vora on November 16, 2020, and January 18, 2021, Defendant Vora cloned the medical records from Claimant A's initial visit on October 1, 2020. The only change was the inclusion of Claimant A having undergone one lumbar epidural steroid injection. The claim was intractable lower back pain.

296.    Meanwhile:



(NYSCEF Index #: 505589/2023)

Commercial MVA, Schwitzer

Elieser Ortiz Leonardo
January 1, 2021 · 🌐

— with Jose Sone.

297.    On January 27, 2021, Claimant A was seen by Defendant Apazidis at Total Ortho with complaints of low back pain, despite purportedly going to PT three times per week.

298.    However, Claimant A's initial physical therapy evaluation with non-party Physical Medicine & Rehabilitation ("PMR") was **also purportedly performed that same day, January 27, 2021**.

299.    Of note, PMR is part of the MSR/HPM/InvestCorp "doc-in-a-box" scheme. The UCC statement perfecting HPM's interest in PMR's accounts receivable was filed three days prior to Defendant SMSR:



300.    Defendant Apazidis reviewed Claimant A's lumbar MRI and Claimant A's initial examination from October 1, 2020, where Vora had stated that Claimant A may be a candidate for posterior lumbar decompression instrumentation fusion *L5/S1* if he failed nonsurgical treatment. Apazidis's purported findings are entirely incongruous with the prior notations, focusing on purported issues at L4-5. Apazidis's notation also provided that at L4-L5, an EMG would be useful for clinical correlation.

301.    Regardless, on February 3, 2021, <u>without having performed such EMG</u>, Defendant Apazidis performed an L4-L5 laminectomy and posterior lateral fusion with hardware.

COMPLAINT                                                                                      84

302.     **The justification given on January 27, 2021 when recommending this surgery was that "Plaintiff has not responded to medical management or therapy" - which as above, Claimant A had started** *that very day.*

303.     On Claimant A's surgery scheduling sheet with Defendant All City Healthcare, the procedure is listed as "Funded – Liakas Law – NL@LiakasLaw.com":



304.     The intake/demographic information identified similar:



305.     Upon information and belief, the NL@LiakasLaw.com address belongs to Defendant N. Liakas, who had no other involvement in the matter beyond All City documentation as having funded the surgery.

306.     Despite being listed as a "Sea Spine" surgery, the hardware utilized was in fact from the Total Ortho-interested Amendia/Spinal Elements:

> • Findings
> 63047 L4 laminectomy
> 63048 L5 partial laminectomy
> 22612 L4-5 posterior lateral fusion
> 22840 nonsegmental instrumentation with Clutch Plate System by Amendia

307.    Indication given day of surgery was failure to respond to multiple injections and failure to respond to physical therapy. *Claimant A had started physical therapy a week prior and at best had a single injection.* Billing records indicate Apazidis received a $10,000 "carve-out" payment to perform such surgery on February 8, 2021, within a week of his first appointment with Claimant A, with knowingly false justification for surgery.

308.    Upon a review of Claimant A's actual diagnostic imaging, an independent peer reviewer opined as follows:

> **DISCUSSION:**
> Based on the images I reviewed, the claimant had degenerative disc disease at L4/5 and L5/S1 with facet tropism and bulging discs. The facet tropism was a preexisting condition, which can lead to lower back pain, unrelated to the accident of record. Bulging discs are seen in asymptomatic patients.

309.    Independent radiological review of Claimant A's cervical MRI, lumbar MRI, and left foot MRI, finding solely degenerative conditions unrelated to the alleged accident:

> It is my opinion, with a reasonable degree of medical certainty based on all of the information provided to me to date, that Mr Sone-Martinez findings on this imaging study are all degenerative in nature, not related to the traumatic event of 6/15/2020.
>
> It is my opinion, with a reasonable degree of medical certainty based on all of the information provided to me to date, that Mr Sone-Martinez findings on this imaging study are all degenerative in nature, not related to the traumatic event of 6/15/2020.
>
> Scattered joint degenerative changes of the forefoot and midfoot, greatest at the first TMT articulation.
>
> It is my opinion, with a reasonable degree of medical certainty based on all of the information provided to me to date, that Mr Sone-Martinez findings on this imaging study are all degenerative in nature, not related to the traumatic event of 6/15/2020.

COMPLAINT                                                                                        86

310.    Boiled down to the key point, Defendant Apazidis performed an entirely unwarranted and unnecessary surgical spinal fusion at L4-L5, in a 35-year-old patient with at best degenerative conditions at L5-S1, for justification contradicted by his own records, and severely contradicted by every other record available, in an operation performed within a week of meeting and as, pursuant to facility records, funded by Claimant A's attorneys.

311.    In creating the multitude of falsified reports regarding Claimant A purporting to support, with no objective sign of injury on date of accident, that continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, Total Ortho Defendants and Apazidis knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

312.    Such transmission was in fact made on May 26, 2022, when Total Ortho faxed such records to Plaintiff's medical records agent, constituting a violation of § 1343 as a necessary step in furtherance of the Fraud Scheme; and again on April 4, 2024, when All City Family Healthcare electronically transmitted such knowingly false records *via* Sharefile to Plaintiff's medical records agent, constituting a violation of § 1343. These transmissions directly caused Plaintiff damages in the form of litigation costs and actionable expenses in reviewing, defending, and in discovering the truth underlying the representations therein, as well as costs, expenses, and other damages directly caused by the Fraud Scheme itself for which the transmission was in furtherance.

COMPLAINT                                                                                                    87

313.    Notably, pursuant to later review by another Total Ortho physician, the surgery resulted in failed union and segmental instability.[14] Follow up CT demonstrated the continued existence of a disc protrusion, raising a question as to what precisely Apazidis even did during the surgery other than insert a device to which Total Ortho had an interest:

> Impression: 4 views of the lumbar spine reviewed including AP, lateral, flexion-extension radiographs demonstrating status post L4-L5 interspinous clamp.  No evidence of facet or posterior lateral bony fusion.  there does appear to be intersegmental motion at the L4-L5 level with questionable loosening of the orthopedic hardware,  concern for pseudoarthrosis

> L4-L5
> Disc bulging with a broad-based central disc protrusion. Normal facet joints. No spinal canal or foraminal stenosis.

314.    It is all the harder to say when the third page of the four-page report, which contains the portion of the procedure detailing what was in fact done, is missing from every single copy of every operative report stored at Total Ortho and All City, and even at trial has never been located.

315.    Notably, much of the above was premised on Prakash of AcceleRad's July 1, 2020, read of a purported June 27, 2020, MRI (and a later September 2020 read purportedly referred by a doctor Claimant A did not see), which had findings no other provider interpreted with even close proximity to such findings, even amongst Claimant A's own physicians. As demonstrated *infra*, as well as within similar actions to which Prakash and AcceleRad are named Defendants, this was knowingly overcalled so as to justify unnecessary surgery.

---

[14] Notably, every other provider mentioned Claimant A was a smoker; Apazidis universally marked him a non-smoker. "It has been clearly demonstrated from both a biochemical and clinical perspective that smoking increases the rate of perioperative complications for patients undergoing spinal fusion surgery, **particularly pseudoarthosis**." Berman D, Oren JH, Bendo J, Spivak J. *The Effect of Smoking on Spinal Fusion*. Int J. Spine Surg. 2017 Nov 28;11(4):29. doi: 10.14444/4029. PMID: 29372133; PMCID: PMC5779238.

316.    Prakash and AcceleRad knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1). AcceleRad in fact transmitted such documentation through web upload on or about January 27, 2021, to Total Ortho, in violation of § 1343.

317.    Claimant A's case proceeded to trial in October 2025. Notably, Plaintiff testified at trial that he was disabled to the point he was unable to put on his underwear without assistance.

318.    The trial resulted in a total defense verdict. Within one month thereof:





NYSCEF Index #: 817177/2024E (Subin)

COMPLAINT                                                                              89

319.    On April 5, 2021, Dean Liakas verified and filed a Verified Complaint on behalf of Claimant A, alleging directly and under penalty of perjury, and not "upon information and belief," that Claimant A "was severely injured, bruised and wounded, suffered, still suffers and will continue to suffer for some time physical pain and bodily injuries and became sick, sore, lame and disabled and so remained for a considerable length of time," and "was compelled to and did necessarily require medical aid and attention" as a result of the events of June 15, 2020, wherein Claimant A sought no medical treatment for a week and it is alleged no injury was suffered, if any such trip and fall occurred at all.

320.    On March 9, 2022, at the direction of Liakas Defendants, Matthew Kerner of Liakas Firm verified and mailed a Verified Bill of Particulars on behalf of Claimant A, alleging Claimant A suffered various injuries to his cervical spine, lumbar spine, right shoulder, left ankle, and left foot as a result of the result of the purported accident, as a necessary step in furtherance of the scheme.

321.    As the Liakas Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the verified documents mailed to Plaintiff and/or Plaintiff's retained counsel in the underlying matter were knowingly false and mailed in furtherance and as a necessary step in the Fraud Scheme.

322.    Sone had obtained funding from FC-1, facilitated by Liakas Defendants.

### ii.      Claimants B & C

323.    Claimant B's relevant records are attached as **Exhibit 5-B**.

324.    Claimant C's relevant records are attached as **Exhibit 5-C.**

325.    Claimants B & C, along with non-exemplar Claimant Johan Miguel Perez Rodriguez ("JMP Rodriguez"), alleged to have sustained injuries stemming from a motor vehicle accident which occurred on May 7, 2021.

### *Prior, Subsequent, and Related Claims*

326.    Claimant B, alongside two other Claimants who are documented to have been prior roommates with him, were in a purported motor vehicle accident on November 17, 2018, which resulted in claims brought by non-party William D. Schwitzer & Associates. One of whom is a current roommate at the same address as Claimant A (Sone) and has recently brought another virtually identical claim under Index #: 807428/2024E.

327.    Liakas Defendants took over that representation on May 7, 2020. It was alleged Claimant B suffered disc bulges from L3-S1 and C5-6 and underwent a lumbar epidural, a cervical trigger point injection, as well as suffered left shoulder, wrist, ankle, and knee injury. Notably, later peer review of the MRI films in that matter revealed no signs of any pathology or injury, whatsoever.

328.    The carrier on the above action successfully moved for disclaimer of no-fault benefits as to the above action after Claimant B repeatedly failed to appear for his repeatedly noticed Examination Under Oath.

329.    Claimant B also had a purported trip and fall of his own, alleged to have occurred on August 23, 2022, originally brought by Omrani & Taub, who was substituted by non-Party Bogoraz Law Group.

330.    Claimant B resided at the exact same three addresses in the Bronx during the relevant timeframe as Claimant A. Claimant C resided with them at two of the three addresses.

331.    JMP Rodriguez is, upon information and belief, the source of such belief being public records, the brother of Claimant C. In addition to the shared accident claim with Claimants

COMPLAINT                                                                                                      91

B and C, JMP Rodriguez also had a subsequent standing height sidewalk trip and fall, purportedly on January 24, 2024, which was brought and is presently being prosecuted by non-party Ross & Hill under Index #: 723041/2024.

332.    JMP Rodriguez's *wife also* has a trip-and-fall case arising from a purported stairwell fall on November 3, 2022, which was brought and is presently being prosecuted by non-party Harmon Linder under Index #: 710434/2024.

333.    Claimant C also separately shared an address with multiple other Claimants, including:

a.   Aaliyah Perez Rodriguez, the ***sister*** of JMP Rodriguez and Claimant C, Index #: 701027/2023, brought by non-party Elefterakis, Elefterakis & Panek (taken over later by Erik Ikhilov), arising from a purported commercial vehicle accident on May 4, 2022. At just 21 years old, and four months post-"accident" in September 2022, she underwent a C5-6 anterior cervical diskectomy and fusion – **by Defendant Apazidis**, after following the rote 410 Ditmas protocol (Brooklyn Medical -> NSF Chiro and Unicorn -> CMI MRI -> failed Apple injections -> NSF Chiro "evidence of" radiculopathy -> spinal referral) **and presenting to the emergency room at NUMC two counties away**;

b.   Yoany Perez Rodriguez, brother-in-law of JMP Rodriguez and Claimant C, Index #: 519473/2020, alleging a standing height sidewalk trip and fall on February 7, 2020, brought by Cherny & Podolsky, taken over by Subin and then subsequently Erik Ikhilov;

c.   Rosa Tiburcio-Luna, a/k/a "Claimant G" from the Union/Liakas Complaint (who similarly was represented by Liakas for a purported trip and fall on March 7, 2020, underwent a right shoulder by Capiola at Empire Ambulatory Surgical Center approximately twenty days after Claimant A, and also underwent a spinal fusion);

d.   Albert Contreras Lamar, Index #: 724042/2023, claimed commercial vehicle accident involving rental Penske vehicle "sideswipe," who purportedly required a right shoulder surgery, left knee surgery, a C5-6 cervical fusion, and a lumbar laminectomy at L4-L5-S1 (the other passenger, Jose Miguel Florentino Cruz, incredibly, purportedly required a left knee surgery, a C5-6 cervical fusion, and a lumbar laminectomy at L4-L5-S1, all by the same providers);

COMPLAINT                                                                                                    92

e.   Americo Duran, whom State Farm filed a declaratory judgment action against for purportedly having staged his subject accident (and who testified he was in fact living in Freeport at EUO; 617703/2024); and

f.   Sorangel Saldana, Index #: 539670/2025, brought by non-party Marc DeSalvo, who has also been the recipient of Rolnik referrals.

334.   Claimant C himself had a prior purported standing height sidewalk trip and fall alleged to have occurred on February 11, 2020 (four days after his brother-in-law's accident, *supra*), which was brought by the Liakas Firm. Claimant C attended Brooklyn Medical after "one of his friends" referred him there. Claimant C testified he received treatment for his neck, back, and right knee. Without identifying the specific locations other than the 410 Ditmas Clinic, Claimant C told a familiar tale of immediate prescription for PT 3x/week, sent to another facility for an MRI, two failed injections, referral to a spine "specialist" for "two bad discs" and ultimately a lumbar surgery "in Long Island," presumably NUMC, in June 2020 – as did sister Aaliyah, four months post-"accident." Claimant C was nineteen years old at the time.

335.   The above matter was taken over by three subsequent law firms, ultimately staying with Defendant Bogoraz Law.

336.   Claimant C recently filed a new action in 2025, arising from another purported August 2024 commercial motor vehicle accident, represented by Harmon Linder.

### *Subject "Accident" – Claimant B*

337.   In providing HIPAA authorizations in the subject underlying suit, Liakas Firm forwarded a previously signed Power of Attorney dated August 15, 2019, from Claimant B's prior 2018 accident.

338.   In providing HIPAA authorizations in the subject underlying suit, Liakas Firm forwarded a previously signed Power of Attorney dated February 13, 2020, from two days after Claimant C's prior 2020 trip and fall.

339.    The police report from the subject motor vehicle accident describes a side swipe on the right passenger side of the vehicle Claimant B was purportedly riding in, driven by Claimant B's friend and Claimant C's relative, JMP Rodriguez, one of the defendants in the subject lawsuit and who pursued his own lawsuit, happening to treat with entirely the same providers.

340.    The police report notably listed Claimant C as a passenger and JMP Rodriguez as the driver, but **there is nothing documenting Claimant B's presence in the vehicle**. The underlying defendant driver, a CDL holder since 1980 with zero prior accidents, provided a contemporaneous statement that a) Claimant B/C/JMP Rodriguez's vehicle sped into his rear quarter panel as he changed lanes and b) he described observing "both" (2) vehicle occupants getting out of their vehicle (no observation of third person).

341.    Claimant B's Hospital ER records note complaints of bilateral knee pain, chest pain, and left-sided neck pain with no radiation into his extremities. He had full range of motion and no neck stiffness, no swelling or bruising. The sole indication of any injury was a subjective complaint of neck tenderness. His complaint was ultimately summarized as "body achiness."

342.    Despite later claims on September 15, 2021, to Total Otho that he was unconscious for three minutes and subsequent testimony given at EBT on June 5, 2024, that he was unconscious until he arrived at the hospital (and later in testimony, that he was unconscious until EMTs arrived), Claimant B reported in the ER no loss of consciousness.

343.    X-rays taken in the ER of Claimant B's bilateral knees were negative, with no joint effusion and no abnormal soft tissue. Medical records note he was "ambulating with a steady gait."

344.    Despite the lack of objective evidence of any injury or limitation whatsoever on date of accident, Claimant B underwent no less than five (5) surgeries: a cervical fusion performed on October 28, 2021, by Defendant Jeyamohan (Total Ortho); a left knee surgery on May 19, 2023,

COMPLAINT                                                                                                94

performed by non-party Howard Baum ("Baum") at All City; a posterolateral lumbar spine fusion on July 3, 2023, performed by Defendant Apazidis at All City; a left wrist surgery on October 2, 2023, performed by Defendant Apazidis at All City; and a left shoulder surgery on December 11, 2023, performed by Defendant Apazidis at Health East Medical Center.

345. Claimant B attempted to go to 410 Ditmas the following day, but they would not commence treatment without a police accident report. Despite the fact that both Claimant C and JMP Rodriguez treat at 410 Ditmas and Claimant C had previously treated there, Claimant B testified his friend Juan Carlos Mejia recommended him (while Claimant C testified that his friend Christian, who he has known for a long time but does not know his last name, referred him).

346. Of note regarding Claimant B's first treatment date at 410 Ditmas:



```
     Q      Did he also recommend you to an
attorney?
     A      Right there they recommended an
attorney to me.
     Q      Right where, at Ditmas Avenue?
     A      Yes.
     Q      When you went to Ditmas Avenue, did
Juan Carlos Mejia go with you?
     A      Yes.
     Q      What attorney did they recommend to
you?
     A      I don't remember.
     Q      Did you sign up with that attorney?
     A      Yes.
```

347. Also consistent with the Fraud Scheme, when asked as to why he stopped going to 410 Ditmas (original attorney was Liakas Firm):

> Q       Have you stopped going there or do you still go there sometimes?
>
> **A       No, I have not returned again.**
>
> Q       Why did you stop going there?
>
> **A       Because they are no longer my attorneys.**
>
> Q       So your original attorney was connected with the Ditmas Avenue place and when you changed attorneys you stopped going there?
>
> **A       Yes.**

348.    The 410 Ditmas providers claim to have no records of Claimant B's treatment.

349.    In August of 2021, Claimant B underwent a cervical spine MRI at Defendant CMI, which purportedly identified a C3/4 herniation at the left lateral canal and disc bulges at C3/4 through C6/7.

350.    On September 15, 2021, Claimant B presented to Defendant Total Ortho, where his ultimate coded diagnosis was degeneration of C3-4 and C4-5.

351.    Jeyamohan performed an anterior cervical discectomy and fusion on Claimant B on November 28, 2021, at C4-5. Notably, no fault is listed as a full write-off as a manual arbitration adjustment, denoting the claim for payment was denied and the carrier prevailed at arbitration.

352.    As to the recommendation to Total Ortho, Claimant B testified as follows:



> Q       Sir, who recommended you for surgery for your neck?
>
> **A       On Ditmas Avenue.**

353.    In creating the multitude of falsified reports regarding Claimant B purporting to support continuing and escalating treatments and, ultimately, unnecessary surgeries in a claimant

COMPLAINT                                                                                          96

with no objective sign of injury on date of accident, Jeyamohan and Total Ortho knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

354.    Such transmissions were in fact caused to be made on March 17, 2022, when Total Ortho transmitted such knowingly false records regarding knowingly unnecessary treatment to Plaintiff's medical records agent *via* fax, constituting a violation of § 1343.

355.    The remainder of the surgeries occurred after Claimant B changed attorneys multiple times, ultimately landing at Defendant Bogoraz Law. Notably, Claimant B not only explicitly testified that Bogoraz herself recommended the surgeries, but that Apazidis worked for Bogoraz:

```
Q       What surgery did you have next?
A       Left knee.
Q       Who recommended you to have left
knee surgery?
A       Here at the attorney Bogoraz.
```

```
Q       Sir, your back, who recommended you
for a back surgery?
A       Bogoraz.
```

COMPLAINT                                                                                    97

Q        Your left wrist, sir, who recommended that you have surgery on your left wrist?

A        **Bogoraz.**

Q        How many doctors did the surgery?

A        **One on Ditmas, which is not from here. The other one was from here, Bogoraz.**

Q        The neck, that was from the Ditmas facility and the other four were from the Bogoraz facility; right?

A        **Yes.**

Q        Other than Ditmas, did you have any treatment to your back?

A        **Here from Bogoraz.**

Q        Sir, as a result of the injuries you claimed to have suffered on May 7, 2021, did you take prescription medication?

A        **I have taken, yes, but I'm not one to take medication.**

Q        Who prescribed medication for you?

A        **The doctor.**

Q        What doctor, sir?

A        **From Bogoraz.**

COMPLAINT                                                                98

356.    The left knee surgery by non-party Baum is of equal caliber. An MRI taken by a non-defendant provider on September 2, 2022, of the left knee a) was taken post-subsequent trip and fall, in part explaining the freshly acute findings (bone contusion, sprain, etc.) and b) found as follows, including effectively intact structures of the knee including the meniscus:

**INTERPRETATION:** There is bone contusion with marrow edema ventrally within the lateral tibial plateau.

There is sprain of the ACL which is diffusely thickened and edematous approaching distal insertion.

Lateral patellar tilt. Insertional tendinosis, distal quadriceps tendon. There is trace fluid within the knee joint.

Osseous signal and morphology are, otherwise, unremarkable. The medial meniscus, the lateral meniscus, the medial and lateral collateral ligaments, the posterior cruciate ligament, and patellar tendon are, otherwise, unremarkable.

**IMPRESSION:**

- Bone contusion with marrow edema ventrally within the lateral tibial plateau.

- Sprain of the ACL which is diffusely thickened and edematous approaching distal insertion.

- Lateral patellar tilt. Insertional tendinosis, distal quadriceps tendon. Trace fluid within the knee joint.

357.    Regardless, on May 19, 2023, Baum performed a surgery detached from any form of legitimate justification or rational connection to diagnostics:

PREOPERATIVE DIAGNOSIS: Internal derangement of the left knee.

POSTOPERATIVE DIAGNOSES:
1. Anterior horn of medial meniscal tear.
2. Fat pad impingement secondary to medial and lateral parapatellar adhesions.
3. Three-compartment hypertrophic synovitis.

| Baum (5/19/2023) | MRI (9/2/2022) |
|---|---|
| "Tear of anterior horn of medial meniscus" + performs meniscectomy | No tears at all identified. "Medial meniscus…unremarkable." |
| "Fat pad impingement secondary to medial and lateral parapatellar adhesions" and "three-compartment hypertrophic synovitis." | Not identified at all. "Trace fluid." |
| "No chondral issues." | Bone contusion lateral tibial plateau. |
| "ACL intact." | Diffusely thickened. |

358.   The purported left knee operative report is not possible to square with the diagnostics. Incredibly, Baum claimed to have performed all of the following **in what facility records document – in more than one location - <u>was an *eight-minute surgery.*</u>**



359.   Notably, Baum's operative report has no date as to when it was signed. Baum also performed his initial consultation with Claimant B on May 9, 2023 – just ten days prior to performing surgery – and attributed the cause to the August 2022 trip and fall, not the subject car accident.

COMPLAINT                                                                                              100

360.    Another MRI was performed on September 2, 2022, which further erodes the viability of Apazidis's justification for, and purported findings during, a posterolateral fusion performed on July 3, 2023.



**MAGNETIC RESONANCE IMAGING OF THE LUMBAR SPINE**

**TECHNIQUE:** Multiplanar, multisequential MRI was performed in the recumbent position on a high-field 3 Tesla magnet.

**HISTORY:** The patient complains of lower back pain radiating to bilateral legs causing numbness, weakness and difficulty walking.

**INTERPRETATION:** Lumbar lordotic curvature is maintained.

At L3-4, posterior annular disc bulge flattens the ventral thecal sac.

At L4-5, posterior annular disc bulge deforms the ventral thecal sac.

At L5-S1, posterior subligamentous disc bulge deforms the ventral epidural space and abuts the traversing S1 nerve roots. Mild facet hypertrophic changes contributing to foraminal narrowing.

Examination otherwise demonstrates the remaining lumbar vertebral bodies and intervertebral discs to be unremarkable in height and signal. The conus medullaris is unremarkable in signal, morphology and position. No focal prevertebral or posterior paraspinal abnormal masses or altered signals are otherwise noted.

**IMPRESSION:**

- L3-4 posterior annular disc bulge flattens the ventral thecal sac.
- L4-5 posterior annular disc bulge deforms the ventral thecal sac.
- L5-S1 posterior subligamentous disc bulge deforms the ventral epidural space and abuts the traversing S1 nerve roots. Mild facet hypertrophic changes contributing to foraminal narrowing.

Thank you for referring your patient to us for evaluation.

361.    Claimant B did not treat with Apazidis when initially treated with Total Ortho in 2021. However, consistent with the pre-existing relationships described *supra*, at ¶¶ 193-196, Claimant B commenced treatment with Apazidis over two years post-accident, after the Bogoraz Law Group took over representation of the matter in 2023.

362.    Apazidis saw Claimant B for consultation on June 19, 2023 – a **telehealth** consultation. Unlike Baum, Apazidis made no mention of the intervening August 2022 trip and fall, and attributes complaints to the 2021 subject MVA. There was no reference to any diagnostics or EMG testing.

COMPLAINT                                                          101

363.    As with Claimant A, despite every other provider noting the Claimants' tobacco use (smoking), Apazidis lists "never smoker." This is not harmless oversight. "It has been clearly demonstrated from both a biochemical and clinical perspective that smoking increases the rate of perioperative complications for patients undergoing spinal fusion surgery, particularly pseudoarthosis."[15]

364.    **Claimant B was scheduled for a lumbar fusion with no documented MRI review, with clinical testing including range of motion** *via* **a video chat (at best), and with no documented evidence of radiculopathy.** The basis given was "patient who has failed 2 years of nonsurgical care with worsening back pain," with zero documentation as to what that two years of purported treatment consisted of.

365.    Once again, Apazidis was compensated *via* litigation finance, source unknown.



366.    No UCC has ever been filed memorializing these advances.

367.    The lumbar surgery on July 3, 2023, was purportedly justified due to "**disc herniation, low back pain, lumbar radiculopathy, lumbar spinal stenosis.**" This is the same

---

[15] Berman D, Oren JH, Bendo J, Spivak J. *The Effect of Smoking on Spinal Fusion*. Int J. Spine Surg. 2017 Nov 28;11(4):29. doi: 10.14444/4029. PMID: 29372133; PMCID: PMC5779238.

verbatim justification given in fifteen other surgeries in fifteen other patients, in which Apazidis purportedly performed the verbatim same operation, with the verbatim same <u>purportedly individualized findings</u>, changing only name, date, level, implant size, and occasionally laterality of nerve root – including, had the third page not been omitted in every and all copies of it, Claimant A's procedure, as well as:

| <u>Claimant</u> | <u>Surgery Date</u> | <u>Attorney</u> | <u>State</u> |
|---|---|---|---|
| Keion Charles | 12/16/2022 | Oleg Smylar **(Bogoraz Counsel)** | NJ |
| Cy Mingo | 11/29/2021 | **Bogoraz Law** | NY |
| Mirielle Mathieu-Royal | 11/3/2022 | **Bogoraz Law** | NJ |
| Latashia Adger | 2/16/2023 | **Bogoraz Law** | NY |
| Ian Davey | 3/11/24; 5/9/24[16] | Afruz Akhundova **(Bogoraz Counsel)** | NJ |
| Shawna Levy | 5/13/2024 | **Bogoraz Law** | NJ |
| Hernan Cuenca | 7/8/2024 | **Bogoraz Law** | NJ |
| Dane Plummer | 10/25/2022 | Khavinson & Mandronico | NY |
| Nicole Sutton | 12/7/2021 | Gabriel Law Firm | NY |
| Cassidy Ekweremuba | 5/10/2021 | Paul Schietroma | NY |
| Jose Benites | 6/13/2024 | Liakas | NJ |
| Issa Hamden | 1/18/2022 | Elefterakis Elefterakis & Panek | NY |
| Carlos Toribio | 4/13/2021 | Schwitzer & Associates | NJ |
| Kevin Prince | 2/8/2022 | Harmon Linder | NY |

---

[16] Apazidis purportedly performed two separate operations at the same level, the second added a fusion to the same level just six (6) weeks after the first. The **operative report prior to the fusion portion remained identical despite having purportedly done the same work six weeks prior, including removal of ligamentum flavum from the same level (<u>non-regenerative</u> tissue).**

COMPLAINT                                                                 103

368.    By way of example:

| Toribio (5/5/22) | Davey (5/9/24) | Claimant B (7/3/23) |
|---|---|---|
| draped the patient using sterile techniques. We then performed a surgical time-out procedure in accordance with hospital policy verifying antibiotics given within 60 minutes of incision. We then utilized fluoroscopic imaging to mark out the access for the L4-5 level. This was done bilaterally. The level was infiltrated with Marcaine with epinephrine. We then incised through the skin and dissected to the lumbosacral fascia. The L4-5 spinous processes were identified and verified by fluoroscopic guidance. Once I had verified that we were at the appropriate level, I then incised through the lumbosacral fascia and dissected out to the facet joints and transverse processes on the left. Once we had skeletonized the bony surfaces and performed the dissection necessary, a deep retractor was placed. Deep retractor was placed and we began the decompression portion of the surgery. | draped the patient using sterile techniques. We then performed a surgical time-out procedure in accordance with hospital policy verifying antibiotics given within 60 minutes of incision. We then utilized fluoroscopic imaging to mark out the access for the L4-5 level. This was done bilaterally. The level was infiltrated with Marcaine with epinephrine. We then incised through the skin and dissected to the lumbosacral fascia. The L4-5 spinous processes were identified and verified by fluoroscopic guidance. Once I had verified that we were at the appropriate level, I then incised through the lumbosacral fascia and dissected out to the facet joints and transverse processes bilaterally. Once we had skeletonized the bony surfaces and performed the dissection necessary, a deep retractor was placed. Deep retractor was placed and we began the decompression portion of the surgery. | We then prepped and draped the patient using sterile techniques. We then performed a surgical time-out procedure in accordance with hospital policy verifying antibiotics given within 60 minutes of incision. We then utilized fluoroscopic imaging to mark out the access for the L5-S1 level. This was done bilaterally. The level was infiltrated with Marcaine with epinephrine. We then incised through the skin and dissected to the lumbosacral fascia. The L5-S1 spinous processes were identified and verified by fluoroscopic guidance. Once I had verified that we were at the appropriate level, I then incised through the lumbosacral fascia and dissected out to the facet joints and transverse processes bilaterally. Once we had skeletonized the bony surfaces and performed the dissection necessary, a deep retractor was placed. Deep retractor was placed and we began the decompression portion of the surgery. |
| Utilizing Leksell rongeur, pituitary rongeur and Kerrison rongeurs, the ligamentum flavum, was elevated and divided at the L4-5 disc level. We used fluoroscopic guidance to verify the disc level we were at. Working through our approach, the ligamentum flavum was elevated and divided. We identified the dural tissues. Care was taken to protect them during the decompression. We removed portions of the L5 lamina as well as the L4 lamina in order to fully expose the space as well as have better access to the disc space. Once we had fully removed bone as well as ligamentum flavum and fully accessed the epidural space and identified the dural elements, we then mobilized dural elements identified the disc space. There was herniated material in the area of the disc space impinging on the traversing L5 nerve root on the left. There was a rent or tear in the posterior annulus there which appeared the herniated material had come. This was removed utilizing a Kerrison as well as a pituitary rongeur. I then traced out the traversing L5 nerve roots on the left and verified that they had a full decompression throughout their path. Otherwise the remaining posterior annulus of the disc appeared to be intact and decision was made that patient would not require and intervertebral spacer device as he did maintain a good disc height. Once I verified that I had a good decompression, then moved onto the hemostasis portion of the surgery. | Utilizing Leksell rongeur, pituitary rongeur and Kerrison rongeurs, the ligamentum flavum, the supraspinous ligament, and the intraspinous ligaments were elevated and divided at the L4-5 disc level. We used fluoroscopic guidance to verify the disc level we were at. Working through our approach the ligamentum flavum was elevated and divided. We identified the dural tissues. Care was taken to protect them during the decompression. We removed portions of the L5 lamina as well as the L4 lamina in order to fully expose the space as well as have better access to the disc space. Once we had fully removed bone as well as ligamentum flavum and fully accessed the epidural space and identified the dural elements, we then mobilized dural elements identified the disc space. There was herniated material in the area of the disc space impinging on the traversing L5 nerve roots bilaterally. There was a rent or tear in the posterior annulus there which appeared the herniated material had come. This was removed utilizing a Kerrison as well as a pituitary rongeur. I then traced out the traversing L5 nerve roots bilaterally and verified that they had a full decompression throughout their path. Otherwise the remaining posterior annulus of the disc appeared to be intact and decision was made that patient would not require and intervertebral spacer device as he did maintain a good disc height. Once I verified that I had a good decompression, moved onto the fusion portion of the surgery. | Utilizing Leksell rongeur, pituitary rongeur and Kerrison rongeurs, the ligamentum flavum, the supraspinous ligament, and the interspinous ligaments were elevated and divided at the L5-S1 disc level. We used fluoroscopic guidance to verify the disc level we were at. Working through our approach, the ligamentum flavum was elevated and divided. We identified the dural tissues. Care was taken to protect them during the decompression. We removed portions of the L5 lamina as well as the S1 lamina in order to fully expose the space as well as have better access to the disc space. Once we had fully removed bone as well as ligamentum flavum and fully accessed the epidural space and identified the dural elements, we then mobilized the dural elements and identified the disc space. There was herniated material S1 in the area of the disc space impinging on the traversing S1 nerve roots bilaterally. There was a rent or tear in the posterior annulus there in which appeared the herniated material had come from. This was removed utilizing a Kerrison as well as a pituitary rongeur. I then traced out the traversing S1 nerve roots bilaterally and verified that they had a full decompression throughout their path. Otherwise the posterior annulus of the disc appeared to be intact and decision was made that patient would not require and intervertebral spacer device as he did maintain a good disc height. Once I verified that I had a good decompression, we then moved onto the fusion portion of the surgery. |

369.    The above, and the repeated instance of "herniated material in the area of the disc

space" and a "rent or tear in the posterior annulus there which appeared the herniated material had

come," is of particular note where **Claimant B was never documented to have a herniation nor was he ever documented to have stenosis or radiculopathy.**

370.    The left wrist surgery was following another MRI taken September 2, 2022, by the same provider, which a) was a post-subsequent trip and fall and b) found the following:

> **INTERPRETATION:** The ECU tendon is perched on the ulnar styloid and demonstrates tendinosis/tendinopathy.
>
> Carpometacarpal articulation at the base of the thumb demonstrates joint space narrowing due to cartilage loss and spurs lining the joint margins. There is trace fluid within the prestyloid recess.
>
> Osseous signal and morphology are otherwise unremarkable. There is no other evidence of significant effusion or focal mass or altered signal in the soft tissues. The radial and ulnar collateral ligaments and the area of the triangular fibrocartilage appear otherwise unremarkable. Flexor retinaculum is otherwise intact and there is no evidence of abnormal fluid in the superficial or deep flexor compartment.
>
> **IMPRESSION:**
>
> - The ECU tendon is perched on the ulnar styloid and demonstrates tendinosis/tendinopathy.
>
> - Carpometacarpal articulation at the base of the thumb demonstrates joint space narrowing due to cartilage loss and spurs lining the joint margins.
>
> - Trace fluid within the prestyloid recess.

371.    Regardless, on October 2, 2023, Defendant Apazidis performed a left wrist surgery detached from any semblance of legitimate justification or rational connection to diagnostics:

| Apazidis Op Report    (10/2/2023) | MRI (9/2/2022) |
|---|---|
| POSTOPERATIVE DIAGNOSES:<br>1. TFCC TEAR<br>2. SYNOVITIS<br>3. FOREIGN BODY<br>4. SCAPHOID BONE OSTEOCHONDRAL LOSS<br>Notably, within op report, scaphoid cartilage/lunate cartilage were "in good condition." | 1. "TFCC appear otherwise unremarkable."<br>2. No synovitis identified. "No other evidence of significant effusion."<br>3. "No other evidence of… focal mass."<br>4. "Osseous signal and morphology are otherwise unremarkable." No scaphoid osteochondral defect described. |
| "Suggestive of TFCC injury. An MRI did in fact show a tear." | It plainly did not. |

372.    Prior to the surgery, Apazidis consulted with Claimant B on September 22, 2023. He once again attributed the purported injury to the subject 2021 MVA without reference to the

2022 trip and fall. Once again, the justification is given that "patient [] failed nonsurgical care," with no documentation as to what that nonsurgical care was, this time with an MRI review which consisted, in its entirety, of the following analysis:

> MRI: left wrist - cartilage damage

373.    On October 9, 2023, an MRI was performed on Claimant B's left shoulder, which a) was post-subsequent trip and fall accident and b) found the following:

> **INTERPRETATION**: The supraspinatus tendon is bulbous and inhomogeneous extending toward its anterior leading edge and distally representing tendinosis/tendinopathy where there is obscuring of the adjacent peritendinous fat. There is distal subscapularis tendinosis/tendinopathy.
>
> Anteriorly down sloping type II acromion extends to abut the underlying supraspinatus.
>
> There is localized involvement of intracapsular long head of biceps tendinosis/tendinopathy at its critical zone. There is some fluid in its tendon sheath.
>
> There is some fluid also accumulating in the subacromial bursa representing bursitis.
>
> There is a focal linear superior labral tear at 12 o'clock location in proximity to the labrocartilaginous junction, extending toward the inferior surface of biceps anchor but not through it.
>
> There is paucity of synovial fluid at the glenohumeral articulation.
>
> Examination otherwise demonstrates the osseous structures of the shoulder to be otherwise unremarkable in signal and morphology. Muscular and tendinous structures including remaining portions of the rotator cuff are also felt to remain otherwise unremarkable in signal and morphology.

374.    Notably absent from the above is any documented rotator cuff tear, any acromioclavicular joint instability or degeneration, or evidence of extensive synovitis (and indeed, a *paucity* of synovial fluid in the glenohumeral articulation). There is documented a "focal linear *superior* labral tear."

375.    On December 11, 2023, Apazidis purportedly performed left shoulder surgery on Claimant B at Health East Medical Center in New Jersey. In doing so, Apazidis purportedly:

COMPLAINT                                                                                  106

a. *removed a section of Claimant B's clavicle* justified by that the joint was "unstable with significant osteophytes and degeneration," *none of which is documented* on the MRI from the month before;

b. found significant synovitis in the glenohumeral compartment, which *was not documented* on the MRI from the month before, which when removed, purportedly revealed an *anterior* labral tear, *which was not documented* on the MRI the month before;

c. purportedly repaired a supraspinatus tear, *which was not documented* on the MRI the month before; and,

d. found the remainder of the labrum intact, including the superior labrum, where a focal tear *was documented* on the MRI from the month before.

> inflamed synovium observed. Synovitis of the glenohumeral compartment was debrided exposing an anterior labral tear. The capsule was noted to be severely inflamed with adhesions and limited caspulorphy was performed with the arthrocare coblation device to reduce the adhesions and free the joint for greater mobilization.

> the remaining labrum was probed and found to be intact.

> I then inspected the supraspinatus and subscapularis tendons. The subscapularis tendon was intact throughout its length; however, there was a partial thickness tear of the supraspinatus tendon. The shaver was used to debride devitalized portion of the supraspinatus tendon which was debrided back to healthy tissue. Care was taken not to damage the remaining rotator cuff. I then switched off the shaver for the ArthroCare system. The ArthroCare system was used to apply thermal shrinkage technique to supraspinatus tendon and resolved the interstitial component of the tears. After the debridement, the remaining rotator cuff was probed and found to be intact. It was firmly fixed to the tuberosity after the debridement. Once I

> a range of motion and no impingement was seen. The acromioclavicular joint was noted to be unstable with significant osteophytes and degeneration of the joint surface. The burr was used to remove the distal clavicle and reduce the malarticulation of the joint.

COMPLAINT                                                                                                    107

376.    The above is *incompatible* with the month-prior MRI – and the *fourth* surgery by Apazidis on Claimant B with no semblance of justification or credibility. Further, intra-op arthroscopy photographs taken during the procedure do not demonstrate the purported rotator cuff tear or labrum tear.

377.    Defendant Apazidis made use of interstate facilities with the intent to further, and in fact furthered, a bribery, extortion, and the Fraud Scheme, in performing a manufactured shoulder surgery on Claimant B at Health East Medical Center in New Jersey, with knowingly false justification, in violation of 18 U.S.C. § 1952.

378.    In travelling to New Jersey to perform a knowingly unjustified surgery, and availing himself of New Jersey's laws, Apazidis subjected himself to the legal and regulatory schemas of New Jersey, which are specifically, as a matter of public policy, aimed at combatting insurance fraud.

379.    In creating the multitude of falsified reports regarding Claimant B purporting to support, in a claimant with no objective sign of injury on date of accident, that continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, Apazidis knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

380.    Such transmission was in fact caused to be made on April 29, 2024, when Health East Medical Center emailed billing records generated from such knowingly false records and knowingly unnecessary treatment to Plaintiff's medical records agent, constituting a violation of § 1343.

COMPLAINT                                                                                                108

381.    Such transmission was in fact caused to be made on May 22, 2024, when Total Ortho emailed such knowingly false records of knowingly unnecessary treatment to Plaintiff's medical records agent, constituting a violation of § 1343.

382.    Such transmission was in fact caused to be made on May 28, 2024, when All City transmitted such knowingly false records of knowingly unnecessary treatment to Plaintiff's medical records agent *via* sharefile, constituting a violation of § 1343.

### *Subject "Accident" – Claimant C*

383.    In connection with Claimant C's prior lawsuit against the City of New York, he testified at his 50-H Hearing that he sustained injuries to his back and right knee and made complaints of pain to his right knee, low back, right shoulder and neck in the ER of Jamaica Hospital following the alleged accident



384.    In that earlier case, Claimant C testified that he went to Brooklyn Medical the following day, where he was referred to by "a friend." In relation to the earlier case, Claimant C ultimately received lumbar surgery by Total Ortho in June 2020. Claimant C further previously injured his left shoulder in September 2019 when playing soccer.

385.    This time around, Claimant C was similarly treated with the 410 Ditmas providers, CMI, and ultimately a cervical fusion through Total Ortho performed by Jeyamohan. Claimant C also had shoulder surgery by Apazidis, for which no Supplemental Bill of Particulars was provided and no records were produced.

386.    This purported date of accident was May 7, 2021. On May 12, 2021, Claimant C had an initial evaluation with Brooklyn Med. On May 13, 2021, Claimant C underwent an "Initial Cupping Examination" at Unicorn with Wang at 410 Ditmas. On May 17, 2021, Claimant C had an initial consultation with NSF Chiro.

387.    At deposition in the subject case, Claimant C claimed he was referred to the 410 Ditmas clinic by his long-time friend, Christian, although he could not remember Christian's last name.

388.    Claimant C denied ever treating at 410 Ditmas for his prior claim under oath at the subject EBT, which was false.

389.    Claimant C further testified that he had no prior injuries to his neck, left shoulder or left knee, which is also false.

390.    Despite no initial examination for PT, Claimant C purportedly commenced PT on May 17, 2021, with Brooklyn Med. For one such purported appointment, JMP Rogriguez signed instead of Claimant C, and the appointment is crossed out.



COMPLAINT                                                                 110

391.    On identical dates of PT, Claimant C purportedly also underwent treatment at NSF Chiro. The noted levels of problematic discs are noted in sporadic and arbitrary-appearing fashion for each date of treatment:



392.    There is similarly an occurrence of JMP Rodriguez signing for an appointment, which is apparently marked off a month later.

393.    Within two weeks of commencing at 410 Ditmas, on May 26, 2021, Claimant C was sent to Defendant CMI for an MRI, as ostensibly read by Defendant McDonnell. The report claimed a diffuse disc bulge with midline herniation at C5-6, with no indication of any nerve compression, stenosis, instability/listhesis, or any pathology of the facet joints – *i.e.*, nothing that would justify total removal of a vertebral disc and instrumented fusion, even as overcalled by CMI.

COMPLAINT                                                                                                              111

> **FINDINGS:** The vertebral bodies are unremarkable. The cord is unremarkable. The posterior elements are unremarkable. There is no asymmetry of the paraspinal musculature. C1 ring and skull base are unremarkable. Limited visualization of the brainstem and cerebellum appears unremarkable. There is no paravertebral abnormality.
>
> There is prominent straightening of the cervical lordosis. There is no fracture or listhesis. There are no endplate changes. Facet joints are unremarkable.
>
> The dens is unremarkable.
>
> C2-C3: There is no central or foraminal stenosis.
>
> C3-C4: There is a disc bulge. There is no stenosis.
>
> C4-C5: There is a diffuse disc bulge.
>
> C5-C6: There is a diffuse disc bulge. A protrusion/herniation is noted at the midline. There is slight elevation of a posterior longitudinal ligament.
>
> C6-C7: There is a diffuse disc bulge. There is no stenosis. A herniation is seen at the left lateral canal.

394.    A June 18, 2021 EMG provided by NSF Chiro provided the standard "evidence of" radiculopathy "impression," as opposed to a clinical or diagnostic finding or diagnosis.

395.    Consistent with the rote protocol, Jeyamohan and Total Ortho later used this entirely baseless finding of "evidence of" C5-6 to "confirm[] the diagnosis" and justify needless surgery.

> We discussed the nature of this condition including non-operative and operative treatment options. Given the lack of response to activity modification, analgesics, physical therapy for more than 3 months and injections with excellent, but unfortunately short-term, relief, he is a candidate for surgical intervention. EMG's also consistent with pathology from C5-6 confirming the diagnosis.

396.    BAPM's records reflected the standard rote protocol failure of three injections by Apple on June 3, 2021, June 29, 2021, and August 19, 2021. Further notable from the August 19, 2021 report is **a completely normal neurological exam**.

COMPLAINT                                                                                  112

NEUROLOGIC EXAM:
Strength: 5/5 Bilateral in the upper extremities.
Sensation: Intact bilateral in the upper extremities.
Reflexes: Biceps R-normal L-normal
            Brachioradialis R-normal L-normal
            Triceps R-normal L-normal
Hoffmann's Sign: Negative.
Lhermitte's Sign: Negative.

PROVOCATIVE TESTS:
Spurling's Test: Negative.
Cervical Distraction Test: Negative.
Extension and lateral rotation: Negative Bilateral.

397.    On August 20, 2021, Claimant C presented to his one consultation with Total Ortho and Jeyamohan. Despite Claimant C purportedly receiving the third cervical epidural the day before and reporting the epidurals gave him approximately 80% relief between two days and a week, Jeyamohan rated a current complaint of 9/10 pain. Notably, Total Ortho's chart reflects the MRI and EMG testing records, which were purportedly relied upon in making the surgical recommendation, but the records were not received by Total Ortho until August 23, 2021, which is three days after the consultation occurred.

398.    On September 7, 2021, 21-year-old Claimant C underwent a C5-6 ACDF by Defendants Jeyamohan and Kumar at Bayonne Medical Center in New Jersey (although at EBT he testified Apazidis performed this surgery). The operative report was purportedly dictated at midnight ten days later, with template fields still left blank.

Once the space was appropriately sized, the cage was packed with local autograft as well as allograft and placed into the space and tamped in. A plate was then placed over the cage and secured with one screw above and one screw below _____ respectively. The screws were finally tightened. Final fluoroscopic images showed all instruments to be in good position. Signals were stable.

399.    Upon information and belief, the source of such belief being the pattern and past practice of these surgeons (as previously described) and the description of the instrumentation, the implant used was a Total Ortho-interested Amendia/Spinal Elements Ceres-C:

COMPLAINT                                                                113



- which is indicated solely for treating degenerative conditions, not trauma, at a single level.

**INDICATION**
The Ceres-C Stand-Alone Cervical System is a stand-alone anterior cervical interbody fusion device indicated for use in skeletally mature patients with degenerative disc disease (DDD) with accompanying radicular symptoms at one level from C2-T1. DDD is defined as discogenic pain with degeneration of the disc confirmed by history and radiographic studies. These patients should have had six weeks of non-operative treatment. The Ceres-C Stand-Alone Cervical implant should be packed with autograft or allogenic bone graft comprised of cancellous and/or corticocancellous bone graft and implanted with an anterior approach.

**CONTRAINDICATIONS**
3.   This device is not intended for use except as indicated.

400.    Defendants Jeyamohan, Kumar, and Total Ortho made use of interstate facilities with the intent to further, and in fact furthered, the Fraud Scheme, including bribery and extortion, in performing a manufactured and unnecessary cervical fusion on Claimant C at Bayonne Medical Center in New Jersey, with knowingly false justification, in violation of 18 U.S.C. § 1952.

401.    In travelling to New Jersey to perform a knowingly unjustified surgery, and availing themselves of New Jersey's laws, Jeyamohan, Kumar, and Total Ortho subjected themselves to the legal and regulatory schemas of New Jersey, which are specifically, as a matter of public policy, aimed at combatting insurance fraud.

COMPLAINT                                                                              114

402.    In creating the multitude of falsified reports regarding Claimant C purporting to support, in a claimant with no objective sign of injury on date of accident, that continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, Wang, Unicorn, BAPM, Apple, Jeyamohan, Total Ortho, CMI, McDonnell, Salehin, and Brooklyn Med knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

403.    Such transmission did in fact occur on August 17, 2022, when Unicorn e-mailed such records of BAPM, Apple, CMI, McDonnell, Salehin, and Brooklyn Med, as a necessary step in furtherance of the Fraud Scheme, to Plaintiff's medical records agent, in violation of 18 U.S.C. § 1343.

404.    Such transmission did in fact occur on May 5, 2022, when CMI sent such records of CMI and McDonnell *via* fileshare, as a necessary step in furtherance of the Fraud Scheme, to Plaintiff's medical records agent, in violation of 18 U.S.C. § 1343.

405.    Such transmission did in fact occur on August 7, 2025, when Total Ortho sent such records of Total Ortho, Jeyamohan, and Kumar *via* fileshare, as a necessary step in furtherance of the Fraud Scheme, to Plaintiff's medical records agent, in violation of 18 U.S.C. § 1343.

406.    These transmissions directly caused Plaintiff damage in the form of litigation costs and actionable expenses in reviewing, defending, and in discovering the truth underlying the representations therein, as well as costs, expenses, and other damages caused by the Fraud Scheme for which the transmission was in furtherance.

COMPLAINT                                                                                              115

407.    Notably, as to JMP Rodriguez's related case, he:

a.    Treated with the 410 Ditmas Defendants;

b.    Received MRIs from CMI and McDonnell;

c.    Saw Total Ortho and Jeyamohan once on August 27, 2021, and subsequently underwent a C6-7 ACDF by Jeyamohan and Kumar on September 17, 2021.[17]

408.    Claimant B's and C's subject lawsuit was commenced as a single action by the filing of a Verified Summons and Complaint, verified by Dean Liakas, at the Liakas Defendants' direction, on or about June 7, 2021. It is alleged Dean Liakas and the Liakas Defendants had actual knowledge of the falsity of the claimed injuries, having represented both Claimants in other preceding matters having already alleged the same injuries now reiterated and presented as if new.

409.    On February 28, 2022, at the direction of Liakas Defendants, Stephanie Gallo of Liakas Firm verified and mailed a Verified Bill of Particulars on behalf of Claimants B and C, alleging knowingly pre-existing and non-existent injuries, and knowingly manufactured treatment, to be the result of the purported accident, as a necessary step in furtherance of the scheme.

410.    As the Liakas Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the verified documents caused to be mailed to Plaintiff and/or Plaintiff's retained counsel in the underlying matter were knowingly false, and mailed in furtherance and as a necessary step in the Fraud Scheme, constituting a violation of 18 U.S.C. § 1341 and § 1343.

411.    Claimants B and C's case remains open.

---

[17] September 7, 2021: Claimant C cervical fusion by Jeyamohan/Kumar
September 17, 2021: JMP Rodriguez cervical fusion by Jeyamohan/Kumar
November 28, 2021: Claimant B cervical fusion by Jeyamohan/Kumar

COMPLAINT                                                                                          116

### iii.    **Claimant D**

412.    Claimant D's relevant records are attached as **Exhibit 5-D.**

413.    Claimant D, a Freeport resident, claimed to suffer a trip and fall on July 12, 2022, on a claimed broken piece of sidewalk located in Queens, New York.

414.    **Contemporaneous documentation reveals that this simply never occurred.**

415.    Claimant D is associated with Defendant Sone, as well as Defendants Tavarez's ex-wife.[18] Claimant D's roommates in Freeport asserted a claim for a (yet another) purported commercial vehicle sideswipe accident arising on September 15, 2023, in the Bronx.[19]

416.    EMS was called to the scene of Claimant D's alleged accident. Upon arrival, EMS personnel found Claimant D lying on the ground. Although Claimant D reported her right shoulder, hip, and knee hurt, the narrative history noted that Claimant D was dizzy and nauseated before falling. The EMS notes further found Claimant D had <u>suffered no physical injuries</u>.

**Narrative History Text:**
UPON ARRIVAL 26 YR OLD FEMALE WAS FOUND LAYING ON THE GROUND ON THE SIDE WALK. BY STANDER STATES SHE WATCHED PT FALL. PT STATES SHE DID NOT HIT HER HEAD. PT STATES HER RIGHT SHOULDER HIP AND KNEE HURTS. PT STATES SHE FELT A LITTLE DIZZINESS AND NAUSEOUS BEFORE SHE FELL.
PT IS ALERT AND AMBULATORY. NO PHYSICAL INJURIES AT THIS TIME.

417.    Claimant D was brought to the ER of New York Presbyterian Queens where she made complaints of right shoulder and right knee pain. The triage nurse, the first to see Claimant

---

[18] Herself a Claimant, represented by previously top-Rolnik referral recipient Bader & Yakaitis, under NYSCEF Index #: 516197/2019, and further associated with Claimant "A" from the Tavarez Wheel/Union Liakas Action, as well as with a Claimant represented directly by Rolnik with Liakas coming in as Trial Counsel, 522881/2018.

[19] 820478/2023E, passengers Catalina Fabian Duran (right knee arthroscopy, percutaneous lumbar discectomy) and Luis Ramirez-Marte (lumbar discectomy and posterolateral fusion, anterior cervical discectomy and fusion, left shoulder arthroscopy); 801155/2024E, driver Jose Ramirez-Marte (anterior cervical discectomy and fusion, right wrist arthroscopy).

COMPLAINT                                                                                                      117

D upon her arrival at the ER, noted that Claimant D fainted while walking and her admission diagnosis was listed as **syncope[20] and collapse and she expressly denied any injuries:**



418.    Imaging was negative, and Claimant D was discharged a few hours later with instructions to take Ibuprofen.

419.    Claimant D's Hospital billing records revealed that Claimant D paid for her ER visit with her Medicaid insurance. However, moving forward through her treatment protocol, the Liakas Defendants steered Claimant D to treat with various Medical Provider Defendants who did not accept Medicaid. This forced Claimant D to use liens and litigation finance, which would be taken out of any money Claimant D might receive in a settlement or trial.

420.    Following this innocuous visit related to a fall from syncope and with no documented injury, upon information and belief, with documentation necessary to conclusively establish same within the exclusive knowledge of Defendants, and with the source of information and belief being the consistent narrative, timing, location, and connections with those both undergoing and in fact managing the scheme, it is alleged that Claimant D was recruited by Rolnik, Tavarez, Sone, Rodriguez, or those operating at theirs or the Liakas Firm's direction and control.

421.    Despite no injury on date of accident from a fall documented to be from syncope and collapse, at twenty eight years old, Claimant D purportedly underwent a L4/L5 discectomy

---

[20] Syncope is a broad medical term for fainting.
https://my.clevelandclinic.org/health/diseases/17536-syncope.

and posterolateral fusion claimed to result from this non-event. At twenty nine years old, Claimant D underwent a C4-5 anterior discectomy and fusion claimed to result from this non-event.

422.    On July 20, 2022, Claimant D had an initial evaluation with Geraci at Defendant SMSR with complaints of neck pain and back pain, the latter of which was claimed to radiate to Claimant D's right leg and knee.  Physical examination purportedly showed minor range of motion deficits in Claimant D's cervical and lumbar spine as well as her right knee. A course of physical therapy was recommended as well as an MRI of the right knee. She started the next day on a case lien.

423.    A non-defendant MRI facility performed MRIs of her cervical spine, right shoulder, and lumbar spine on September 7, 2022.

424.    The lumbar spine MRI found the following, which notably found *no nerve root impingement or significant stenosis at L4-5*, unremarkable lumbar nerve roots throughout the lumbar spine, no traumatic indication (no acute fracture or misalignment, no focal bone marrow signal, unremarkable soft tissue), no spinal cord concerns, and no noted instability:

**FINDINGS**:
There is no acute fracture or malalignment. There is no visible pars defect. There is no suspect osseous lesion or focal bone marrow signal abnormality.

The conus medullaris is normal in size, position, and signal intensity, terminating at the level of L1. The lumbar nerve roots are unremarkable. There is no intraspinal mass lesion identified.

There is mild multilevel desiccation of the lumbar intervertebral discs, greatest at L5-S1. Disc space height is well preserved.

At T12-L1, there is no evidence of disc bulge or herniation. There is no spinal canal or foraminal stenosis.

At L1-2, there is no evidence of disc bulge or herniation. There is no spinal canal or foraminal stenosis.

At L2-3, there is no evidence of disc bulge or herniation. There is no spinal canal or foraminal stenosis.

At L3-4, there is no evidence of disc bulge or herniation. There is no spinal canal or foraminal stenosis.

At L4-5, there is a shallow broad-based left paracentral disc herniation with annular fissure, mildly indenting the left lateral recess, without nerve root impingement or significant stenosis.

At L5-S1, there is no evidence of disc bulge or herniation. There is no spinal canal or foraminal stenosis.

The paraspinal soft tissues are unremarkable.

425.    The reader further made clear under his impression:

> 1. Mild multilevel degenerative disc disease, greatest at L5-S1.
> 2. Shallow broad-based left paracentral disc herniation at L4-5 with annular fissure.
> 3. No evidence of nerve root impingement or significant spinal canal or foraminal stenosis.

426.    Further, on October 7, 2022, a non-defendant facility performed an ECG/NCV study, which **was negative for lumbar radiculopathy.**

427.    On August 14, 2023, Claimant D underwent provocative contrast injection and evaluation of nucleograms at the L3/L4 and L4/L5 levels by non-party herein (but frequent defendant under similar allegations) Boleslav Kosharskyy, all of which was performed on a case lien despite Claimant D's Medicaid.

428.    On October 4, 2023, Kumar, Jeyamohan, and Total Ortho made use of interstate facilities with the intent to further, and in fact furthering the Fraud Scheme including bribery and extortion, in performing an L4/L5 discectomy and posterolateral fusion at CareWell Health Medical Center in New Jersey, with knowingly false justification on then-28-year-old Claimant D, in violation of 18 U.S.C. § 1952.

429.    The justification provided was:

> **Indications:**
>
> **Lumbar radiculopathy:**
> Patient presents after an injury with severe low back pain, progressive lower extremity weakness, severe back and radicular pain, numbness, and resultant functional decline. Imaging illustrated disc protrusion with concern for annular tear. Several conservative treatment modalities were instituted, including activity modification, physical therapy, injections, and medications. Despite these interventions, patient's symptoms persisted, resulting in deconditioning, atrophy, and functional deficits. Consequently, surgery was offered. Risks,

430.    Prior EMG revealed no lumbar radiculopathy – an EMG **in Total Ortho's notes, the only EMG in their notes**. The MRI plainly found no nerve root issues and no nerve root

impingement. **Nor was Claimant D evidencing any neurological symptoms or functional deficits either the day before or the morning of the surgery.**

| SUBJECTIVE | |
|---|---|
| Recorded Date | 10/3/2023 |
| Recorded Time | 12:47 EDT |
| Recorded By | Rafiuddin,Hafeza RN |
| Procedure | |
| Skin Symptoms | None |
| Neurological Symptoms | None |

| Braden Assessment | |
|---|---|
| Recorded Date | 10/4/2023 |
| Recorded Time | 08:04 EDT |
| Recorded By | Cameron,Mesha RN |
| Procedure | |
| Sensory Perception Braden | No impairment |
| Moisture Braden | Rarely moist |
| Activity Braden | Walks frequently |
| Mobility Braden | No limitation |
| Nutrition Braden | Excellent |
| Friction and Shear Braden | No apparent problem |
| Braden Score | 23 |

> ~~No evidence of nerve root impinge~~
> EMG   [10/07/2022]: IMPRESSION:
> 1. THIS IS A NORMAL STUDY

431.    The non-Total Ortho hospital staff also noted pre-operatively that ***she was not in any actual or suspected pain*** at 8:35 AM that morning, nor at 12:47 PM the day before.

| Pain Assessment | |
|---|---|
| *Pain Present :*  No actual or suspected pain | Cameron, Mesha RN - 10/4/2023 8:35 EDT |

COMPLAINT                                                                                        121



**Pain Assessment**
*Pain Present :*  No actual or suspected pain

Rafiuddin, Hafeza RN - 10/3/2023 12:47 EDT

432.  **Nor was Claimant D in any distress.**

| General | | |
|---|---|---|
| Recorded Date | 10/4/2023 | 10/3/2023 |
| Recorded Time | 08:04 EDT | 12:47 EDT |
| Recorded By | Cameron,Mesha RN | Rafiuddin,Hafeza RN |
| Procedure | | |
| Distress | None | None |

433.  The justification provided was clinical fiction. The operative report further has its date written in, and Jeyamohan's signature is undated, with no indication of dictation or transcription record.



EBL: 15 mL
DISPO: Stable to PACU

Submitted by,

Shivendra Jeyamohan, MD

Date of Surgery: 10‑4‑2023

434.  Notably, the non-Total Ortho staff at Carewell documented diagnoses of anemia, syncope, and ***motor vehicle accident***, with no mention of any causally related fall, but did note of a fall undisclosed in litigation within the three months prior to surgery (well after claimed date of accident).

Problems(Active)
Anemia (SNOMED CT
:406636013 )

*Name of Problem:*  Anemia ; *Recorder:*  Rafiuddin, Hafeza RN; *Confirmation:*  Confirmed ; *Classification:*  Medical ; *Code:* 406636013 ; *Contributor System:*  PowerChart ; *Last Updated:* 10/3/2023 12:50 EDT ; *Life Cycle Date:*  10/3/2023 ; *Life Cycle Status:*  Active ; *Vocabulary:*  SNOMED CT

| | |
|---|---|
| MVA (motor vehicle accident) (SNOMED CT :2576858015 ) | *Name of Problem:* MVA (motor vehicle accident) ; *Recorder:* Rafiuddin, Hafeza RN; *Confirmation:* Confirmed ; *Classification:* Medical ; *Code:* 2576858015 ; *Contributor System:* PowerChart ; *Last Updated:* 10/3/2023 12:56 EDT ; *Life Cycle Date:* 10/3/2023 ; *Life Cycle Status:* Active ; *Vocabulary:* SNOMED CT |
| Syncope (SNOMED CT :406440010 ) | *Name of Problem:* Syncope ; *Recorder:* Rafiuddin, Hafeza RN; *Confirmation:* Confirmed ; *Classification:* Medical ; *Code:* 406440010 ; *Contributor System:* PowerChart ; *Last Updated:* 10/3/2023 12:51 EDT ; *Life Cycle Date:* 10/3/2023 ; *Life Cycle Status:* Active ; *Vocabulary:* SNOMED CT |

*Clothes :* At bedside
*Wallet :* At bedside
**Morse Fall Risk**
*History of Fall in Last 3 Months Morse :* Yes
*Presence of Secondary Diagnosis Morse :* No
*Use of Ambulatory Aid Morse :* None, bedrest, wheelchair, nurse
*IV/Heparin Lock Fall Risk Morse :* Yes
*Gait Weak or Impaired Fall Risk Morse :* Normal, bedrest, immobile
*Mental Status Fall Risk Morse :* Oriented to own ability
*Morse Fall Risk Score :* 45

435. The implant hardware and multiple allograft utilized in this knowingly unjustified surgery were from the Total Ortho-interested manufacturer Amendia/Spinal Elements. *See supra*, at ¶¶ 177-182.

| | | |
|---|---|---|
| Jeyamohan, MD Shiveindra Spine Lumbar 1 MEDIUM, 5.6CC MEDTRONIC 7510400 MGP780AA3 | Jeyamohan, MD Shiveindra Spine Lumbar 1 10CC SPINAL ELEMENTS BORX010 | Jeyamohan, MD Shiveindra Spine Lumbar 1 50 X 20 X7MM SPINAL ELEMENTS BNES5027 |
| 03/01/25 | 05/18/25 | 03/15/24 |

| | | |
|---|---|---|
| Jeyamohan, MD Shiveindra Spine Lumbar 4 7.5 X 45MM SPINAL ELEMENTS 108-ET-7545C | Jeyamohan, MD Shiveindra Spine Lumbar 1 5.5 X 40MM SPINAL ELEMENTS 62210-040 | Jeyamohan, MD Shiveindra Spine Lumbar 1 5.5 X 45MM SPINAL ELEMENTS 6221-045 |

COMPLAINT                                                                                      123

436.    Total Ortho and Jeyamohan performed this surgery in exchange for an upfront amount from an unknown Funder, despite availability of Medicaid. CareWell was similarly compensated through funding.

| 10/24/2023 | Jeyamohan, Shiveindra | | Visit Totals: | $13,000.00 | $13,000.00 |
|---|---|---|---|---|---|
| 10/24/2023 | Jeyamohan, Shiveindra | Prepay - Prepay | | $13,000.00 | $0.00 |
| 10/24/2023 | | Patient Payment - Carve-out check | | | $13,000.00 |

437.    Defendants Jeyamohan, Kumar, and Total Ortho made use of interstate facilities with the intent to further, and in fact furthered, bribery of a witness, extortion, and the Fraud Scheme, in performing a manufactured lumbar surgery on Claimant D at Carewell Health Medical Center in New Jersey, with knowingly false justification, in violation of 18 U.S.C. § 1952.

438.    In travelling to New Jersey to perform a knowingly unjustified surgery, and availing themselves of New Jersey's laws, Jeyamohan, Kumar, and Total Ortho subjected themselves to the legal and regulatory schemas of New Jersey, which are specifically, as a matter of public policy, aimed at combatting insurance fraud.

439.    Back on September 7, 2022, the cervical MRI read found no evidence of traumatic injury (no acute fracture, no focal bone marrow signal issue, soft tissues were unremarkable), with a shallow broad-based left foraminal herniation resulting in mild left foraminal stenosis – in the context of explicitly stated multilevel degenerative disc disease. No evidence of instability or spinal cord compression was noted.

**FINDINGS**: There is no acute fracture. There is minimal convex right cervicothoracic spinal curvature. There is straightening of cervical lordosis. There is no suspect osseous lesion or focal bone marrow signal abnormality.

The cervicomedullary junction is unremarkable. The cervical cord is normal in size and signal intensity. There is no intraspinal mass lesion identified.

There is mild multilevel desiccation of the cervical intervertebral discs, with disc space height well preserved.

At C2-3, there is no evidence of disc bulge or herniation. There is no spinal canal or foraminal stenosis.

At C3-4, there is no evidence of disc bulge or herniation. There is no spinal canal or foraminal stenosis.

At C4-5, there is a shallow broad-based left foraminal herniation resulting in mild left foraminal stenosis.

At C5-6, there is a minimal disc bulge indenting the ventral thecal sac. There is no spinal canal or foraminal stenosis.

At C6-7, there is a minimal disc bulge indenting the ventral thecal sac. There is no spinal canal or foraminal stenosis.

At C7-T1, there is no evidence of disc bulge or herniation. There is no spinal canal or foraminal stenosis.

The paraspinal soft tissues are unremarkable.

**IMPRESSION**:
1. Mild multilevel degenerative disc disease with minimal dextroconvex cervicothoracic spinal curvature and straightening of lordosis.
2. Shallow broad-based left foraminal disc herniation at C4-5 with mild left foraminal stenosis.

440.    A subsequent cervical MRI on January 18, 2024, which noted "**these findings do not appear significantly changed**," and noted the normal spinal cord and the facet joints of C4-5 to be unremarkable, *i.e.*, the condition was a) degenerative and b) stable as to C4-5.

**FINDINGS**: There is straightening of the cervical spine.  The vertebral bodies outline normally. The marrow signal demonstrates no evidence of an infiltrative or destructive marrow process. The cervical spinal cord demonstrates a normal course, caliber, and signal intensity. The visualized paravertebral soft tissues are grossly unremarkable.

C2-3, C3-4, and C7-T1: No evidence of disc herniation. The neural foramina are patent. The facet joints are within normal limits.

C4-5: Small left foraminal disc herniation. Mild left foraminal narrowing. The facet joints are within normal limits.

C5-6 and C6-7: Mild disc bulging exerting pressure on the thecal sac. The neural foramina are patent. The facet joints are within normal limits.

**IMPRESSION**:

1. Left foraminal disc herniation, C4-5.

2. Disc bulging, C5-6 and C6-7.

3. These findings do not appear significantly changed.

4. Straightening of the cervical spine suggesting muscle spasm.

COMPLAINT                                                                              125

441.    On January 11, 2024, Claimant D purportedly had an office visit at Total Ortho in the Bronx at 9 A.M. – their first of the day given the clinic opens at 9 A.M.

442.    The purported findings from review of Claimant D's systems at the January 11, 2024 visit were impossibly entered on January 10, 2024 by a medical assistant.

> Review of Systems (Cynthia Saldana MA; 1/10/2024 3:06 PM)
>
> Note: Constitutional Symptoms:. • Pertinent negatives: fever and chills. Musculoskeletal: back pain; neck pain; and weakness. • Pertinent negatives: decrease in size of muscles. Neurological: difficulty thinking; difficulty walking; numbness; tingling or "pins and needles" sensation; and weakness. The following systems were reviewed and are negative: Cardiovascular, Ears, Nose, Mouth, Throat, Endocrine, Eyes, Gastrointestinal, Genital/Urinary, Hematological/Lymphatic, Immunologic, Integumentary, Psychiatric, Respiratory.

443.    Claimant D's purported vitals are input seven minutes before the facility opens.

> Vitals (Agatha Koch FNP RNFA; 1/11/2024 8:54 AM)
> 1/11/2024 8:53 AM
> **Weight:** 166 lb  **Height:** 64 in
> **Body Surface Area:** 1.81 m²  **Body Mass Index:** 28.49 kg/m²

444.    The full patient history is input by 9:02 A.M.

> History of Present Illness (Agatha Koch FNP RNFA; 1/11/2024 9:02 AM)

445.    A purportedly extensive physical and neurological exam is completed and fully recorded just **one minute later.**

> Physical Exam (Agatha Koch FNP RNFA; 1/11/2024 9:03 AM)
> The physical exam findings are as follows:

446.    The assessment and plan, **two minutes later.**

> Assessment & Plan (Agatha Koch FNP RNFA; 1/11/2024 9:05 AM)

COMPLAINT                                                                126

447.    Visit complete, document reviewed, signed and finalized, **one extra minute.**



Signed electronically by Agatha Koch, FNP RNFA (1/11/2024 9:06 AM)

448.    Claimant D purportedly returned on February 23, 2024. It is claimed Claimant D frequently requires a cane and is experiencing progressive functional decline, weakness, inability to hold utensils, difficulty with memory due to the pain, and an inability to sleep or lay flat. Total Ortho's RN recommended an anterior discectomy and fusion at C4-5.

449.    Claimant D posted the following video on March 2, 2024, of her singing and dancing, including holding a microphone for several minutes, sitting down and standing up, and gyrating.



COMPLAINT                                                                            127



450.   Once again, on February 23, 2024, the purported findings from review of systems was input prior to the actual date by a medical assistant; here, three days earlier.

Review of Systems (Madalyn Guardado, MA; 02/20/2024 5:24 PM)

451.   The first piece of information input on February 23, 2024, was the patient history at 1:06 P.M. The physical and neurological exam is entered at 1:12 P.M., and the plan and assessment with suggestion of major surgery, along with final signature, is entered one minute later at 1:13 P.M.

History of Present Illness (Agatha Koch FNP RNFA; 2/23/2024 1:06 PM)

Physical Exam (Agatha Koch FNP RNFA; 2/23/2024 1:12 PM)

Assessment & Plan (Agatha Koch FNP RNFA; 2/23/2024 1:13 PM)



Signed electronically by Agatha Koch, FNP RNFA (2/23/2024 1:13 PM)

452.    On March 9, 2024, Claimant D purported returned for a 10:40 A.M. appointment. The purported review of systems was again input by a medical assistant the day prior. The patient history is input at 9:40 A.M., an hour before the scheduled appointment. The purported physical and neurological exam is completed and entered five minutes thereafter.

Appointment: 3/9/2024 10:40 AM
Location: BRONX

Review of Systems (Cynthia Saldana, MA; 03/08/2024 3:5 PM)

Physical Exam (Agatha Koch FNP RNFA; 3/9/2024 9:45 AM)

453.    Total Ortho was then able to explain all of the following in obtaining informed consent and scheduling the surgery, including "demonstration using MRI and models of the surgical procedure as well as discussion of the surgical risks..." in the span **of two minutes**.

We discussed the above once again. Given the failure of PT, injections, activity modification, medications, with progressive weakness in her left shoulder despite concerted attempts to strengthen and maintain in the gym, surgery is indicated.

We discussed C4-5 ACDF with demonstration using MRI and models of the surgical procedure as well as discussion of the surgical risks including but not limited to swallowing difficulty, blood loss, nerve damage, esophageal injury, nonunion or infection requiring revision surgery and the risk of adjacent segment disease in the future.

Will plan for C4-5 ACDF in April.

Assessment & Plan (Agatha Koch FNP RNFA; 3/9/2024 9:47 AM)

COMPLAINT                                                                                      129

454.    A notation is made, purportedly on March 9, 2024, at 9:45 A.M., that the signature is incorrect due to technical error. However, that signature was not added until three minutes after the purported "correction" at 9:48 A.M.



455.    On April 20, 2024, Claimant D posted a video of her bowling.

456.    Having spent – at best – approximately five clinical minutes with Claimant D regarding her neck, Defendants Jeyamohan and Kumar of Total Ortho performed a C4-5 anterior cervical discectomy and fusion on then-29-year-old Claimant D at Syosset Ambulatory Surgical Center, a facility owned by the Total Ortho principles Lerman, Avanesov, and others, on June 5, 2024. Total Ortho's purported justification given for surgery on Claimant D's neck included **severe neck pain, "functional decline," "atrophy," and "progressive neurological and functional**

**deficits."** Below are still photos of "reels" uploaded on Facebook from one month before and one month after the surgery, including four days before the operation:







Saturday, June 1, 2024



457.    Partial payment for this surgery was notably marked "**attorney payment**."

COMPLAINT                                                                                          132



458.    There is a Total Ortho record **created on May 10, 2024**, which purports to record a post-operative visit of Claimant D for her ACDF erroneously marked as **May 1, 2024**. (Per the earlier medical note, the surgery was originally planned for April 2024.)

> Appointment: 5/10/2024 11:45 AM
> Location: BRONX
> Patient #:
> DOB:
> Undefined / Language: Undefined / Race: Undefined
> Female

> 05/10/2024:
> The patient is here today s/p ACDF C4-5 dated 05/01/2024. The patient is doing well in terms of postoperative outcomes. The patient denies dysphagia and dysphonia. There is no systemic symptoms such as fever or chills.
> The patient appreciates alleviation of pain and rates the pain at 8/10 on the subjective pain scale in the neck. The patient admits to resolving radiculopathy. The patient still has tension between the shoulder blades. The patient admits to improved posture and hands coordination. The patient noted increasing endurance towards basic ADLS and improved sleeping pattern.
> The patient is taking medication as needed. Physical therapy was not initiated as of yet. The patient is currently not working.

459.    This "post-operative," successful outcome exam, with "resolving radiculopathy," "alleviation of pain," "improved posture," and "increasing endurance," **was an impossibility. The surgery had not occurred yet.**

COMPLAINT                                                                                          133

460.    The physical exam, review of systems, assessment and plan within this impossible report **are further dated as completed and signed May 7, 2024,** by Madalyn Guardado, MA – **as in, medical assistant.**

461.    The report concludes with a May 16, 2024, signature, which is notated as follows, detailing nothing about the impossible dating.



462.    There is then a July 5, 2024, note titled "Orders Only," which reflects both the contents of the May 10, 2024, prior note, and *five days in advance,* contains the substance of what will be the July 10, 2024, visit note. They are notably identical except for a blank field to fill in pain rating.

05/10/2024:
The patient is here today s/p ACDF C4-5 dated 05/01/2024. The patient is doing well in terms of postoperative outcomes. The patient denies dysphagia and dysphonia. There is no systemic symptoms such as fever or chills.
The patient appreciates alleviation of pain and rates the pain as 8/10 on the subjective pain scale in the neck. The patient admits to resolving radiculopathy. The patient still has tension between the shoulder blades. The patient admits to improved posture and hands coordination. The patient noted increasing endurance towards basic ADLS and improved sleeping pattern.
The patient is taking medication as needed. Physical therapy was not initiated as of yet. The patient is currently not working.

7/10/24: The patient is here today s/p C4-5 ACDF dated 06/05/2024. The patient is doing well in terms of postoperative outcomes. The patient denies dysphagia and dysphonia. There is no systemic symptoms such as fever or chills.
The patient appreciates alleviation of pain and rates the pain as * * */10 on the subjective pain scale in the neck. The patient admits to resolving radiculopathy. The patient still has tension between the shoulder blades. The patient admits to improved posture and hands coordination. The patient noted increasing endurance towards basic ADLS and improved sleeping pattern.
The patient is taking medication as needed. Physical therapy was not initiated as of yet. The patient is currently not working.

463.    The review of systems, physical exam, and assessment and plan portions are similarly filled out within the report as dated July 5, 2024 by Cynthia Saldana, MA – as in, **medical assistant.**

464.    When the purported actual post-op visit occurs on July 11, 2024, **the notations from 5/10/2024 and (7/5/2024)/(7/10/2024) were removed,** with only the July 11, 2024,

**notation remaining, and having adopted the previously planned note content in its entirety with one line added about home exercises.**

> 3/9/24:
> The patient present today to discuss ACDF C4-5 surgery and f/u S/P PSF & EFD L4/5 performed on 10/04/2023. The patient rates her neck pain as a 7 on a 0-10 pain scale. The patient rates her back pain as a 1-2. The patient is doing gym exercises. The patient is currently not working. The patient is taking Aleve for pain as needed.
>
> 07/11/2024:
> The patient is here today s/p ACDF C4-5 dated 06/05/2024 and s/p EFD/PSF on 10/04/24. The patient is doing well in terms of postoperative outcomes to the neck and lower back. The patient denies dysphagia and dysphonia. There is no systemic symptoms such as fever or chills. The patient appreciates alleviation of pain and rates the pain as 7/10 on the subjective pain scale in the neck. The patient admits to resolving radiculopathy. The patient still has tension between the shoulder blades. The patient admits to improved posture and hands coordination. The patient noted increasing endurance towards basic ADLS and improved sleeping pattern. The patient is taking medication as needed. HEP daily for 15 minutes. The patient is currently not working.

465.     There is only one inference to draw from the above. The purported "findings," review of systems, physical exam, and assessment and plan **were already pre-written – dictated to medical assistants – two times over without having actually seen Claimant D. These were not just pre-planned outcomes, but** *pre-prepared office visits, observations, and plans* **masquerading as medical judgment.**

466.     In creating the multitude of falsified reports regarding Claimant D purporting to support, in a claimant with no objective sign of injury on date of accident, that continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, Jeyamohan, Total Ortho, and Kumar knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

467.     Such transmission did in fact occur on August 20, 2024, when Carewell Health Medical Center faxed such records of Jeyamohan, Kumar, and Total Ortho, as a necessary step in furtherance of the Fraud Scheme, to Plaintiff's medical records agent, constituting a violation of 18 U.S.C. § 1343.

COMPLAINT                                                                                           135

468.    Such transmission did in fact occur on July 10, 2024, when Liakas mailed such records of Jeyamohan, Kumar, and Total Ortho, to Plaintiff's panel counsel on the underlying case as a necessary step in furtherance of the Fraud Scheme, to Plaintiff's medical records agent, constituting a violation of 18 U.S.C. § 1341.

469.    Claimant D's subject lawsuit was commenced by the filing of a Verified Summons and Complaint, verified by Dean Liakas, at the Liakas Defendants' direction, on or about April 28, 2023. It is alleged Dean Liakas and the Liakas Defendants had actual knowledge of the falsity of the claimed injuries and false claim of liability.

470.    On October 16, 2023, at the direction of Liakas Defendants, Paul Generosa of Liakas Firm verified and mailed a Verified Bill of Particulars on behalf of Claimants D, alleging knowingly pre-existing and non-existent injuries, and knowingly manufactured treatment, to be the result of the result of the purported accident, as a necessary step in furtherance of the scheme.

471.    On March 5, 2024, at the direction of Liakas Defendants, Paul Generosa of Liakas Firm verified and mailed a Supplemental Verified Bill of Particulars on behalf of Claimant D, alleging knowingly pre-existing and non-existent injuries, and knowingly manufactured treatment, to be the result of the purported accident, as a necessary step in furtherance of the scheme.

472.    On July 10, 2024, at the direction of Liakas Defendants, Paul Generosa of Liakas Firm verified and mailed a Second Supplemental Verified Bill of Particulars on behalf of Claimants D, alleging knowingly pre-existing and non-existent injuries, and knowingly manufactured treatment, to be causally related to the non-existent trip and fall.

473.    As the Liakas Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the verified documents  caused to be mailed to Plaintiff and/or Plaintiff's retained counsel in the underlying matter were knowingly

COMPLAINT                                                                                              136

false, and mailed in furtherance and as a necessary step in the Fraud Scheme, constituting violations of 18 U.S.C. § 1341 and § 1343.

### iv. Claimant E

474.    Claimant E alleged to have suffered a trip and fall on a sidewalk in Jamaica, Queens, on October 4, 2022. He is a Suffolk County resident, who previously lived at two addresses in Freeport, New York, including with Claimant B at an address associated with the no-fault "Freeport Ring." Claimant E's relevant records are attached as **Exhibit 5-E**.

475.    In addition to the above, Claimant E's daughter had a personal injury case, represented by Mariya Aminov.[21]

476.    In addition to the above, the mother of Claimant E's daughter had an injury case.[22] She underwent left shoulder surgery and a lumbar discectomy and was represented by Mariya Aminov.

477.    In addition to the above, Claimant E's associated cell phone number is registered to yet another personal injury claimant,[23] who was represented by Mariya Aminov.

478.    Two of Claimant E's roommates and presumed relatives also had a personal injury case,[24] as well as another of Claimant E's roommates at that address had an injury case.[25]

479.    Another roommate at that same address in Freeport also had an injury case, a sidewalk trip and fall in Brooklyn, represented by Liakas,  with Total Ortho/Avanesov/Kumar lumbar fusion, and a right knee surgery (Julio Jerez, 520406/2021). And another, presumably Julio Jerez's relative, Cesar Jerez, represented by Mariya Aminov, 600703/2024.

---

[21] 600492/2025.
[22] 600529/2024.
[23] 614940/2022.
[24] 705326/2020; 615208/2018.
[25] 31990/2019E.

480.     It is respectfully submitted that this is a statistically anomalous number of injury cases to arise out of the following property:



481.     In addition to the above, and in addition to the voluminous number of claimants connected through Claimant B, Sone, and Tavarez, Claimant E has also shared a Freeport address with the following *further* Claimants:

        a.   604671/2018 (connected to no-fault Freeport Ring);
        b.   718071/2019;
        c.   614494/2020;
        d.   614243/2021;
        e.   617267/2022;
        f.   705249/2022;
        g.   608742/2024;
        h.   600724/2024 (connected to no-fault Freeport Ring);
        i.   622292/2025.

482.     Claimant E has shared a separate address with Claimants in 601796/2025 and 601745/2023. Together with Sone and Tavarez wheels, this brings the total to **sixty two related cases.**

COMPLAINT                                                                                          138

483.    Claimant E obtained funding through Funder Key Legal Funding, LLC, who in turn assigned its secured interest to a German bank as Administrative Agent, suggesting this advance was part of a secondary securitized investment instrument.

SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)
3a. ORGANIZATION'S NAME    DZ Bank AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main, New York Branch, as Administrative Agent

484.    On October 4, 2022, after the purported standing-height sidewalk trip and fall in Jamaica, NY, Claimant E was taken to the hospital, where diagnostic testing was negative for any injury, including of the left shoulder, left knee, and lumbar spine. No cervical imaging was done, as **no complaints about the neck were made**, he had full range of motion, and neck was supple. Full range of motion in all extremities was noted, without pain. On the left shoulder, the sole finding was a superficial linear abrasion, with no decreased ROM. The Cleveland Clinic defines the term as follows: "A linear abrasion is also known as a scratch." **Claimant E's only observable injury on date of purported injury was a scratch**. Imaging found zero acute findings.

485.    After a Tylenol, Claimant E reported no pain and was discharged. Not one later record is consistent with the contemporaneous exam and imaging.

486.    **Claimant E's very first exam was with a spinal surgeon**. On October 13, 2022, Claimant E presented to Vagmin Vora of Defendant Premier. Claimant E, with no neck complaint on date of accident, reported 10/10 pain. Contrary to the hospital, Vora claimed that the ROM of the cervical was limited and painful. As notable here, the cervical neurological exam was completely normal. Regardless, Vora diagnosed cervical radiculopathy.

Neurological exam of bilateral upper extremities:Power is 5/5.
Sensation is intact to light touch.
Tone is normal.
Reflexes:Biceps ++, Triceps ++, Brachioradialis ++.
Hoffmans sign is -ve.

COMPLAINT                                                                                     139

487.    On October 20, 2022, Claimant E presented to a Geraci at SMSR, who found mild ROM limitation in the left shoulder. Geraci purportedly found significant cervical ROM deficits flatly inconsistent with findings in the ER. Contrary to Vora, Geraci purportedly found strength deficits and diminished sensation. The clinic's diagnosis was shoulder sprain and cervical sprain with myofascial pain. Notably, Geraci noted normal gait with no assistive device. It was noted Claimant E was working full time at a pizzeria.

488.    On November 14, 2022, Claimant E presented to Simhaee at Premier. The entirety of the HPI is copy-pasted from Claimant E's prior visit with Vora, and the physical exam consisted of a preprinted format with findings completely contradictory to Vora, and the blanks in it left unfilled. Notably, that appointment was at 12 P.M. Simhaee signed this half-filled template form, with an "assessment" of "plan for cervical vs lumbar injection," twenty one minutes beforehand, at 11:49 A.M. All other portions of the "report" were carried over from the prior visit. Simhaee billed for forty-five minutes.

**Upper Extremities :** Patient has 5/5 strength in the bilateral upper extremities. Sensation is impaired to light touch throughout the bilateral upper extremities. Patient has spasm and tenderness over the cervical paravertebral musculature bilaterally. Patient has a positive Spurling and stretch root test bilaterally. Patient has pain with rotation of the cervical spine. The patient has positive facet loading bilaterally. Patient has a negative Hoffman sign.
Range of motion testing using a goniometer for the cervical spine: forward flexion was ____ (normal 50°). Extension ____ (normal 60°). Lateral bend to the left ____ (normal 45°). Lateral bend to the right ____ (normal 45°). Rotation of the cervical spine ____ (normal 80°).

**Appointment Date**   11/14/2022  12:00 PM

Electronically signed by Simhaee Jonathan on 11/14/2022  11:39:00 AM

Reviewed by Ocampo Gloria on 10/13/2022 09:54:05

Reviewed by Ocampo Gloria on 10/13/2022 09:54:21

Reviewed by Ocampo Gloria on 10/13/2022 09:54:42

**CPT Codes**

| CPT | Description | Side |
|---|---|---|
| 99204 | OFFICE OUTPATIENT NEW 45 MINUTES | |

489.    On December 2, 2022, Simhaee purportedly performed the cervical injection.

490.    On December 19, 2022, Claimant E returned to Defendant Simhaee of Premier. The entirety of the report remained unchanged, less an interval history indicating Claimant E was now status post-cervical epidural, and a sentence added to the assessment to "plan lumbar epidural injection." Physical exam was left in the same prior form as shown above. This time Simhaee signed it three minutes *before* Claimant E' listed appointment time – and billing for a twenty-five minute visit.

**Appointment Date**   12/19/2022 12:15 PM

Electronically signed by Simhaee Jonathan on 12/19/2022 12:12:00 PM

**CPT Codes**

| CPT | Description | Side |
|---|---|---|
| 99214 | OFFICE OUTPATIENT VISIT 25 MINUTES | |

491.    On January 16, 2023, Claimant E returned to Simhaee at Premier. The only difference from the report from the previously dated visit was two lines added to the assessment,

COMPLAINT                                                                                                   141

to consider repeat injections. Simhaee billed for twenty-five minutes, Claimant E's appointment was at 12:00 p.m. and Simhaee purportedly signed at precisely 12:25:00 p.m.



492.    On January 26, 2023, Claimant E presented to Vagmin Vora at Defendant Premier. MRI review that day noted "**MRI of the lumbar spine does not show any evidence of neural compression. MRI of the cervical spine shows evidence of very mild foraminal stenosis to the <u>left at C3-4</u>.**" Vora notably made the following assessment:

> The patient has been recommended to follow-up with pain management service for further evaluation and treatment.   He will follow-up with me on a as needed basis.   He will continue nonsurgical treatment in the form of physical therapy.

493.    Claimant E did not return to Premier.

494.    On February 14, 2023, Geraci at SMSR noted Claimant E was scheduled for surgery with Defendant Chaudhary. It was also noted Claimant E was still working full time at the pizzeria; same was noted on March 28, 2023.

495.    One month later, on March 31, 2023, Defendant Chaudhury performed a **<u>C4-5</u>** ACDF "with spinal cord and foraminal decompression," and hardware instrumentation on Claimant E at a facility in New Jersey.

496.    Notably, the prior imaging – which were in the surgical records – only identified herniation at **C3-4**, with purported foraminal and cord impingement. There was no soft tissue abnormality to indicate a traumatic injury. Mild facet arthropathy was present throughout the cervical spine, with bulges in C3-4, C4-5, and C5-6. C4-5 purportedly had right foraminal impingement. Mild spondylosis and no spondylolisthesis was noted. There was no indication C4-5 had any cord impingement, and any foraminal impingement was solely right-sided at that level. Further, there was no clinical or diagnostic evidence of radiculopathy. Premier's review of the film prior revealed only "**very mild foraminal stenosis to the left at C3-4.**"

497.    Regardless, Chaudhury gave the following justification for surgery:

| Pre-Op. DX: | 1. | Cervical disc herniation at C4-5. |
| | 2. | Cervical radiculopathy. |

498.    Despite that the only evidence of pathology at this level, at worst, was a bulge with annular fissure (crack in outer annulus) and right-sided foraminal impingement, Chaudhary performed a complete annulotomy, an "uncovertebral joint to uncovertebral joint discectomy," and *bilateral* foraminal decompression with implant and instrumentation. There is no explanation as to why this particular level, or why a fusion was necessary in light of no instability or deformity.

499.    As to the shoulder, on October 31, 2022, Claimant E presented to Defendant Capiola at McCulloch Ortho. He found Claimant E – with a scratch on date of accident, full range of motion, negative imaging, and a completely normal neurological exam shortly thereafter – to have "significant weakness, swelling, stiffness, and pain" in the left shoulder, wholly undocumented on date of accident, October 13, 2022, and October 20, 2022. Capiola sent Claimant E for MRIs, which he expected to be complete and a return visit within two to four weeks.

COMPLAINT                                                                                       143

500.    Claimant E did not obtain a left shoulder MRI until four months later, on February 24, 2023. He did not return to McCulloch until March 27, 2023, who immediately planned left shoulder surgery, largely on the basis of a purported subscapularis partial tear and SLAP tear the MRI *plainly did not find.*

501.    On August 17, 2023, Claimant E underwent a left shoulder arthroscopy. Anesthesia noted the supporting diagnosis as "shoulder lesion, unspecified." The anesthesia records indicate the procedure occurred starting with anesthesia at 14:00, incision at 14:31, end of surgery at 15:03, and end of anesthesia at 15:10. Meanwhile, one provider signed the notes 14:13, eigtheen minutes before the incision took place. The other provider signed the notes at 12:09, two hours before the procedure and at the exact same time as the anesthesia pre-op was completed.

| Anes Start: 14:00 | Time-Out: 14:30 | Incision: 14:31 | Surgery End: 15:03 | Anes End: 15:10 |
|---|---|---|---|---|

| Providers | Start - End |
|---|---|
| VD - DJESEVIC, Vedan (Anesthesiologist) | 08/17/2023 14:00 - 08/17/2023 15:10<br>Signed at: 08/17/2023 12:09 |
| Medical Direction<br>VG - GORI, Virginia (CRNA) | 08/17/2023 14:00 - 08/17/2023 15:10<br>Signed at: 08/17/2023 14:13 |

| Diagnostic Studies | |
|---|---|
| Labs: N/A | |
| Preop Signature(s): | Signed by DJESEVIC, Vedan (Anesthesiologist) 08/17/2023 12:09 |
| Day of Surgery Note | |
| NPO clear liquids greater than 2 hours, NPO solids greater than 6 hours, Patient is cleared for surgery in an ambulatory setting. Anesthesiologist and Surgeon agree the patient is an appropriate candidate for this facility<br>PONV Risk Factors: Current Non-Smoker, Never smoker, PONV Risk Score:1 | |
| Preop Anesthesia Provider Signature: | Signed by DJESEVIC, Vedan (Anesthesiologist) 08/17/2023 12:09 |

COMPLAINT                                                                                      144

502.    The purported ultrasound-guided regional nerve blocks both take place in the exact same four-minute time window and yet the provider signature is *also* timestamped 12:09, a half hour before the purported procedure.



503.    The ultrasound images, provided to support the occurrence of the procedure, upon closer inspection, make things worse: the imaging is tied to "<u>no patient specified</u>," and are timestamped at **<u>7:09 A.M. that morning, five hours before it was signed that they occurred</u>,** <u>with a sticker slapped on claiming that they are Claimant E's.</u>



COMPLAINT                                                                    145

504.    This is of particular note as Claimant E was not admitted until at least two hours after the purported ultrasounds took place (which themselves were purportedly in relation to a procedure five hours later):



505.    The anesthesia post-op evaluation and clearance is then at 6:28 P.M.:



506.    However, the CRNA's notes indicate Claimant E had been discharged over two hours earlier.

507.    As for the surgery itself, Capiola's operative report, consistent with pattern and practice, is incompatible with the MRI, purportedly finding and "fixing" advanced conditions never previously documented:

| Anatomy | MRI report says | Op report says |
|---------|-----------------|----------------|
| Superior labrum (SLAP) | Type I SLAP; *i.e.,* degenerative fraying, not a tear. | "Significant SLAP tear" with peel-back sign - SLAP repair with anchor/FiberWire |
| Anterior labrum | Not identified. | Anterior labrum tearing → extensive debridement |
| Rotator cuff | Low-grade interstitial tear in infraspinatus; subscapularis tendinosis, no tear | Partial rotator cuff tear – debridement |
| Biceps tendon | Tendinosis + moderate tenosynovitis; "no definitive tear" language | Biceps tendon partial tear - debridement |
| Cartilage (glenoid) | Articular cartilage intact | Cartilage defect of glenoid - debridement |
| Impingement / acromion | Notes acromion lateral downslope Not low-lying, Type (flat). No impingement noted. | Claims impingement and performs a subacromial decompression |

508.    All three post-op visits were with Capiola's PAs.

509.    In creating the multitude of falsified reports regarding Claimant E purporting to support that continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, SMSR, Geraci, McCulloch Orth, Capiola, Premier, Simhaee, and Chaudhary knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

510.    Such transmission did in fact occur on January 24, 2024, when Health East Ambulatory Surgical Center, another New Jersey facility, e-mailed such records of Chaudhary, as

COMPLAINT                                                                                          147

a necessary step in furtherance of the Fraud Scheme, to Plaintiff's medical records agent, constituting a violation of 18 U.S.C. § 1343.

511.    Such transmission did in fact occur on March 7, 2024, when Premier transmitted such records of Simhaee and Premier *via* digital fileshare, as a necessary step in furtherance of the Fraud Scheme, to Plaintiff's medical records agent, constituting a violation of 18 U.S.C. § 1343.

512.    Such transmission did in fact occur on March 15, 2024, when ESASC e-mailed such records of Capiola and McCulloch Ortho, as a necessary step in furtherance of the Fraud Scheme, to Plaintiff's medical records agent, constituting a violation of 18 U.S.C. § 1343.

513.    Claimant E's subject lawsuit was commenced by the filing of a Verified Summons and Complaint, verified by Matthew Kerner of Liakas Firm, at the Liakas Defendants' direction, on or about July 26, 2023, as a necessary step in furtherance of the scheme.

514.    On January 12, 2024, at the direction of Liakas Defendants, Stephen Chyi of Liakas Firm verified and mailed a Verified Bill of Particulars on behalf of Claimant E to Plaintiff's panel counsel, alleging knowingly pre-existing and non-existent injuries, and knowingly manufactured treatment, to be the result of the purported accident, as a necessary step in furtherance of the scheme.

515.    As the Liakas Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the verified documents caused to be mailed to Plaintiff and/or Plaintiff's retained counsel in the underlying matter were knowingly false, and mailed in furtherance and as a necessary step in the Fraud Scheme, constituting a violations of 18 U.S.C. § 1341 and § 1343.

COMPLAINT                                                                                              148

<u>v.</u>      **Claimant F**

516.     Claimant F, a Freeport, New York resident, claimed to have suffered a standing height trip and fall on a sidewalk in Queens, New York, on June 18, 2022. Claimant F's relevant redacted records are attached as **Exhibit 5-F**.

517.     As with Claimant E, Claimant F received funding through Key Legal Funding, LLC, the interest to which was also assigned to a German bank.  As with Claimant E, Claimant F signed a power of attorney with Liakas Firm (signed by Dean Liakas) one day after the unwitnessed purported fall.

518.     As with Claimant E, Claimant F underwent a cervical spinal fusion at C4-5 on July 21, 2023, as well as a shoulder arthroscopy on September 29, 2022, with Capiola - effectively identical, down to usage of the same 2.9mm BioComposite PushLock anchor and FiberWire to Claimants A and E.

519.     Consistent with other Rolnik-referred matters, Claimant F did not know who the photographer of the defect was, nor had access to originals, despite digital images purporting to have been taken just two days post-"accident" (notably, with editing fields plainly visible.)

> 1.   Upon a diligent search, Plaintiff is not in possession of the contact information of "the photographer". Plaintiff objects to all other portions of this demand.
>
> 2.   The Plaintiff's objects to this demand. Without waiving said objection, annexed hereby are the photographs exchanged by Plaintiff with metadata.
>
> 3.   The phone used to take photographs was an Apple 12 iPhone Pro Max.
>
> 4.   Upon a diligent search, Plaintiff is not in possession of the phone used to obtain photographs.

COMPLAINT                                                                                   149



520.    As with Claimant E, Claimant F has shared addresses with numerous other injury Claimants, including his current roommate (and emergency contact on his medical forms),[26] and a raft of additional claimants associated with his current address:

   a.  600902/2018;
   b.  160869/2018;
   c.  600024/2018;
   d.  615619/2021;
   e.  520406/2021;[27]
   f.  702405/2022;
   g.  705249/2022;
   h.  713823/2023;
   i.  609049/2023;
   j.  526778/2023;[28]
   k.  809824/2023E;
   l.  610623/2024;
   m.  727810/2024;
   n.  614113/2025.

521.    On the purported date of accident, Claimant F went to the ER *via* ambulance, wherein first responders noted. He was in no acute distress. There was no complaint of neck pain made. His complaints were of right shoulder, right knee, and right rib/back. There was no swelling or deformity observed, with normal strength, and normal range of motion. Same with the right

---

[26] 602181/2025 (discectomy and FC-1 Funding).
[27] Previously referenced Julio Jerez (represented by Liakas, Total Ortho/Avanesov/Kumar lumbar fusion, right knee surgery).
[28] Represented by DeSalvo, standing height sidewalk trip and fall in Brooklyn, treatment with Brooklyn Premier, Precision AcceleRad.

knee and back. The only relevant observations were subjective pain with ROM at the right shoulder, "slightly decreased abduction" as to the right shoulder, and subjective tenderness as to the right shoulder and neck. It was noted straight leg raise was normal bilaterally (no indicia of lumbar radiculopathy).

522.    Imaging of the right ribs, right shoulder, right knee, and neck were entirely normal with no signs of acute process. He was discharged the same day.

523.    Upon information and belief, as set forth on the basis above, Claimant F was steered to the Liakas Firm by one or more Runner Defendants, and this Freeport Claimant from Jarabacoa signed a power of attorney with Manhattan-based Liakas Firm on June 21, 2022.

524.    On June 27, 2022, Claimant F presented to Geraci at SMSR. Despite the delay in treatment, and the full ROM demonstrated at the ER, Geraci now purportedly found significant reduced range of motion in Claimant F's neck, back, right shoulder, and right knee. Geraci noted "Patient works in both a restaurant and landscaping. He attempted to return to work on June 22nd but was unable…." Geraci prescribed PT 3x/week for four to six weeks. He purportedly started that day; despite Geraci's finding of normal ambulation, the PR provider claimed an antalgic gain with poor to fair balance. PT was on a lien.

525.    On June 30, 2022, Claimant F presented to Capiola at McCulloch Ortho. He was referred for right knee and shoulder MRIs and given a prescription for PT. Capiola noted "he did have to take a day off from working at a restaurant due to pain."

526.    Notably, McCulloch attempted to refer him to co-Defendant AcceleRad in Manhattan despite the Freeport residence.

COMPLAINT                                                                                  151



527.    On September 29, 2022, Claimant F underwent a right shoulder arthroscopy with McCulloch at ESASC. The procedure was funded. The referral source was the Liakas Firm.

| Referral Source | Liakas Law, P.C. |
|---|---|

| INSURED NAME: | POLICY/GROUP #: LIAKAS LAW 212 937 7765 |
|---|---|
| ID#: | AUTHORIZATION #: |
| DATE OF INJURY: 06/18/22 | Auto  Worker's Comp  Other  FUNDED |

528.    The facility anesthesia records noted a diagnosis not specified as traumatic:

| Diagnosis | Incomplete rotator cuff tear or rupture of right shoulder, not specified as traumatic (M75.111) |
|---|---|

529.    As with Claimant E, and with the same provider, the anesthesia records were signed two hours before the procedure even took place.



| Providers | Start - End |
|---|---|
| VD - DJESEVIC, Vedan (Anesthesiologist) | 09/29/2022 12:50 - 09/29/2022 13:47 Signed at: 09/29/2022 11:26 |
| Medical Direction AM - MERTIRI, Anisa (CRNA) | 09/29/2022 12:50 - 09/29/2022 13:47 Signed at: 09/29/2022 13:41 |

530.    As with Claimant E, and with the same provider, the anesthesia records of the two regional blocks both occurred within the same four-minute time window, per reports signed four minutes *before* they took place.



531.    As with Claimant E, the records contain fluoroscopy images intended to confirm the performance of the regional block, but, once again, the images are time stamped hours before the Claimant arrived to the facility (this time, six hours prior to when they were allegedly taken) and are not connected to the Claimant in-system.



532.    Capiola purportedly performed an outsized surgery on the minor findings from the MRI:

| Anatomy | MRI report | Op report | Issue |
|---|---|---|---|
| SLAP / Superior labrum | SLAP tear 10–12 o'clock + ~2 mm paralabral cyst | SLAP tear and SLAP repair with anchor + FiberWire | Small, localized SLAP treated with a full hardware repair; op report leans on "positive peel-back" and broader pathology to justify it. |
| Anterior labrum | No anterior labral tear described | Tearing of the anterior labrum + extensive debridement | Not identified on MRI. |
| Biceps tendon | Tendinosis + mild teno-synovitis; no definite tear | Partial biceps tendon tear + debridement | MRI reads tendon inflammation/ degeneration, not tear; op report upgrades it to "tear" and "fixes." |
| Rotator cuff | No supraspinatus tear; low-grade infraspinatus bursal tearing + low-grade subscapularis interstitial tearing | Partial rotator cuff tear + debridement | MRI describes mild, specific partial-thickness changes; op report describes a more general "partial cuff tear" without matching any tendon-specific findings. |
| Synovitis | No synovitis described; small/physiologic effusion | Complete synovectomy | MRI doesn't support an inflamed joint narrative; op report adds it and performs a major intra-articular cleanup. |

533.    All of the above, plus a subacromial decompression, allegedly took all of twenty five minutes.



534.    Capiola did not dictate the operative report until October 4, 2022, six days post-surgery, ostensibly by memory.

535.    This discrepancy is best explained for the same reason as Claimant E's incompatibility with diagnostic findings: despite the time difference, change in laterality, and difference in MRI findings, Capiola's description of procedure is over 82% verbatim for both

COMPLAINT                                                                        154

Claimant E and F, down to the same order of words. It is similarly verbatim to numerous of the claimants in the Union Liakas action and elsewhere; and further worth noting *every time* the operative reports – of purportedly individualized findings and intra-operative decision making – are dictated *days after the fact*. The reports are a rote template, and an unreliable source of whatever in fact occurred within the arthroscopic portals. They exist for billing purposes, not treatment.

536.    Claimant F followed up with Capiola on October 3, 2022. He was instructed to commence PT and follow up in three weeks. Claimant F did not return until five months later in February 2023, when it was noted he had not commenced the instructed PT. The instruction was reiterated; Claimant F never returned.

537.    On October 12, 2022, Claimant F presented at Total Ortho, complaining of a trip and fall "about 8 months ago" (which was purportedly in June 2022, four months prior), and complained of purported 10/10 neck pain. No instability was present in the cervical or lumbar spine and he had an entirely normal neurological exam. A caudal epidural was performed regardless.

538.    On November 7, 2022, Claimant F presented at Total Ortho, reiterated a trip and fall "about 8 months ago," and complained of purported 10/10 neck pain. He notably had an entirely normal neurological exam with no instability noted in the neck or back. They performed a second caudal spinal injection anyway. The report notes "MRI report of cervical and lumbar spine reviewed with the patient," however, no notation is made throughout the note to any MRI or results. The findings during the purported physical exam are verbatim identical to the exam the month prior.

539.    On July 21, 2023, Claimant F purportedly underwent an anterior cervical discectomy and fusion at C4-5 with Cohen at CareWell Health in New Jersey. That very morning

in pre-operative exam, Claimant F's neck was supple, non-tender, he had no weakness or numbness, with normal range of motion and strength (*i.e.*, clinically intact, per the facility's own records).

540.    The only imaging done prior was the hospital on the date of accident with complete normal findings, an X-ray on July 7, 2022 with completely normal findings and specifically no instability, normal joints, and no indication of trauma, and an MRI that found at best disc bulges from C3-4 through C7-T1 without any particularly distinct level of pathology, with no stenosis and no instability. As noted above, even Total Ortho found normal neurological exams and no instability clinically.

Is no fracture or subluxation. Vertebral bodies are intact. Disc spaces are maintained. There is no abnormal motion during lateral flexion and extension views. Atlantoaxial relationship is undisturbed. Posterior joints appear normal. Prevertebral soft tissues are unremarkable.

**IMPRESSION**: Normal radiographs of the cervical spine.

The cervical vertebral bodies are normal in size and shape without evidence of fracture or suspicious intrinsic lesion. There is a benign-appearing hemangioma within the right side of C7.

There is no evidence of a spondylolisthesis.

There is no significant loss of height of the cervical discs.

There posterior disc bulges at the C3-4 through C7-T1 levels. These are each encroaching upon the ventral aspect of the thecal sac and to some extent the lateral recesses bilaterally.

No other epidural impression upon the thecal sac is observed.

There is no significant spinal stenosis.

The cord has a normal course, caliber and signal intensity without evidence of a mass, myelomalacia, cord edema or syrinx.

541.    Regardless, and without clarification, Defendant Cohen decided Claimant F needed his healthy facets drilled out and destroyed, the lamina of his spine removed, the intervertebral disc removed, and instrumented fixation at C4-5 using a spacer/fixation device called the

COMPLAINT                                                                                        156

Blackhawk™ by Choice Spine, for the amorphous justification of "intractable cervicalgia," or more simply stated, unspecified neck pain.

542.     Within the operative report itself, the justification claimed was:

> **Preoperative Diagnosis:** Injured C4-5 disc with herniation and loss of lordosis with cervicalgia and radiculopathy.

543.     However, the ink on that very page was the first time anyone said Claimant F had a herniation. The ink on that page was the first time anyone said Claimant F had cervical radiculopathy. The justification was pulled from thin air and contradicts each and every one of Claimant F's records up through the date of the unjustified surgery.

544.     It is alleged Cohen made this unjustifiable determination for economic motive having to do with his referral stream and royalties and having nothing to do with Claimant F's well-being.

**General Payments Across All Years received from CHOICE SPINE, LLC**

Display as:  Chart   Table

| Year | Amount | Records |
|------|--------|---------|
| All | $306,634.83 | 34 |
| 2024 | $60,145.29 | 7 |
| 2023 | $47,407.32 | 5 |
| 2022 | $32,215.74 | 6 |
| 2021 | $31,603.66 | 5 |
| 2020 | $45,692.49 | 2 |
| 2019 | $56,662.65 | 5 |
| 2018 | $32,907.68 | 4 |

COMPLAINT

157



545.    In travelling to CareWell in New Jersey to perform this unjustified surgery on July 21, 2023, Cohen made use of interstate facilities with the intent to further, and in fact did further, bribery of a witness, extortion, and fraud scheme in violation of 18 U.S.C. § 1952, in performing a knowingly unnecessary cervical spine fusion on Claimant F, with knowingly false justification.

546.    On April 17, 2025, Cohen purportedly performed an L5-S1 posterolateral fusion on Claimant F at CareWell in New Jersey. The facility diagnosis justification is simply "pain," the **purportedly installed implants are missing any FDA-mandated UDI tracking information** (serial and/or batch/lot numbers), and Cohen purportedly performed this complex procedure **in just thirty two minutes**.



**Case Times EOGH**

| Patient | Entry 1 | | |
|---|---|---|---|
| In Room Time | 04/17/25 14:23:00 | Out Room Time | 04/17/25 16:08:00 |
| Surgery/Procedure Start Time | 04/17/25 15:19:00 | Stop Time | 04/17/25 15:50:00 |
| Last Modified By: | Estime, Khayla RN 04/17/25 16:12:37 | | |

| | Entry 1 | Entry 2 | Entry 3 |
|---|---|---|---|
| Procedure | Lumbar Decompression and Fusion | Lumbar Decompression and Fusion | Lumbar Decompression and Fusion |
| Implant Action | Implanted | Implanted | Implanted |
| Implant/Explant Site | Back | Back | Back |
| Implant Identification (EOGH) | | | |
| Description | agilon moldable | 8.5 x 50mm screw | rod 45mm |
| Quantity | 1 | 1 | 1 |
| Size | 6cc | 50mm x 8.5 | 45mm |
| Manufacturer | biogennix | resurrection spine | resurrection spine |
| Catalog Number | 006-ag1 | rs108550 | rs40p045 |
| Lot/Batch Number | 17619 | n/a | n/a |
| Serial Number | n/a | n/a | n/a |
| Donor ID | | | |

| | Entry 4 | Entry 5 |
|---|---|---|
| Procedure | Lumbar Decompression and Fusion | Lumbar Decompression and Fusion |
| Implant Action | Implanted | Implanted |
| Implant/Explant Site | Back | Back |
| Implant Identification (EOGH) | | |
| Description | set screw | 8.5 x 45mm screw |
| Quantity | 2 | 1 |
| Size | n/a | n/a |
| Manufacturer | resurrection spine | resurrection spine |
| Catalog Number | rs20-0002 | rs108545 |
| Lot/Batch Number | n/a | n/a |
| Serial Number | n/a | n/a |

547.    This is in comparison to Claimant F's earlier surgery, wherein Cohen had a vested interest in tracking accurate usage of his royalty-bearing device:

COMPLAINT                                                                159



548.    Meanwhile, earlier lumbar X-rays from July 7, 2022, were completely normal. A lumbar MRI from that same day was **completely normal**. A lumbar CT on May 29, 2024, found no bulge or herniation at L5-S1, with solely a finding of an incidental cyst at L2-3 and straightening of lordosis. Later independent review of these MRIs chiefly agreed with the findings, stating "aside from the incidental cyst at L2-3 level, this is a completely normal exam." At no point in time was Claimant F even suggested to have any pathology at L5-S1.

549.    **Cohen's justification for surgery was simply made up**.

7/7/2022

L4-L5: No disc bulging or herniation...
L5-S1: No disc bulging or herniation. No spinal canal or foraminal stenosis.

IMPRESSION: MRI of the lumbar spine demonstrates:

No focal disc herniation or spinal stenosis.

5/24/2024

5-S1 level demonstrates no disc bulge or herniation. No foraminal impingement or canal stenosis.

IMPRESSION:
4 mm para facet cyst posterior to the left-sided L2-L3 facets.
Straightening of the normal lumbar lordosis indicative of muscular spasm.

COMPLAINT                                                                                   160

Cohen, April 17, 2025

**Preoperative Diagnosis:** Injured L5-S1 Disc with disc bulge and loss of lordosis with mechanical low back pain and radicular pain.

550.    Cohen operated on a **completely healthy spinal level**, **removing healthy bone, facet, and disc**. He further performed the same one-sided "half-instrumentation" at issue that failed for numerous Claimants described in the *Union Liakas* Action.

551.    In travelling to CareWell in New Jersey to perform this unjustified surgery on April 17, 2025, Cohen made use of interstate facilities with the intent to further, and in fact did further, bribery of a witness, extortion, and the Fraud Scheme in violation of 18 U.S.C. § 1952, in performing a knowingly unnecessary cervical spine fusion on Claimant F, with knowingly false justification.

552.    In creating the multitude of falsified reports regarding Claimant F purporting to support that continuing and escalating treatments, and ultimately unnecessary surgeries, were plausibly justified, SMSR, Geraci, McCulloch Orth, Capiola, Total Ortho, Burducea, and Cohen knew, or should have known, that such records were false, and further knew, or should have known, such false documentation would be mailed or otherwise transmitted as a necessary step and in furtherance of the Fraud Scheme, with each such mailing and transmission constituting violations of 18 U.S.C. §§ 1341 & 1343, predicate acts pursuant to 18 U.S.C. § 1961(1).

553.    Such transmission did in fact occur on June 13, 2024, when Total Ortho faxed such records of Burducea and Total Ortho, as a necessary step in furtherance of the Fraud Scheme, to Plaintiff's medical records agent, constituting a violation of 18 U.S.C. § 1343.

COMPLAINT                                                                    161

554.     Such transmission did in fact occur on July 18, 2024, when McCulloch Ortho e-mailed such records of Capiola and McCulloch Ortho, as a necessary step in furtherance of the Fraud Scheme, to Plaintiff's medical records agent, constituting a violation of 18 U.S.C. § 1343.

555.     Such transmission did in fact occur on August 16, 2024, when ESASC e-mailed such records of Capiola and McCulloch Ortho, to Plaintiff's panel counsel on the underlying case as a necessary step in furtherance of the Fraud Scheme, to Plaintiff's medical records agent, constituting a violation of 18 U.S.C. § 1343.

556.     Such transmission did in fact occur on October 29, 2024, when ESASC e-mailed billing records of Capiola and McCulloch Ortho, to Plaintiff's panel counsel on the underlying case as a necessary step in furtherance of the Fraud Scheme, to Plaintiff's medical records agent, constituting a violation of 18 U.S.C. § 1343.

557.     Claimant F's subject lawsuit was commenced by the filing of a Verified Summons and Complaint, verified by Paul Generosa, at the Liakas Defendants' direction, on or about May 16, 2023. It is alleged Dean Liakas and the Liakas Defendants had actual knowledge of the falsity of the claimed injuries and false claim of liability.

558.     On January 23, 2025, at the direction of Liakas Defendants, Paul Generosa of Liakas Firm verified and mailed a Verified Bill of Particulars on behalf of Claimants F, alleging knowingly pre-existing and non-existent injuries, and knowingly manufactured treatment, to be the result of the purported accident.

559.     On August 27, 2025, at the direction of Liakas Defendants, Manuel Perez of Liakas Firm verified and mailed a Supplemental Verified Bill of Particulars on behalf of Claimant F, alleging knowingly pre-existing and non-existent injuries, and knowingly manufactured treatment, to be the result of the purported accident.

560.    As the Liakas Firm is alleged to have coordinated the fraudulent and knowingly unnecessary medical treatment, it is directly alleged that the verified documents  caused to be mailed to Plaintiff and/or Plaintiff's retained counsel in the underlying matter were knowingly false, and mailed in furtherance and as a necessary step in the Fraud Scheme, constituting a violation of 18 U.S.C. § 1341 (October 16, 2023; March 5, 2024; July 10, 2024) and § 1343 (April 28, 2023)

## VII.    DEFENDANTS' FURTHER PATTERN OF RACKETEERING ACTIVITY

561.    In addition to the acts set forth above, the predicate acts as alleged against the Liakas Firm, Dean Liakas, Total Ortho, Lerman, McCulloch Ortho, NY S&J, McCulloch, Capiola, AcceleRad, and Cohen as set forth in the *Union Liakas* Action. (Ex. 1) and the *Roosevelt Liakas* Action (Ex. 3) are incorporated by reference as if fully set forth herein.

## VIII.   DAMAGES

562.    Plaintiff is an insurance carrier which underwrites policies that cover the various claims and lawsuits filed and prosecuted by Claimants and the Legal Defendants, with the necessary and substantial assistance of the Medical Provider Defendants, the Runner Defendants, and the Funding Defendants, as part of the Fraud Scheme.

563.    As a result of the Fraud Scheme, Plaintiff has incurred substantial damages. Such damages include the payments that Plaintiff made to Legal Defendants in the form of settlements due to Defendant's pattern of fraudulent conduct. Damages also include payments Plaintiff made as legal and investigative costs for defending fraudulent lawsuits and/or for reimbursement for payments made as part of settlement which were diverted to Defendant Medical Providers through liens for treatment predicated upon, in whole or in part, the fraudulent reports generated by Defendants.

COMPLAINT                                                                                                    163

564.    But for Defendants' perpetration of the Fraud Scheme, Plaintiff would not have incurred such damages. Each and every predicate act contributed to the damages incurred, as the scheme is designed reinforce itself, becoming more difficult to discern, more expensive to combat, and more effective generally upon each subsequent production of false statements and documents, effectuated through the use or mail and wire communication, and through reinvestment in the scheme and iteration, in an ever-escalating bootstrap; damages would have lessened or not incurred at all but for fraudulent scheme.

565.    New York law mandates that an insurer's duty to defend is triggered by the filing of a claim or suit - even if the allegations are false or groundless, the insurer has a duty to defend its insured. By law, each and every fraudulent claim and lawsuit immediately and directly triggered mandated expenses by Plaintiff in discharging its duty to defend its insured.

566.    Each transmission of records of fraudulent medical treatment rendered (or falsely recorded) had the direct and immediate effect of causing additional damages through Plaintiff's further incurred fees and costs in discharging its legal obligation to provide a defense to its insured, through prolonged litigation, the need for experts, required additional reserves, and were relied upon in valuing the claim as to exposure and/or settlement in figures that were fraudulently inflated.

567.    Further, Plaintiff's business operations include general liability services from underwriting through claims handling and subsequent administrative and legal actions, including effective handling of personal injury claims. As a direct and foreseeable result of the fraudulent scheme, Plaintiff was obligated to hire and retain additional personnel specifically to address fraudulent claims beyond the normal scope of business.

COMPLAINT                                                                                              164

## IX.    CAUSES OF ACTION

### COUNT I
**RICO Violation (§ 1962[c])**
***Fraud Scheme Enterprise* (Association-In-Fact)**

**As Against:**

**LIAKAS LAW, P.C.,**
**DEAN LIAKAS,**
**NICHOLAS LIAKAS,**
**ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC**
**d/b/a TOTAL ORTHOPAEDICS,**
**ALEXIOS APAZIDIS, M.D.,**
**MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C.**
**s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS**
**("Count I Defendants")**

568.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

569.    Each of Liakas Firm, Dean Liakas, N. Liakas, Total Ortho, Apazidis, and McCulloch Ortho is a "person" as that term is defined by statute under 18 U.S.C. § 1961, *et seq.*

570.    The Count I Defendants constituted an association-in-fact enterprise as that term is defined by statute under 18 U.S.C. § 1961, *et seq.* (the "Fraud Enterprise").

571.    The Count I Defendants maintained a common purpose: to generate and monetize personal-injury claims through falsified testimony, false medical necessity, and unnecessary surgeries. The relationships among Count I Defendants and others enabled the enterprise's functions (referrals, imaging, surgeries, liens, funding, and litigation coordination; closed loop referral systems). Roles have not always remained fixed, notably with other Enterprise participants, named herein and otherwise, assuming roles within certain iterations of the underlying scheme, with the Enterprise functioning as a continuing unit distinct from any individual Count I Defendant. The Fraud Scheme Enterprise has maintained sufficient longevity to pursue its purpose, as well as continues through the present.

COMPLAINT                                                                     165

572.    Each Count I Defendant conducted the affairs, or participated in the conduct of the affairs, of the Enterprise as set forth at length *supra*, § V.

573.    From at least 2018 through the present, each Count I Defendant conducted and/or participated in the conduct of the affairs of the Fraud Enterprise, by engaging in transactions and conduct constituting a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

574.    This conduct included predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, Hobbs Act violations under 18 U.S.C. § 1951, Travel Act violations under 18 U.S.C. § 1952, and New York Penal Law § 215.05 ("the Predicates"), directly and proximately causing Plaintiff's recoverable and compensable damages. These acts included, but are not limited to, the following:

### LIAKAS LAW, P.C.

| Claimant/ (Why) | Date/ (When) | From/To/ (Who) | Sent/ (What) | Sent/ (How) | Statute Applicable |
|---|---|---|---|---|---|
| A | 4/4/2021 | Dean Liakas -> Court; later emailed to Plaintiff | Verified Complaint | NYSCEF; E-mail | § 1343 |
| A | 3/9/2022 | M. Kerner -> Plaintiff's Panel Counsel | Verified Bill of Particulars | Mail | § 1341 |
| A | Ongoing | Conspiracy with Enterprise ->Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |
| A | 2/8/2021 | Liakas Firm -> Apazidis | $10,000 | Unknown | NY PL § 215.00 |
| B & C | 6/7/2021 | Dean Liakas -> Court; later emailed to Plaintiff | Verified Complaint | NYSCEF; E-mail | § 1343 |
| B & C | 6/8/2021 | Dean Liakas -> Court; later emailed to Plaintiff | Supplemental Summons and Amended Complaint | NYSCEF; E-mail | § 1343 |
| B & C | 2/28/2022 | S. Gallo -> Plaintiff's Panel Counsel | Verified Bill of Particulars | Mail | § 1341 |
| B & C | Ongoing | Conspiracy with Enterprise ->Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |

COMPLAINT

166

| D | 4/28/2023 | Dean Liakas -> Court; later emailed to Plaintiff | Verified Complaint | NYSCEF; E-mail | § 1343 |
|---|---|---|---|---|---|
| D | 10/16/2023 | P. Generosa -> Plaintiff's Panel Counsel | Verified Bill of Particulars | Mail | § 1343 |
| D | 3/5/2024 | P. Generosa -> Plaintiff's Panel Counsel | Supplemental Verified Bill of Particulars | Mail | § 1341 |
| D | 6/25/2024 | Liakas Firm -> Total Ortho | $13,000 | Unknown | NY PL § 215.00 |
| D | 7/10/2024 | P. Generosa -> Plaintiff's Panel Counsel | Second Supplemental Verified Bill of Particulars | Mail | § 1341 |
| D | 7/10/2024 | Liakas Firm -> Pl. Panel Counsel | Medical Records | Mail | § 1341 |
| D | Ongoing | Conspiracy with Enterprise ->Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |
| E | 7/26/2023 | M. Lerner -> Court; later emailed to Plaintif | Verified Complaint | NYSCEF; E-mail | § 1343 |
| E | 1/12/2024 | S. Chyi -> Court; later emailed to Plaintif | Verified Bill of Particulars | Mail | § 1341 |
| E | Ongoing | Conspiracy with Enterprise ->Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |
| F | 5/16/2023 | P. Generosa -> Court; later emailed to Plaintiff | Verified Complaint | NYSCEF; E-mail | § 1343 |
| F | 1/23/2025 | P. Generosa -> Plaintiff's Panel Counsel | Verified Bill of Particulars | Mail | § 1341 |
| F | 8/27/2025 | M. Perez -> Plaintiff's Panel Counsel | Supplemental Verified Bill of Particulars | Mail | § 1341 |
| F | Ongoing | Conspiracy with Enterprise ->Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |

## **DEAN LIAKAS**

| Claimant/ (Why) | Date/ (When) | From/To/ (Who) | Sent/ (What) | Sent/ (How) | Statute Applicable |
|---|---|---|---|---|---|
| A | 4/4/2021 | Dean Liakas -> Court; later emailed to Plaintiff | Verified Complaint | NYSCEF; E-mail | § 1343 |

COMPLAINT                                                                                                  167

| A | Ongoing | Conspiracy with Enterprise ->Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |
|---|---|---|---|---|---|
| B & C | 6/7/2021 | Dean Liakas -> Court; later emailed to Plaintiff | Verified Complaint | NYSCEF; E-mail | § 1343 |
| B & C | 6/8/2021 | Dean Liakas -> Court; later emailed to Plaintiff | Supplemental Summons and Amended Complaint | NYSCEF; E-mail | § 1343 |
| B & C | Ongoing | Conspiracy with Enterprise ->Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |
| D | Ongoing | Conspiracy with Enterprise ->Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |
| E | Ongoing | Conspiracy with Enterprise ->Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |
| F | Ongoing | Conspiracy with Enterprise ->Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |

## NICHOLAS LIAKAS

| Claimant/ (Why) | Date/ (When) | From/To/ (Who) | Sent/ (What) | Sent/ (How) | Statute Applicable |
|---|---|---|---|---|---|
| A | Ongoing | Conspiracy with Enterprise ->Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |
| A | 2/8/2021 | N. Liakas -> Apazidis/Total Ortho | $10,000 | Unknown | NY PL § 215.00 |
| B & C | Ongoing | Conspiracy with Enterprise -> Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |
| D | Ongoing | Conspiracy with Enterprise -> Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |
| D | 6/25/2024 | N. Liakas -> Jeyamohan/ Total Ortho | $15,000 | Unknown | NY PL § 215.00 |
| E | Ongoing | Conspiracy with Enterprise -> Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |

COMPLAINT                                                                            168

| F | Ongoing | Conspiracy with Enterprise -> Plaintiff | Conspiracy/ Attempt to Extort | Fear of Economic Harm | § 1952 |

## ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC
## d/b/a TOTAL ORTHOPEDICS

| Claimant/ (Why) | Date/ (When) | From/To/ (Who) | Sent/ (What) | Sent (How) | Statute Applicable |
|---|---|---|---|---|---|
| A | 5/26/2022 | Total Ortho -> Pl. Med. Rec. Agent | Medical Records | Fax | § 1343 |
| A | 4/4/2024 | AllCity -> Pl. Med. Rec. Agent | Medical Records | Digital File Share | § 1343 |
| A | Ongoing | Conspiracy with Enterprise -> Plaintiff | Conspiracy to Extort | Fear of Economic Harm/ Use of Force | § 1952 |
| B | 3/17/2022 | Total Ortho -> Pl. Med. Rec. Agent | Medical Records | Fax | § 1343 |
| B | 5/22/2024 | Total Ortho -> Pl. Med. Rec. Agent | Medical Records | E-mail | § 1343 |
| C | 9/7/2021 | NY -> NJ Jeyamohan/Kumar | Inter-state Use Facilities in Furtherance | Intent to, and did, further schemes | § 1952 |
| C | 8/7/2025 | Total Ortho -> Pl. Med. Rec. Agent | Medical Records | Dig. File Share | § 1343 |
| B&C | Ongoing | Conspiracy with Enterprise -> Plaintiff | Conspiracy to Extort | Fear of Economic Harm/ Use of Force | § 1952 |
| D | 10/24/2023 | Unknown Funder -> Jeyamohan | $13,000 | unknown | NY PL § 215.05 |
| D | 10/24/2023 | NY -> NJ Jeyamohan/Kumar | Inter-state Use Facilities in Furtherance | Intent to, and did, further schemes | § 1952 |
| D | 6/25/2024 | Liakas Firm -> Jeyamohan | $15,000 | Unknown | NY PL § 215.05 |
| D | 8/20/2024 | CareWell -> Pl. Med. Rec. Agent | Medical Records | Fax | § 1343 |
| D | 7/20/2024 | Liakas Firm -> Pl. Med. Rec. Agent | Medical Records | Mail | § 1341 |
| D | Ongoing | Conspiracy with Enterprise -> Plaintiff | Conspiracy to Extort | Fear of Economic | § 1952 |

| | | | | Harm/ Use of Force | |
|---|---|---|---|---|---|
| F | 6/13/2024 | Total Ortho -> Pl. Med. Rec. Agent | Medical Records | Fax | § 1343 |

### ALEXIOS APAZIDIS, M.D.

| Claimant/ (Why) | Date/ (When) | From/To/ (Who) | Sent/ (What) | Sent (How) | Statute Applicable |
|---|---|---|---|---|---|
| A | 2/8/2021 | Liakas Firm -> Apazidis | $10,000 | Unknown | NY PL § 215.05 |
| A | 5/26/2022 | Total Ortho -> Pl. Med. Rec. Agent | Medical Records | Fax | § 1343 |
| A | 4/4/2024 | AllCity -> Pl. Med. Rec. Agent | Medical Records | Dig. File Share | §1343 |
| A | 4/4/2021 -> Present | Conspiracy with Enterprise -> Plaintiff | Conspiracy to Extort | Fear of Economic Harm/ Use of Force | § 1952 |
| B | 9/19/2023 | Unknown Funder -> Apazidis | $15,000 | Unknown | NY PL § 215.05 |
| B | 12/11/2023 | NY -> NJ Apazidis | Inter-state Use Facilities in Furtherance | Intent to, and did, surgery | § 1952 |
| B | 4/29/2024 | Health East Med. Center -> Pl. Med. Rec. Agent | Billing Records | E-mail | § 1343 |
| B | 5/22/2024 | Total Ortho -> Pl. Med. Rec. Agent | Medical Records | E-mail | § 1343 |
| B | 5/28/2024 | AllCity -> Pl. Med. Rec. Agent | Medical Records | Dig. File Share | § 1343 |
| B | Ongoing | Conspiracy with Enterprise -> Plaintiff | Conspiracy to Extort | Fear of Economic Harm/ Use of Force | § 1952 |
| C | Ongoing | Conspiracy with Enterprise -> Plaintiff | Conspiracy to Extort | Fear of Economic Harm/ Use of Force | § 1952 |

COMPLAINT                                                                 170

**MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C.**
**s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS**

| Claimant/ (Why) | Date/ (When) | From/To (Who) | Sent (What) | Sent (How) | Statute Applicable |
|---|---|---|---|---|---|
| A | 3/8/24 | Emp. State Amb. Surg. Center -> Plaintiff's Med. Records Agent | Surgical Records | E-mail | § 1343 |
| A | Ongoing | Conspiracy with Enterprise -> Plaintiff | Conspiracy to Extort | Fear of Economic Harm/ Use of Force | § 1952 |
| E | 3/15/2024 | Emp. State Amb. Surg. Center -> Plaintiff's Med. Records Agent | Surgical Records | E-mail | § 1343 |
| E | Ongoing | Conspiracy with Enterprise -> Plaintiff | Conspiracy to Extort | Fear of Economic Harm/ Use of Force | § 1952 |
| F | 7/18/2024 | McCulloch Ortho -> Plaintiff's Med. Records Agent | Medical Records | E-mail | § 1343 |
| F | 8/16/2024 | Emp. State Amb. Surg. Center -> Plaintiff's Med. Records Agent | Surgical Records | E-mail | § 1343 |
| F | 10/29/2024 | Emp. State Amb. Surg. Center -> Plaintiff's Med. Records Agent | Billing Records | E-mail | § 1343 |
| F | Ongoing | Conspiracy with Enterprise -> Plaintiff | Conspiracy to Extort | Fear of Economic Harm/ Use of Force | § 1952 |

575.    The predicate acts were horizontally related in that they share purposes, results, participants, victims, methods of commission, and generally similar *modus operandi* with the other predicate acts alleged. The predicate acts were vertically related in that the offenses related to the activities of the Enterprise; the scheme behind the predicate acts alleged indeed only functioned in conjunction with the other predicate acts alleged as against the other members.

COMPLAINT                                                                171

576. The transactions and predicate acts occurred over a substantial period of time, at least five years, and through to the present, with credible risk of continuing into the future.

577. Upon information and belief, there exists a presently unknown number of additional predicate acts in the same pattern and practice which are within the exclusive knowledge of Count I Defendants which Plaintiff cannot readily ascertain without discovery.

578. The Predicates of mail and wire fraud have been pled with particularity, with the tabled of Predicates set forth above detailing who sent the mail and/or wires, how, when, and to whom, and in what manner they a) were in furtherance of the scheme or artifice to defraud as set forth within each applicable Claimant section, with the details of such overarching scheme detailed *en passim, supra*, and specifically pp. 26-33, and/or b) why were contents of those mail/wire transmissions were themselves fraudulent, as set forth at length within the applicable Claimant section. Each Count I Defendant knew, intended, and/or could reasonably foresee the use of such mails and wires as a necessary step in furtherance of the larger scheme or artifice to defraud.

579. The Hobbs Act violations pled are not subject to heightened pleading requirements, and sufficient allegations have been set forth as to affecting commerce through obtaining of, attempting to obtain, and/or conspiring to obtain property from Plaintiff through Plaintiff's consent, as induced or attempted to induce by wrongful use of actual force and violence (upon Claimants), as well as fear of economic harm (upon Plaintiff), as set forth at length in Count I.

580. Dean Liakas agreed, conspired to, and in fact did, attempt to impose such fear of economic harm upon Plaintiff so as to induce consent for Plaintiff's property to be obtained in at least the matters of the Claimants herein, constituting, at minimum, six discreet such violations of § 1951.

COMPLAINT                                                                                        172

581.    N. Liakas agreed, conspired to, and if fact did, attempt to impose such fear of economic harm upon Plaintiff so as to induce consent for Plaintiff's property to be obtained; beyond the allegations set forth in Counts I and II, incorporated herein, N. Liakas evidenced such agreement and attempt in facilitating funding, if not directly funding, knowingly unnecessary surgeries in at least the matters of the Claimants herein, constituting, at minimum, six discreet such violations of § 1951.

582.    Total Ortho agreed, conspired to, and in fact did, attempt to impose such fear of economic harm upon Plaintiff, and engaged in actual force or violence in performing knowingly unnecessary surgeries which permanently altered their spines, so as to induce consent for Plaintiff's property to be obtained in at least the matters of Claimants A-D, six discreet such violations of § 1951.

583.    McCulloch Ortho agreed, conspired to, and in fact did, attempt to impose such fear of economic harm upon Plaintiff, and engaged in actual force or violence in performing knowingly unnecessary surgeries which Claimants' shoulders were opened, invaded, and altered, so as to induce consent for Plaintiff's property to be obtained in at least the matters of Claimants A-D, six discreet such violations of § 1951.

584.    The Travel Act violations pled, here as against Total Ortho, are not subject to heightened pleading requirements, and sufficient allegations have been set forth regarding interstate travel to New Jersey, with intent to carry on or facilitate the carrying on, an extortion scheme (Hobbs Act, above) and/or bribery scheme (below) (sufficient "unlawful activity" under § 1952[b]), and did in fact so carry on or facilitate the carrying on of such scheme through the performance of knowingly unnecessary surgeries, in at least the matters of Claimant C and D.

COMPLAINT                                                                                           173

585.     New York Penal Law § 215.00 (bribing a witness) and § 215.05 (bribe receiving by a witness) are similarly not subject to heightened pleading requirements.

586.     N. Liakas engaged in a violation of New York Penal Law § 215.00 in the matter of Claimant A, in conferring $10,000 to Apazidis, the treating physician and known anticipated witness in that pending action, upon an agreement or understanding that Apazidis would (i) conduct a medically unnecessary spinal surgery, together with creating documentation known to be submitted to the Court falsely finding necessity and causal relation, and (ii) provide fraudulent documentation and testimony supporting the need for the surgery.

587.     Liakas Firm, upon information and belief, by, though, or at the direction of N. Liakas, engaged in a violation of New York Penal Law § 215.00 in the matter of Claimant D, in conferring $15,000 to Jeyamohan of Total Ortho, the treating physician and known anticipated witness in that pending action, upon an agreement or understanding that Jeyamohan would (i) conduct a medically unnecessary spinal surgery, together with creating documentation known to be submitted to the Court falsely finding necessity and causal relation, and (ii) provide fraudulent documentation and testimony supporting the need for the surgery.

588.     Total Ortho engaged in a violation of New York Penal Law § 215.05 in the matter of Claimant A, by and through Apazidis (an officer and/or employee of Total Ortho at that time), the treating physician and known anticipated witness in that pending action, receiving $10,000 upon an agreement or understanding that Total Ortho would (i) conduct a medically unnecessary spinal surgery, together with creating documentation known to be submitted to the Court falsely finding necessity and causal relation, and (ii) provide fraudulent documentation and testimony supporting the need for the surgery.

589.    Total Ortho engaged in a violation of New York Penal Law § 215.05 in the matter of Claimant D, by and through Jeyamohan (an officer and/or employee of Total Ortho at that time), the treating physician and known anticipated witness in that pending action, receiving $13,000 upon an agreement or understanding that Total Ortho would (i) conduct a medically unnecessary spinal surgery, together with creating documentation known to be submitted to the Court falsely finding necessity and causal relation, and (ii) provide fraudulent documentation and testimony supporting the need for the surgery.

590.    Total Ortho engaged in a violation of New York Penal Law § 215.05 in the matter of Claimant D, by and through Jeyamohan (an officer and/or employee of Total Ortho at that time), the treating physician and known anticipated witness in that pending action, receiving $15,000 upon an agreement or understanding that Total Ortho would (i) conduct a medically unnecessary spinal surgery, together with creating documentation known to be submitted to the Court falsely finding necessity and causal relation, and (ii) provide fraudulent documentation and testimony supporting the need for the surgery.

591.    The transmissions pled by Total Ortho, McCulloch Ortho, Apazidis, and Liakas Firm Defendants were made to support monetary demands backed by such wrongful use of actual violence or force, and fear of economic harm, were made by wire and mail, involve several instances of violence and force in other states, and thus constituted acts of extortion or attempted extortion affecting interstate commerce.

592.    Liakas Firm's lawsuits, proxy filings *via* affiliates, pre-suit demands, *ad damnum* demands, and lien/assignment claims (collectively, the "Sham Claims") lacked any probable cause and were/are objectively baseless. Across even, and at least, the exemplars herein, Liakas Firm,

COMPLAINT                                                                                    175

Dean Liakas, and N. Liakas, with the substantial assistance of McCulloch Ortho, Total Ortho, Apazidis, and others known and unknown:

    a. knowingly pursued injury claims contradicted by contemporaneous medical records, IME findings, even their own diagnostic reviews;

    b. knowingly relied on templated reports cut-and-paste across patients with identical "findings" and billing codes;

    c. knowingly relied on inflated or fabricated treatment records;

    d. brought cases forward provided by a knowingly illicit referral source;

    e. knowingly, or in conscious avoidance of the truth, engaged in business, and provided things of value, to receive Claimants for the Fraud Scheme who are at high likelihood of a trafficking operation;

    f. utilized escalating and unjustified medical treatments and surgeries on non-English speaking, often undocumented, immigrants with limited education and understanding, not to obtain legitimate redress on any merits, but to impose escalating litigation and discovery costs and exposure risk so as to coerce payments unrelated to claim validity - *i.e.*, to use the governmental process, as opposed to the valid outcome of that process, as a weapon.

593. As evidenced herein and elsewhere, Liakas Firm wages a repeated and identifiable campaign in Courts to block, burden, and penalize Plaintiff's right and ability to contest claims, flooding calendars with virtually identical actions and repeated allegation supplements so as to prevent any sustained scrutiny on any individual treatment, surgery, or provider, to multiply the expense of defense, and to continuously raise exposure risk so as to impose the falsely imposed construct of settling at or near policy or risking bad faith exposure for failing to so *via* potential bad faith claims.

594. Liakas Firm abused process through knowing and material falsehoods to Court and other litigants, as well as Plaintiff and similarly situated ultimate-payors *via* fabricated accident narratives, testimony, and medical findings, false statements of treatment rendered, and intentionally utilizing a network of concealed kickbacks and closed-loop self-referral

COMPLAINT                                                                                    176

arrangements. The lawsuits and claims were (a) objectively baseless and (b) subjectively intended to burden and coerce rather than to win legitimate merits.

595.    As the ultimate goal of the Fraud Scheme Enterprise was to extort and/or defraud Plaintiff out of settlements and awards, Plaintiff is the intended victim of the Fraud Scheme Enterprise and the pattern of racketeering activity. Put simply, should the Fraud Scheme succeed, the success is marked by a settlement check. Plaintiff's account would be, or has been, drawn upon for purposes of such check, and in the interim, such accounts are drawn upon to pay investigative fees, expert fees, legal fees, and litigation costs as required under the duty to defend. There is no break in the causal chain between Defendants' conduct and Plaintiff's damages.

596.    As a result of the pattern of racketeering activity, Plaintiff has suffered damage to their business and property.

**WHEREFORE**, Plaintiff demands judgment against the Count I Defendants, and each of them, jointly and severally, for:

a.  An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.  Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c.  Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d.  Such other relief as the Court deems just and proper.

COMPLAINT

## COUNT II
### RICO – 18 U.S.C. § 1962(c) – Equitable Relief Under 1964(a)
### *Fraud Scheme Enterprise*

**As Against:**

**DAVID R. CAPIOLA, M.D.;**
**ALEXIOS APAZIDIS, D.O.,**
**SHIVEINDRA JEYAMOHAN, M.D.,**
**ANDERS J. COHEN, D.O.**
**("Count II" Defendants)**

597.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

598.    Count II Defendants are physicians licensed to practice medicine in the State of New York and are subject to oversight and discipline by the New York State Department of Health, Office of Professional Medical Conduct ("OPMC"), pursuant to Public Health Law § 230 *et seq.*

599.    As set forth in this Complaint, Defendants have engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including predicate acts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), Travel Act violations (18 U.S.C. § 1952), and conspired to and/or attempted to commit Hobbs Act violations (18 U.S.C. § 1951), all committed in the course of, and possible through, their medical practice and clinical documentation, including the falsification of clinical and operative reports, performance of unnecessary treatment including surgeries, the assertion of fraudulent liens, and the receipt of moneys and referral streams in exchange for such conduct.

600.    The conduct described herein constitutes professional misconduct under New York Education Law § 6530, including but not limited to the willful filing of false reports, conduct evidencing moral unfitness to practice medicine, and practicing fraudulently (Education Law § 6530[2]).

601.    Pursuant to 18 U.S.C. § 1964(a), this Court has authority to issue orders to prevent and restrain violations of § 1962, including equitable orders ancillary to the enforcement of federal racketeering laws. It is suggested that comity interests mandate the appropriate venue for determining these physicians' ability to continue practicing medicine in light of the above should be the New York State Office of Professional Medical Conduct ("OPMC").

602.    This relief requested is narrowly tailored, does not supplant the independent authority of OPMC, and is appropriate to restrain and prevent the ongoing use of a medical license as an instrumentality of a RICO enterprise.

**WHEREFORE**, to prevent irreparable harm to patients and the public, and to restrain ongoing violations of the RICO statute by means of abuse of medical licensure, Plaintiff demands judgment in the form of injunctive relief as against the Count II Defendants:

    a.  Referring the conduct of Count II Defendants as described in this Complaint to the New York State Department of Health, Office of Professional Medical Conduct, for independent evaluation and, if appropriate, investigation into potential professional misconduct;

    b.  Directing the Clerk of the Court to transmit a certified copy of this Complaint and the Court's referral order to OPMC within seven (7) days of entry of the Order;

    c.  Stating that such referral is necessary and proper to prevent further facilitation of racketeering activity through continued licensure; and,

    d.  Retaining jurisdiction to monitor the outcome of any resulting disciplinary proceedings to the extent consistent with principles of comity and federalism.

COMPLAINT                                                                                                      179

## COUNT III
### RICO Conspiracy (§ 1962[d])
### *Fraud Scheme Enterprise*

### As Against All Defendants

603.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

604.    From at least 2018 to the present, Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

605.    The pattern of racketeering activity in which the Defendants intentionally combined to engage in, or otherwise conspired to engage in, involved numerous specific acts and conduct as described in detail in this Complaint, constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), Travel Act violations (18 U.S.C. § 1952), and Hobbs Act violations (18 U.S.C. § 1951) – all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

606.    The predicate acts of mail fraud, wire fraud, Travel Act violations, and Hobbs Act violations also involved the transmission and use of false and misleading documentation in furtherance of the Defendants' scheme to defraud Plaintiff in connection with submitting, filing, prosecuting, and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

607.    These predicate acts were necessary steps in and in furtherance of the Fraud Scheme Enterprise, in meeting the necessary steps of the Fraud Scheme agreed upon by the Defendants, including, *inter alia*:

COMPLAINT                                                                                              180

    a.   Recruiting Claimants and staging accidents;

    b.   Securing retainer of the attorneys within the Fraud Scheme Enterprise;

    c.   Managing Claimants through pre-determined protocol treatments;

    d.   Exaggerating and/or manufacturing claims of injury or severity thereto;

    e.   Creating inaccurate documentation to falsely support the claims;

    f.   Performing pre-determined and unnecessary surgeries;

    g.   Filing and prosecuting the fraudulent suits;

    h.   Providing and transmitting false documentation;

    i.   Providing or facilitating funding to support the Fraud Scheme;

    j.   Concealing the nature of the Fraud Scheme itself to perpetuate the scheme.

608.    Each Defendant knew that the acts detailed herein were part of a pattern of racketeering activity and agreed to facilitate, and did facilitate, the Fraud Scheme to the benefit of the Fraud Scheme Enterprise.

609.    In addition to the acts set forth in Count I, each Defendant knowingly agreed to participate in, adopted the goals of, and facilitated the common purpose of the enterprise.

610.    Dean Liakas agreed to, and did, provide substantial assistance through the management of the Fraud Scheme Enterprise, supervision and management of the litigation proceedings, managing Claimants and Medical Providers, and managing Liakas Firm attorneys and employees in furtherance of the scheme.

611.    N. Liakas agreed to, and did, provide substantial assistance through the management of the runner networks and referrals sourced through runners, supervision and management of the funding operation (including "horse trading" funding amongst affiliate firms),

managing Claimants and Medical Providers, engaging in conduct to both conceal and insulate the Enterprise, and managing logistics and relationships within the Enterprise.

612. Bogoraz Law agreed to, and did, provide substantial assistance through the management of the Enterprise, including management of the litigation proceedings, and coordinating Claimants and Medical Providers in the absence of Liakas Firm and continuing the Enterprise operation, particularly as to Claimants B and C.

613. Tavarez, Sone, and Rodriguez agreed to, and did, provide substantial assistance through Claimant recruitment.

614. Rolnik agreed to, and did, provide substantial assistance through the management of the runner networks and referrals sourced through runners.

615. Jumpstart agreed to, and did, provide substantial assistance through the provision of funds to induce Claimants to carry out the fraud scheme, induce Medical Providers to render unnecessary care and influence testimony, and engage in "horse trading" funding amongst affiliate firms, so as to further and facilitate the Fraud Scheme and its Enterprise;

616. The Total Ortho Defendants, and each of Lerman, Avanesov, Apazidis, Kumar, Jeyamohan, and Burducea agreed to, and did, provide substantial assistance both individually and through supervision and management of Total Ortho employees, in performing knowingly unnecessary surgeries and treatment, and providing falsified records of Claimant treatment and purported observation, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, utilize an implant and graft manufacturer in which they were interested, and coerce needlessly exorbitant settlements and unnecessary defense costs, including the matters of Claimants A, B, C, D, and F.

617.    Capiola and McCulloch Ortho agreed to, and did, provide substantial assistance both individually and through supervision and management of McCulloch Ortho employees, in performing knowingly unnecessary surgeries and providing falsified records of Claimant treatment and purported observation, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, utilize an implant and graft manufacturer in which they were interested, and coerce needlessly exorbitant settlements and unnecessary defense costs, including the matters of Claimants A, E, and F.

618.    Cohen agreed to, and did, provide substantial assistance in performing knowingly unnecessary surgeries and providing falsified records of Claimant treatment and purported observation, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, utilize an implant and graft manufacturer in which they were interested, and coerce needlessly exorbitant settlements and unnecessary defense costs, including the matters of Claimant F.

619.    Chaudhary agreed to, and did, provide substantial assistance in performing knowingly unnecessary surgeries and providing falsified records of Claimant treatment and purported observation, so as to prolong litigation, inflate medical billings and falsely inflate case and settlement values, utilize an implant and graft manufacturer in which they were interested, and coerce needlessly exorbitant settlements and unnecessary defense costs, including the matters of Claimant E.

620.    AcceleRad and Prakash agreed to, and did, provide substantial assistance, through intentionally overcalling MRIs and omitting degenerative and other findings to falsely support unnecessary surgeries, falsely justify continuing, escalating, and unnecessary treatments, to

needlessly prolong litigation, inflate medical billings, and falsely inflate case and settlement values, including the matters of Claimant A.

621.    Premier and Simhaee agreed to, and did, provide substantial assistance, both individually and through supervision and management of Premier, Premier employees, and Premier-run facilities, in providing falsified records of conservative treatments, as well as escalated treatments, so as to facially and falsely support unnecessary surgeries and continuing, escalating, and unnecessary treatments, inflate medical billings, prolong litigation, and falsely inflate case and settlement values, including the matters of Claimant A and E.

622.    Salehin and Brooklyn Med agreed to, and did, provide substantial assistance, both individually and through supervision and management of Brooklyn Med, its employees, and *via* the 410 Ditmas Clinic generally on behalf of its non-physician owners, in providing falsified records of conservative, as well as escalated, treatments so as to facially and falsely support unnecessary surgeries and continuing, escalating, and unnecessary treatments, inflate medical billings, prolong litigation, and falsely inflate case and settlement values, including the matters of Claimants B and C.

623.    Lebson and NSF Chiro agreed to, and did, provide substantial assistance, both individually and through supervision and management of NSF Chiro and its employees, in providing falsified records of conservative, as well as escalated, treatments so as to facially and falsely support unnecessary surgeries and continuing, escalating, and unnecessary treatments, inflate medical billings, prolong litigation, and falsely inflate case and settlement values, including the matters of Claimants B and C, and including through repeated use of rote findings of unsupported diagnostic impressions of "evidence of" radiculopathy to support knowingly unnecessary spinal fusions.

COMPLAINT                                                                                                184

624.     BAPM and Apple agreed to, and did, provide substantial assistance, both individually and through supervision and management of BAPM and its employees, in providing falsified records of conservative, as well as escalated, treatments so as to facially and falsely support unnecessary surgeries and continuing, escalating, and unnecessary treatments, inflate medical billings, prolong litigation, and falsely inflate case and settlement values, including the matters of Claimants B and C, through purported injections: always between one to three injections, *and literally not one patient has ever not purportedly needed to escalate to spinal surgery*.

625.     Wang and Unicorn agreed to, and did, provide substantial assistance, both individually and through supervision and management of Unicorn and its employees, in providing falsified records of conservative, as well as escalated, treatments so as to facially and falsely support unnecessary surgeries and continuing, escalating, and unnecessary treatments, inflate medical billings, prolong litigation, and falsely inflate case and settlement values, including the matters of Claimants B and C.

626.     CMI and McDonnell agreed to, and did, provide substantial assistance through the manufacturing of falsified MRIs and diagnostic tests to falsely support unnecessary surgeries, falsely justify continuing, escalating, and unnecessary treatments, to needlessly prolong litigation, inflate medical billings, and falsely inflate case and settlement values, including the matters of Claimants B and C.

627.     SMSR and Geraci agreed to, and did, provide substantial assistance, both individually and through supervision and management of SMSR, its employees, and *via* affiliated facilities generally on behalf of their shared non-physician and ultimate private equity owners, in providing falsified records of conservative, as well as escalated, treatments so as to facially and

COMPLAINT                                                                                      185

falsely support unnecessary surgeries and continuing, escalating, and unnecessary treatments, inflate medical billings, prolong litigation, and falsely inflate case and settlement values, including the matters of Claimants D, E, and F.

628.    ESASC agreed to, and did, provide substantial assistance, both individually and through supervision and management of ESASC, its employees, and *via* affiliated providers including Capiola, in providing falsified records and facilitating unnecessary surgeries through providing the facility, transportation, and other logistics, escalating, resulting in inflated medical billings, prolonged litigation, and falsely inflated case and settlement values, including the matters of Claimant A, E, and F.

629.    At least one conspirator – and indeed, most, if not all – committed overt acts in furtherance of the conspiracy, including the predicate acts as alleged in Count I.

630.    Each Defendant had knowledge of, at minimum, the general contours of the overall scheme and common objective; specifically, defrauding Plaintiff and those similarly situated.

631.    As a direct and proximate result of the § 1962(c) violations in Count I in which Count III Defendants were conspirators, Plaintiff has been injured in its business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, attorneys' fees, expert costs, and litigation costs.

632.    As a result of the pattern of racketeering activity and the conspiracy to commit same, Plaintiff has suffered damage to their business and property.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, and each of them, jointly and severally, for:

COMPLAINT                                                                                                    186

a. An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b. Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c. Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d. Such other relief as the Court deems just and proper.

## COUNT IV
### RICO Violation (§ 1962[c])
### *Liakas Firm Enterprise*

### As Against:

**DEAN N. LIAKAS,
N. LIAKAS,
ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC
d/b/a TOTAL ORTHOPAEDICS,
MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C.
s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC SPECIALISTS
("Count IV Defendants")**

633.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

634.    Each of Dean Liakas, Total Ortho, and McCulloch Ortho is a "person" as that term is defined by statute under 18 U.S.C. § 1961, *et seq.*

635.    Liakas Firm, as a corporate entity, is an expressly defined "enterprise" as that term is defined by statute under 18 U.S.C. § 1961, *et seq.*

636.    From at least 2018 through the present, each of the Count IV Defendants have conducted and/or participated in the conduct of the affairs of Liakas Firm, and continue to so conduct and participate in conducting, by engaging in transactions and conduct which constitute a pattern of racketeering activity, as that term is statutorily defined under § 1961(5), in violation of 18 U.S.C. § 1962(c).

COMPLAINT                                                                                         187

637. The predicate acts as set forth in Count I are incorporated and alleged as if set forth fully herein.

638. The predicate acts were horizontally related in that they share common purposes, results, participants, victims, methods of commission, and generally similar *modus operandi* with the other predicate acts alleged.

639. The predicate acts were vertically related in that the offenses related to the activities of the Liakas Firm Enterprise; the scheme behind the predicate acts alleged indeed only functioned in conjunction with the other predicate acts alleged as against the other members.

640. The transactions and predicate acts occurred over a substantial period of time, at least five years, and through to the present, with credible risk of continuing into the future.

641. Upon information and belief, there exists a presently unknown number of additional predicate acts in the same pattern and practice which are within the exclusive knowledge of Count IV Defendants which Plaintiff cannot readily ascertain without discovery.

642. As a result of the pattern of racketeering activity, Plaintiff has directly and proximately suffered damages to their business and property.

**WHEREFORE**, Plaintiff demands judgment against Count IV Defendants for:

a.  An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b.  Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c.  Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d.  Such other relief as the Court deems just and proper.

**COUNT V**
**RICO Conspiracy (§ 1962[d])**
*Liakas Firm Enterprise*

**As Against:**

**DEAN N. LIAKAS,**
**NICHOLAS E. LIAKAS,**
**MARK D. ROLNIK,**
**LUIS R. RODRIGUEZ,**
**JOSE SONE MARTINEZ (TRUE NAME UNKNOWN),**
**MARCOS TAVERAS,**
**JUMPSTART FUNDING LLC,**
**DAVID R. CAPIOLA, M.D.,**
**ALEXIOS APAZIDIS, M.D.,**
**SHIVEINDRA JEYAMOHAN, M.D.,**
**ANDERS J. COHEN,**
**SIDDHARTH PRAKASH, M.D.,**
**JONATHAN M. SIMHAEE, M.D.,**
**SILVIA GERACI, D.O.,**
**SAYEEDUS SALEHIN, M.D.,**
**ANDERS J. COHEN, D.O.,**
**SAAD CHAUDHARY, D.O.,**
**("Count V Defendants")**

643.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

644.    From at least 2018 to the present, Count V Defendants did unlawfully, knowingly, and intentionally, combine, conspire, confederate, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Liakas Firm Enterprise through a pattern of racketeering activity set forth in Count V herein in violation of 18 U.S.C. § 1962(d).

645.    The substantive 18 U.S.C. § 1962(c) violations upon which this Conspiracy is based are set forth in Count IV above (and by reference, the relevant predicate acts set forth in Count I).

COMPLAINT                                                                                               189

646.    The predicate acts of mail fraud, wire fraud, bribing a witness or victim, Travel Act violations, and Hobbs Act violations, involved the transmission and use of false and misleading documentation in furtherance of the Count V Defendants' scheme to defraud Plaintiff in connection with submitting, filing, prosecuting and asserting claims and personal injury lawsuits arising out of fraudulent accidents.

647.    The conduct alleged as to knowing agreement and engagement with the Enterprise as to the Count V Defendants, which included agreement as to any two of its members to engage in a pattern of racketeering activity, are set forth at length in Count III, and incorporated herein as if set forth at length. This same conduct is alleged as in furtherance and/facilitation of the Liakas Firm Enterprise.

648.    Each Count V Defendant knew that the acts detailed herein were part of a pattern of racketeering activity and agreed to facilitate, and did facilitate, the such acts to the benefit of the Liakas Firm Enterprise. At least one conspirator committed overt acts in furtherance of the conspiracy, including the predicate acts as alleged in Counts I & IV. Each Count V Defendant had knowledge of, at minimum, the general contours of the overall scheme and common objective; specifically, *inter alia*, defrauding Plaintiff and those similarly situated.

649.    As a direct and proximate result of the § 1962(c) violations in Count IV in which Count V Defendants were conspirators, Plaintiff has been injured in its business or property in an amount to be determined at trial, including but not limited to fraudulent claim payments, settlements, investigative costs, claims handling fees, attorneys' fees, expert costs, and litigation costs.

650.    As a result of the pattern of racketeering activity and the conspiracy to commit same, Plaintiff has suffered damage to their business and property.

COMPLAINT                                                                                              190

**WHEREFORE**, Plaintiff demands judgment against the Count V Defendants, and each of them, jointly and severally, for:

a. An award of Plaintiff's actual and consequential damages to be established at trial, and trebling of such damages pursuant to 18 U.S.C. § 1964;

b. Plaintiff's reasonable attorneys' fees, expenses, costs, and interest;

c. Injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in this Complaint; and,

d. Such other relief as the Court deems just and proper.

## COUNT VI
### New Jersey Insurance Fraud Prevention Act
### (N.J.S.A. § 17:33A-1, *et seq.*)

### As Against:

**LIAKAS LAW, P.C.,**
**BOGORAZ LAW GROUP, PC,**
**ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC**
**d/b/a TOTAL ORTHOPAEDICS,**
**ABHISHEK KUMAR, M.D.,**
**SHIVEINDRA JEYAMOHAN, M.D.,**
**ALEXIOS APAZIDIS, M.D.,**
**VADIM LERMAN, D.O.,**
**KAREN AVANESOV, D.O.,**
**ANDERS J. COHEN, D.O.**

### ("Count VI Defendants")

651.    The New Jersey Insurance Fraud Prevention Act ("NJ IFPA") allows insurance companies to bring an action relating to fraudulent claims in any court of competent jurisdiction pursuant to § 17:33A-7(a). Plaintiff is an insurance carrier authorized to business in New Jersey, and thereby an "insurance company" pursuant to § 17:33A-1.

652.    The NJ IFPA is violated when a person or practitioner, *inter alia*:

a. § 1733A-4(a)(1): Presents or causes to be presented any written or oral statement as part of, or in support of... a claim for payment or other benefit pursuant to an insurance policy... knowing that the statement contains any false

COMPLAINT                                                                 191

or misleading information concerning any fact or thing material to the claim (herein, "Presentation Violation");

    b.  § 1733A-4(a)(2): Prepares or makes any written or oral statement that is intended to be presented to any insurance company… or in support of… any claim for payment or other benefit pursuant to an insurance policy…, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim (herein, "Creation Violation");

    c.  § 1733A-4(c): A person or practitioner violates this act if, due to the assistance, conspiracy or urging of any person or practitioner, he knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act (herein, "Derived Benefit Violation").

653.    § 1733A-3 explicitly defines a "statement," as that term is used in the foregoing provisions, to include a medical record, as well as any writing or notice.

654.    § 1733A-7(a) expressly permits an insurance company injured through violations therein to recover compensatory damages, which shall include reasonable investigation expenses, costs of suit and attorney's fees. § 1733A-7(b) provides that such insurance company so injured shall recover treble damages if the court determines that the defendant has engaged in a pattern of violating the NJ IFPA; a pattern is defined under § 17:33A as five or more related violations. Violations are related if they involve either the same victim, or same or similar actions by the offender.

655.    Each of the Count VI Defendants are alleged to have engaged in at least the following number of related NJ IFPA violations:

| | |
|---|---|
| Liakas Firm | 11 |
| Bogoraz Law | 5 |
| Total Ortho | 6 |
| Kumar | 5 |
| Jeyamohan | 6 |
| Apazidis | 5 |
| Lerman | 2 |
| Avanesov | 2 |
| Cohen | 5 |

656.    Plaintiff has mailed a copy of this Complaint to the New Jersey Commissioner of Banking and Insurance contemporaneous with the filing of this Complaint, and shall report to the commissioner, on a form prescribed by the commissioner, the amount ultimately recovered and such other information as is required by the commissioner.

### 1.      Claimant B

657.    Apazidis travelled to New Jersey on December 11, 2023, and availed himself of New Jersey's laws, performed a knowingly needless surgery, and prepared records thereto which were knowingly intended to be presented to Plaintiff in connection with, or in support of, a claim for payment. The records were material to the claim as they formed the basis for the damages claimed. The records contained misrepresentations in justifying the surgery due to purported pre-operative diagnosis and purported intra-operative findings that were knowingly false. In engaging in this conduct, Apazidis committed a NJ IFPA Creation Violation.

658.    Bogoraz Law conspired with Apazidis to commit the foregoing violation. In so conspiring, Bogoraz Law committed a Conspiracy Violation.

659.    Due to the conspiracy and assistance of Bogoraz Law, Apazidis directly received a payment of $15,000 on September 19, 2023, as proceeds from the knowingly unnecessary surgery and corresponding Creation Violation. In doing so, Apazidis committed a Derived Benefit Violation.

660.    Bogoraz Law conspired with Apazidis to commit the foregoing violation. In so conspiring, Bogoraz Law committed a Conspiracy Violation.

661.    As an intended result of the Creation Violation, Apazidis thereby caused the presentment of billing records regarding the needless surgery to Plaintiff, as emailed on April 29,

COMPLAINT                                                                    193

2024, by Health East Medical Center to Plaintiff's medical records agent. As a result, Apazidis committed a Presentment Violation.

662.    Bogoraz Law conspired with Apazidis to commit the foregoing violation. In so conspiring, Bogoraz Law committed a Conspiracy Violation.

663.    As an intended result of the Creation Violation, Apazidis thereby caused the presentment of the subject medical records regarding the needless surgery to Plaintiff, as emailed by Total Ortho on May 22, 2024, to Plaintiff's medical records agent. As a result, Apazidis committed a Presentment Violation.

664.    Bogoraz Law conspired with Apazidis to commit the foregoing violation. In so conspiring, Bogoraz Law committed a Conspiracy Violation.

665.    As an anticipated result of the Creation Violation, Apazidis thereby caused the presentment of statements from the subject records regarding the needless surgery to Plaintiff, as set forth in the Supplemental Verified Bill of Particulars (specific to the surgery) filed and mailed by Bogoraz Law on November 7, 2024, to Plaintiff's panel counsel. As a result, Apazidis committed a Presentment Violation.

666.    Bogoraz Law conspired with Apazidis to commit the foregoing violation. In so conspiring, Bogoraz Law committed a Conspiracy Violation.

## 2.    Claimants C & D

667.    Individually and on behalf of Total Ortho, Jeyamohan and Kumar travelled to New Jersey on September 7, 2021, and availed themselves of New Jersey's laws, performed a knowingly needless cervical fusion surgery on 21-year-old Claimant C, and prepared records thereto which were knowingly intended to be presented to Plaintiff in connection with, or in support of, a claim for payment. The records were material to the claim as they formed the basis

for the damages claimed. The records contained misrepresentations in justifying the surgery due to purported pre-operative diagnosis and purported intra-operative findings that were knowingly false. In engaging in this conduct, each of Jeyamohan, Kumar, and Total Ortho committed a NJ IFPA Creation Violation.

668.    Liakas Firm conspired with and/or urged Total Ortho, Jeyamohan, and Kumar to commit the foregoing violation through the provision of, and/or facilitation of, funding to perform the needless surgery. In so conspiring, Liakas Firm committed a Conspiracy Violation.

669.    Due to the assistance and conspiracy of Jeyamohan, Kumar, Total Ortho, and Liakas Law, Lerman and Avanesov knowingly benefitted, directly or indirectly, from the proceeds derived from the violation through the usage of implants in the subject surgery from which Lerman and Avanesov derived benefit.

670.    As an intended result of the Creation Violation, Jeyamohan, Kumar, and Total Ortho thereby caused the presentment of the materially misleading subject medical records to Plaintiff, as sent *via* fileshare to Plaintiff's medical records agent on August 7, 2023. As a result, Jeyamohan, Kumar, and Total Ortho committed a Presentment Violation.

671.    Liakas Firm conspired with Jeyamohan, Kumar, and Total Ortho to commit the foregoing violation. In so conspiring, Liakas Firm committed a Conspiracy Violation.

672.    Individually and on behalf of Total Ortho, Jeyamohan and Kumar travelled to New Jersey on October 4, 2023, and availed themselves of New Jersey's laws, performed a knowingly needless cervical fusion surgery on Claimant D, and prepared records thereto which were knowingly intended to be presented to Plaintiff in connection with, or in support of, a claim for payment. The records were material to the claim as they formed the basis for the damages claimed. The records contained misrepresentations in justifying the surgery due to purported pre-operative

COMPLAINT                                                                                      195

diagnosis and purported intra-operative findings that were knowingly false. In engaging in this conduct, each of Jeyamohan, Kumar, and Total Ortho committed a NJ IFPA Creation Violation.

673.    Liakas Firm conspired with and/or urged Total Ortho, Jeyamohan, and Kumar to commit the foregoing violation through the provision of, and/or facilitation of, funding to perform the needless surgery. In so conspiring, Liakas Firm committed a Conspiracy Violation.

674.    Due to the assistance and conspiracy of Jeyamohan, Kumar, Total Ortho, and Liakas Firm, Lerman and Avanesov knowingly benefitted, directly or indirectly, from the proceeds derived from the violation through the usage of implants in the subject surgery from which Lerman and Avanesov derived benefit.

675.    Due to the conspiracy and assistance of Liakas Firm, Jeyamohan and Total Ortho directly received a payment of $13,000 on October 24, 2023, as proceeds from the knowingly unnecessary surgery and corresponding Creation Violation. In doing so, Jeyamohan and Total Ortho committed a Derived Benefit Violation.

676.    Liakas Firm conspired with Jeyamohan and Total Ortho to commit the foregoing violation. In so conspiring, Liakas Firm committed a Conspiracy Violation.

677.    As an intended result of the Creation Violation, Jeyamohan, Kumar, and Total Ortho thereby caused the presentment of the materially misleading subject medical records to Plaintiff, as sent *via* e-mail by CareWell to Plaintiff's medical records agent on August 20, 2024. As a result, Jeyamohan, Kumar, and Total Ortho committed a Presentment Violation.

678.    Liakas Firm conspired with Jeyamohan, Kumar, and Total Ortho to commit the foregoing violation. In so conspiring, Liakas Firm committed a Conspiracy Violation.

679.    As an intended result of the Creation Violation, Jeyamohan, Kumar, and Total Ortho thereby caused the presentment of a written statement submitted in support of a claim specific to

the materially misleading subject medical records by Liakas Firm, in the form of a Verified Bill of Particulars filed and mailed to Plaintiff's panel counsel on July 10, 2024. As a result, Jeyamohan, Kumar, and Total Ortho committed a Presentment Violation.

### 3.    Claimant F

680.    Cohen travelled to New Jersey on July 21, 2023, and availed himself of New Jersey's laws, performed a knowingly needless surgery, and prepared records thereto which were knowingly intended to be presented to Plaintiff in connection with, or in support of, a claim for payment. The records were material to the claim as they formed the basis for the damages claimed. The records contained misrepresentations in justifying the surgery due to purported pre-operative diagnosis and purported intra-operative findings that were knowingly false. In engaging in this conduct, Cohen committed a NJ IFPA Creation Violation.

681.    Liakas Firm conspired with Cohen to commit the foregoing violation. In so conspiring, Liakas Firm committed a Conspiracy Violation.

682.    As an intended result of the Creation Violation, Cohen thereby caused the presentment of medical records regarding the needless surgery to Plaintiff, as faxed on June 4, 2024, by CareWell to Plaintiff's medical records agent. As a result, Cohen committed a Presentment Violation.

683.    Liakas Firm conspired with Cohen to commit the foregoing violation. In so conspiring, Liakas Firm committed a Conspiracy Violation.

684.    Cohen travelled to New Jersey on April 17, 2025, and availed himself of New Jersey's laws, performed a knowingly needless surgery, and prepared records thereto which were knowingly intended to be presented to Plaintiff in connection with, or in support of, a claim for payment. The records were material to the claim as they formed the basis for the damages claimed.

COMPLAINT                                                                              197

The records contained misrepresentations in justifying the surgery due to purported pre-operative diagnosis and purported intra-operative findings that were knowingly false – here, a posterolateral fusion which purportedly only took thirty two minutes, using implants of which no required Unique Device Identifier numbers were recorded, on a disc level that was imaged multiple times to have no pathology. In engaging in this conduct, Cohen committed a NJ IFPA Creation Violation.

685.    Liakas Firm conspired with Cohen to commit the foregoing violation. In so conspiring, Liakas Firm committed a Conspiracy Violation.

686.    Due to the conspiracy and assistance of Liakas Firm, CareWell records indicate Cohen directly received an unknown amount in direct funding as proceeds from the knowingly unnecessary surgery on April 17, 2025, and corresponding Creation Violation. In doing so, Cohen committed a Derived Benefit Violation.

687.    Liakas Firm conspired with Cohen to commit the foregoing violation. In so conspiring, Liakas Firm committed a Conspiracy Violation.

688.    As an intended result of the Creation Violation, Cohen thereby caused the presentment of medical records regarding the needless surgery to Plaintiff, as emailed on October 16, 2025, by CareWell to Plaintiff's medical records agent. As a result, Cohen committed a Presentment Violation.

689.    Liakas Firm conspired with Cohen to commit the foregoing violation. In so conspiring, Liakas Firm committed a Conspiracy Violation.

690.    As an intended result of the Creation Violation, Apazidis thereby caused the presentment of the subject medical records regarding the needless surgery to Plaintiff, as emailed by Total Ortho on May 22, 2024, to Plaintiff's medical records agent. As a result, Apazidis committed a Presentment Violation.

COMPLAINT                                                                                          198

691.    Plaintiff is an insurance company which has been damaged as a result of all the foregoing allegations.

**WHEREFORE**, Plaintiff demands judgment against the Count VI Defendants for:

a.    An award of Plaintiff's compensatory damages, including reasonable investigation expenses, costs of suit and attorneys' fees incurred as a result of the pattern of related NJ IFPA violations of Liakas Firm, Bogoraz Law, Total Ortho, Kumar, Jeyamohan, Apazidis, and Cohen pursuant to § 1733A-7(a), subject to statutory trebling under § 1733A-7(b);

b.    An award of Plaintiff's compensatory damages, including reasonable investigation expenses, costs of suit and attorneys' fees incurred as a result of the NJ IFPA violations of Lerman and Avanesov, pursuant to § 1733A-7(a); and,

c.    Such other relief as the Court deems just and proper.

**COUNT VII**
**Common Law Fraud**

**As Against:**

**ORTHOPAEDICS SPINE & SPORTS MEDICINE, LLC**
**d/b/a TOTAL ORTHOPAEDICS,**
**MCCULLOCH ORTHOPAEDIC SURGICAL SERVICES, P.L.L.C.**
**s/d/b/a NEW YORK SPORTS AND JOINTS ORTHOPAEDIC**
**SPECIALISTS,**
**ALEXIOS APAZIDIS, M.D.,**
**ANDERS J. COHEN, D.O.,**
**JOSE SONE MARTINEZ (TRUE NAME UNKNOWN)**

**("Count VII Defendants")**

692.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

693.    As set forth in the allegations in Counts I and VI, which are incorporated by reference as if fully set forth herein, the Count VII Defendants made misrepresentations of facts, and deliberately concealed and omitted materials facts that they had a duty to disclose, in connection with lawsuits and/or claims for payment under New York law.

COMPLAINT                                                                                              199

694.   These misrepresentations of fact by the Count VII Defendants included, but were not limited to, the material misrepresentations of fact made in asserting the legitimacy of accidents, the existence of injuries, and the necessity of treatment. A list of such misrepresentations, who they were made by, and when, are detailed in the tables under Count I, with additional allegations as to Cohen in Count VI, and allegations relevant to Sone under subsection "VI(i)," all of which is incorporated as if fully set forth herein.

695.   The Count VII Defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading. The falsity of each such representation is set forth under Count I and the corresponding Claimant sections of this Complaint, subsection "VI(i)" as to Sone, and subsection "VI(v)" as to Cohen, *supra*.

696.   The Count VII Defendants made these misrepresentations with the intent they reach Plaintiff and be relied upon thereto, and in furtherance of the Fraud Scheme to defraud Plaintiff by submitting claims for payment and general liability insurance proceeds. Knowingly falsified testimony, treatment records, inflated liens, and other submissions were presented to Plaintiff through the course of the Fraud Scheme. Count VII Defendants presented such misrepresentations in some instances directly to Plaintiff, and otherwise *via* the Liakas Firm as a conduit with Plaintiff as the intended recipient.

697.   The Count VII Defendants' misrepresentations were known to be false from the onset and were made for the purpose of inducing Plaintiff to make payments for claims that were not legitimate. The knowledge of such falsity can be reasonably inferred from the constellation of facts set forth in each Claimant section, *supra*.

698.   Plaintiff reasonably and justifiably relied, to its detriment, on the Count VII Defendants' representations based on the intentionally and systematically structured facial

COMPLAINT                                                                    200

legitimacy of such claims and treatment, and without knowledge of the Count VII Defendants' scheme and artifice to defraud them; and, even in the absence of such belief, Plaintiff's hands were tied under New York law and the duty to defend to provide a defense to its insured. Count VII Defendants' conduct thus induced action by Plaintiff as required by law, regardless of belief or knowledge of veracity.

699.    The Count VII Defendants knew, or should have known, that Plaintiff would rely on such representations, and planned to exploit such reliance.

700.    But for the Count VII Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct, Plaintiff would not have incurred damages.

701.    As a matter of New York law, which requires Plaintiff to fulfill its duty to defend its insured immediately upon the filing of a claim or lawsuit, regardless of merit, and even in the face of suspected or blatant fraud, such reliance was thrust upon Plaintiff. Plaintiff was forced to take action and incur expenses it otherwise would not have taken or incurred, so influenced as a direct result of the false representations.

702.    Each subsequent falsified record produced in the course of the Fraud Scheme, upon disclosure and transmission to Plaintiff, forced reliance upon Plaintiff to, at minimum, rely on such submissions in discharging its legal obligation to provide a defense to its insured, including, *inter alia*, attorneys' fees, expert costs, investigative costs, and other litigation costs, as well as necessarily resulted in prolonged litigation, required additional reserves, and in valuing the claim as to exposure and/or settlement within the parameters of discharging its legal duty to defend.

703.    As to settlements made as a result of the Fraud Scheme, Plaintiff at all times comported with reasonable due diligence requirements through the retention of reputable defense firms, investigators, and experts. However, the Fraud Scheme was designed and implemented in

COMPLAINT                                                                                    201

order to circumvent these safeguards. Further, the protections under HIPAA and attorney-client privilege, along with New York's insulation of litigation financing disclosures, rendered the scheme unable to be detected through the use of ordinary due diligence. Any payments made were after Plaintiff had engaged in reasonable due diligence and were made in reasonably justified reliance.

704.    Plaintiff at no time knew or had reason to know in the exercise of due diligence or reasonable care that the Count VII Defendants were engaged in misrepresentations, omissions, and rampant fraudulent conduct; this is particularly true where the conduit Liakas Firm are considered officers of the Court, and the Medical Providers have taken oaths to do no harm.

705.    As a direct and proximate cause of the Count VII Defendants' misrepresentations, omissions, concealment of material facts, and fraudulent course of conduct by the Count VII Defendants, Plaintiff has been damaged. Plaintiff's damages include, but are not necessarily limited to, settlement payments, administration costs, investigative and defense costs paid by Plaintiff to the Count VII Defendants or caused by the Count VII Defendants.

706.    Because the Count VII Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Count VII Defendants for:

a.    An award of Plaintiff's actual and consequential damages to be established at trial;

b.    Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct;

c.    Punitive damages to be established at trial; and,

d.    Such other relief as the Court deems just and proper.

## COUNT VIII
**Aiding and Abetting Fraud**

**Against All Defendants**

707.   Plaintiff incorporates herein by reference the allegations contained in the above paragraphs as though set forth in their entirety.

708.   All Defendants named herein had actual knowledge of the Fraud Scheme, and the common law fraud as set forth in Count VII.

709.   As set forth in detail, *supra*, and in the charts set forth under Counts I and described further in Count III, each Defendant knowingly agreed to and did engage in overt acts in furtherance of the fraud, or otherwise provided substantial assistance to advance such fraud's commission.

710.   But for the substantial assistance of each Defendant, such Fraud Scheme would not have been possible.

711.   As a direct and proximate cause of the Defendants' aiding and abetting of the Fraud Scheme, Plaintiff has been damaged.

712.   Because the Defendants' conduct was knowing, intentional, willful, wanton, and reckless, Plaintiff is entitled to an award of punitive damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants, and each and all of them, jointly and severally, for:

      a.   An award of Plaintiff's actual and consequential damages to be established at trial;

      b.   Plaintiff's costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct;

      c.   Punitive damages to be established at trial; and,

      d.   Such other relief as the Court deems just and proper.

## IX.    JURY TRIAL DEMAND

713.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims.

Dated: January 27, 2026

Respectfully submitted,

**THE WILLIS LAW GROUP, PLLC**

By: *Daniel A. Johnston*
     **DANIEL A. JOHNSTON**
     **WILLIAM J. CLAY (*admission pending*)**
     **KIRK WILLIS (*admission pending*)**
     **MICHAEL A. GRAVES**
     1985 Forest Lane
     Garland, Texas 75042
     Telephone:  214-736-9433
     Facsimile:  214-736-9994
     Service Email: service@thewillislawgroup.com
     ***ATTORNEYS FOR THE PLAINTIFF***

COMPLAINT                                                    204